## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| In re: | ) | |
| CENTRAL CONCRETE PUMPING, INC. | ) | Case No. 12-17031 HRT |
| | ) | |
| EIN: 84-1148469 | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |
| In re: | ) | |
| AJ CONCRETE PUMPING II, INC. | ) | Case No. 12-17032 HRT |
| | ) | |
| EIN: 58-2377688 | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |
| In re: | ) | |
| SOUTHWEST CONCRETE PUMPING, INC. | ) | Case No. 12-17034 HRT |
| | ) | |
| EIN: 84-1270413 | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | **Jointly Administered Under** |
| | ) | **Case No. 12-17031-HRT** |
| | ) | |

## MODIFIED DISCLOSURE STATEMENT FOR SECOND AMENDED JOINT PLAN OF REORGANIZATION PROPOSED BY DEBTORS DATED MAY 7, 2013

Central Concrete Pumping, Inc. ("Central Concrete"), Southwest Concrete Pumping, Inc. ("SW Concrete") and AJ Concrete Pumping II, Inc. ("AJ Concrete"), debtors and debtors in possession in the above-captioned bankruptcy cases ("Debtors"), submit this Modified Disclosure Statement for Second Amended Joint Plan of Reorganization Proposed by Debtors dated May 7, 2013 (the "Disclosure Statement") pursuant to § 1125 of the Bankruptcy Code, 11 U.S.C. §101 *et seq.* (the "Bankruptcy Code"), to all known holders of claims against Debtors' chapter 11 bankruptcy estates in order to disclose information deemed to be material, important, and necessary for creditors of Debtors to make an informed decision in exercising their right to vote for acceptance or rejection of the Second Amended Joint Plan of Reorganization Proposed by Debtors dated May 7, 2013 (the "Plan"). The Plan has been filed with the United States Bankruptcy Court for the District of Colorado (the "Court"), and a copy of the Plan is attached as **Exhibit 1** hereto.[1]

**COURT APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT IMPLY COURT APPROVAL OF THE PLAN. IN THE EVENT OF ANY INCONSISTENCIES BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE PROVISIONS OF THE PLAN SHALL CONTROL.**

---

[1] Capitalized terms not otherwise defined have meanings given in the Plan.

## I.      DISCLOSURE STATEMENT APPROVAL, VOTING PROCEDURES AND PLAN CONFIRMATION

This Disclosure Statement is provided to all of Debtors' creditors, Interest holders and other parties in interest entitled to it under the Bankruptcy Code. This Disclosure Statement is intended to provide adequate information to enable the typical creditor, Interest holder, or other party in interest to make an informed decision to accept or reject the Plan. **YOU ARE ENCOURAGED TO READ THE PLAN, THIS DISCLOSURE STATEMENT, AND ALL EXHIBITS THERETO IN THEIR ENTIRETY BEFORE VOTING ON THE PLAN.** Prior to its distribution to all creditors, Interest holders and other parties in interest, the Court approved this Disclosure Statement by Order dated June __, 2013, as containing adequate information; however, Court approval of this Disclosure Statement does not imply Court approval of the Plan.

Certain Plan exhibits, being Exhibits E through H, will be filed with the Clerk of the Bankruptcy Court at least ten (10) days prior to the last day upon which holders of Claims may vote to accept or reject the Plan, or such later date as may be approved by the Court on notice to parties in interest, as it may thereafter be altered, amended, modified, or supplemented from time to time in accordance with the terms hereof and in accordance with the Bankruptcy Code and the Bankruptcy Rules, comprising of, without limitation, the following: (a) the Amended Articles of Incorporation; (b) Assumed Executory Contracts and Expired Leases; and (c) the Subscription Agreements.

**A.     Plan Requirements.**   The Bankruptcy Code imposes requirements for acceptance of the Plan by creditors, minimum value of distributions, and feasibility, among other things.  To confirm the Plan, the Court must find that all of these conditions and other conditions set forth in § 1129(a) of the Bankruptcy Code have been met, unless the "cram down" provisions of the Bankruptcy Code are applicable. Even if each Class of Claims accepts the Plan by the requisite majorities, the Court must undertake an independent evaluation of Plan feasibility and other statutory requirements before confirming the Plan.  The conditions for minimum value and feasibility are discussed below and elsewhere in this Disclosure Statement.

**B.     Voting on the Plan.**   Your vote on the Plan is important. The Plan can be implemented only if it is confirmed by the Court. The Plan can be confirmed only if, among other things, it is accepted by the holders of two thirds in amount and more than one-half in number of the holder(s) of Claims in at least one impaired Class who actually vote on the Plan. In the event the requisite acceptances are not obtained from the other impaired Classes, the Court may nevertheless confirm the Plan if the Court finds that it is fair and equitable to the Class or Classes rejecting it.

Holders of Claims or Interests in Classes 1 through 11 are impaired. Holders of Allowed Claims in Classes 1 through 8 are entitled to vote. **IF YOU HAVE A DISPUTED, CONTINGENT OR UNLIQUIDATED CLAIM IN ONE OF THE THESE CLASSES, YOU MUST HAVE YOUR CLAIM ESTIMATED BY THE COURT IN ORDER TO VOTE**.

Even though holders of Allowed Claims or Interests in Classes 9-11 are impaired, since they will receive nothing under the Plan, they are not entitled to vote and are deemed to reject the Plan.

**C.      Balloting and Confirmation of the Plan.**  The Court will hold a hearing on confirmation of the Plan on _____, 2013, and will then, among other things, determine the results of the vote. The date on which the Court approves the Plan is the "Confirmation Date," and the "Effective Date" is the date that is fifteen (15) days after the Confirmation Date (unless an appeal is taken and a stay of the confirmation order is obtained, or Debtors, by notice filed with the Court, elect an earlier Effective Date).   Objections to Confirmation are due on or before _____, 2013.

A ballot pursuant to which the holder of an Allowed Claim may vote on the Plan accompanies this Disclosure Statement.  **Completed ballots should be mailed or otherwise delivered so as to be received no later than 5:00 p.m. Mountain Daylight Time on _____, 2013, to:**

Andrew D. Johnson
Onsager, Staelin & Guyerson, LLC
1873 S. Bellaire St., Suite 1401
Denver, CO 80222

If your ballot is damaged or lost, or if you have any questions concerning voting, you may contact Mr. Johnson (email: ajohnson@osglaw.com) or by phone at (303) 512-1123.

Debtors will not count votes that do not contain the required signature.  Debtors will not count votes that do not indicate acceptance or rejection as votes accepting the Plan.

Section 1126(e) of the Bankruptcy Code states that on request of a party in interest, and after notice and a hearing, the Court may designate any entity whose acceptance or rejection of the Plan is not in good faith, or is not solicited or procured in good faith or in accordance with the provisions of title 11 of the United States Code.

**D.      Cram Down.**  The Bankruptcy Code allows the Court to confirm a plan of reorganization or to "cram down" a plan of reorganization despite its rejection by a class of impaired claims under some circumstances. The Bankruptcy Code provides that if an impaired class rejects the Plan, then the Plan cannot be confirmed unless at least one class of claims that is impaired under the Plan has accepted it. In this regard, the Court must determine acceptance without including any vote by any insider, and further, the Court must conclude that the Plan "does not discriminate unfairly, and is fair and equitable" with respect to the claims of the impaired class. Debtors will invoke their rights to request the Court to confirm the Plan under such circumstances.

## II.     HISTORY OF THE DEBTORS

### A.     Description of Debtors and Debtors' Concrete Pumping Operations.

**1.     Introduction.** Debtors are intertwined full-service concrete pumping contractors, specializing in supplying truck and trailer mounted boom and line pumps quickly, efficiently and cost-effectively, for small and large residential and commercial projects in Colorado, Georgia and Wyoming. None of the Debtors actually mix, sell, or deliver concrete. Rather, utilizing specialized equipment, SW Concrete and AJ Concrete pump the concrete that is purchased and delivered by others to the intended location in a construction project. Central Concrete owns or leases all the equipment and acts as the central manager of the integrated business. Jeffrey C. Moll (Moll") is the president, Steven R, Rosendale ("Rosendale") is the vice-president and Peter DeGrood (DeGrood") is the secretary and treasurer of each Debtor. These individuals (collectively, the "Principals"), also have Interests in each Debtor as described in the following section on Debtors' financial structure. Debtors' corporate and operational structure is described on the flow chart attached here to as **Exhibit 2**.

**2.     Description of Debtors**. On June 11, 1990, the Principals formed Central Concrete as a Colorado corporation. Originally known as "Southwest Concrete Pumping, Inc.," it changed its name on June 28, 1994 to Central Concrete, Inc. On December 30, 2005, it merged with Southcon Pumping, Inc., a Georgia corporation, and JPBT, LLC, a Georgia limited liability company, with Central Concrete being the surviving company.

SW Concrete was also formed by the Principals. Originally known as "Central Concrete Pumping, Inc.," it was incorporated on March 24, 1994, as a Colorado corporation, and changed its name to SW Concrete, Inc. on June 28, 1994.

Finally, AJ Concrete Pumping II, Inc. was formed by Moll and DeGrood on May 15, 2000, as a Georgia corporation. On June 15, 2000, it merged with AJCP II, Inc., another Georgia corporation under the ownership and control of most or all of the Principals, with AJ Concrete as the surviving corporation.

**3.     Operations.** The Principals began the business in 1990 in the Denver, Colorado area, and expanded the physical operations to Georgia in 1998, and Arizona in 2007. In 1998, the Principals formed JPBD, LLC to acquire an existing concrete pumping operation located near Atlanta, Georgia. Through a series of mergers, JPBD, LLC, became AJ Concrete. In 2007, the Principals formed South Concrete Pumping of Arizona, LLC ("SW Arizona") to acquire an existing concrete pumping operation located near Phoenix, Arizona. SW Arizona ceased operations in March, 2012.

*Concrete Pumping Trucks and Other Personality*

As stated above, while Debtors are separately created and maintained corporate entities, each is part of an integrated commercial concrete and construction enterprise. Central Concrete owns/leases a fleet of approximately forty-five (45) concrete pumping trucks, related equipment, vehicles and office equipment. The concrete pumps range in size from thirty-one (31) meters with a horizontal boom reach of ninety-two (92) feet, to sixty-one (61) meters with

4

a horizontal boom reach of 184 feet. The Schwing concrete pumps offer unique abilities such as low overhead unfolding height that allow Debtors to place the booms into places which other pumps cannot reach, saving considerable time and labor.  Debtors also have separate placing booms which allow more efficient concrete placement on medium and high rise structures that do not tolerate conventional boom pumps because of access or other reasons.

SW Concrete and AJ Concrete do not own concrete pumping trucks.  Except for vehicles, substantially all of the personal property AJ Concrete uses is leased from or provided by Central Concrete.  Similarly, except for office equipment, substantially all of the personal property SW Concrete uses is leased from or provided by Central Concrete.  AJ Concrete and SW Concrete entered into written agreements prepetition with Central Concrete for the lease of the concrete pumping trucks and related equipment, described as follows: (i) Equipment Rental Agreement dated January 1, 2010, by and between Central Concrete and SW Concrete, for a term of sixty (60) months, with a monthly rental rate of $102,000.00, relating to the equipment described therein; and (ii) Equipment Rental Agreement dated January 1, 2010, by and between Central Concrete and AJ Concrete, for a term of sixty (60) months, with a monthly rental rate of $26,000.00, relating to the equipment described therein.  Copies of these Equipment Rental Agreements are available upon request.  Prepetition, upon receipt of these payments, Central Concrete would use these funds to make its monthly loan and lease payments to GE, FCC and Wells.  Postpetition, AJ Concrete and SW Concrete stopped making these payments.

*Employees, Payroll and Employee Benefits*

SW Concrete employs approximately forty two (42) people in Colorado and AJ Concrete employs approximately twelve (12) people in Georgia. While each Debtor has separate banking accounts, Debtors share a common payroll system, through Southwest Payroll, LLC ("SW Payroll"), an Affiliate.  Each Debtor pays its own bills and manages its own accounts receivable collections.  Debtors utilize the same accountant for tax and bookkeeping needs.

SW Concrete offers medical benefits to all eligible employees, including medical and prescription coverage administered by Kaiser Permanente (the "Health Plan").  For each eligible employee, an employee pays between $50.00 and $125.00 per month for coverage under the Health Plan, depending on how many dependents of an employee are covered.  The monthly expenses of SW Concrete for the Health Plan excluding employee contributions are between $125.00 and $424.00 per employee, depending on how many of an employee's dependents are covered.  AJ Concrete only provides medical benefits for management personnel (but is considering expanding benefits to cover all employees in the future).

Life insurance coverage (the "Life Insurance Plan") is provided to the employees of SW Concrete as part of the Health Plan.  The cost to SW Concrete for the Life Insurance Plan is included in the Health Plan.
.

SW Concrete also provides dental coverage (the "Dental Plan"), for which SW Concrete and Central Concrete are self-insured.  The Dental Plan is administered through Meridian Health. SW Concrete's cost for the Dental Plan is approximately $1,500 per month.

All full-time employees are eligible to accrue or receive vacation days.  The rate of accrual varies based on the length of service, up to a maximum of 120 hours paid per year.

*Business Locations and Real Estate Leases*

Debtors share the same location as their principal place of business, being 2323 West Oxford in Englewood, Colorado ("Englewood Property"), although satellite locations have been established in Johnstown, Colorado ("Johnstown Property"), and Mableton, Georgia (the "Mableton Property").  Also, Debtors occasionally use certain vacant land located near Denver International Airport in Bennett, Colorado ("Bennett Property").  One or more of the Debtors lease these properties, and information about these properties and leases follow.

- Englewood Property:  SW Concrete operates its business from this location.  This property is owned by SWCP Limited Liability Company ("SWCP"), an Affiliate of Debtors.  SW Concrete leases the property from SWCP pursuant to a Commercial Lease Agreement dated January 1, 2008.  Monthly rental payments are $16,000.00.  The original term expired on December 31, 2012, but was orally extended on a month-to-month basis until such time as the new rental rate is determined.

- Johnstown Property:  This property, with the address being 475 Basher Drive, is also owned by SWCP, SW Concrete leases the property from SWCP pursuant to a Commercial Lease Agreement dated January 1, 2008.  Monthly rental payments are $6,000.00.  The original term expired on December 31, 2012, but was orally extended on a month-to-month basis until such time as the new rental rate is determined.  The combined payments from SW Concrete to SWCP for the Englewood Property and the Johnstown Property for the post-petition period were $17,000 per month.

- Mableton Property:  AJ Concrete operates its business from this location.  SW Concrete and AJ Concrete lease this property, located at 5820 Jacaranda Drive, from Alan and Kathleen Bone pursuant to a Lease Agreement dated October 1, 2009.  The agreement has no termination date, but either party may terminate it upon thirty (30) days written notice.  Monthly rent is $2,500.00.

- Bennett Property:  Debtors occasionally use this property for equipment maintenance and storage.  SW Concrete leases this property, located at 48000 E. 38th Avenue, from SWDMS Properties, LLC ("SWDMS"), an Affiliate of Debtor, pursuant to an oral month to month lease.  Monthly rent is $4,400.  Until recently, another tenant occupied a portion of the Bennett Property.

AJ Concrete and SW Concrete assumed the lease for the Mableton Property pursuant to Court order entered December 20, 2012 effective November 6, 2013.  On or about the Effective Date SW Concrete will enter into new leases with SWCP for the Johnston Property and the Englewood Property.  Copies of the three (3) written leases are available from Debtors upon request.

6

Prepetition, Colorado Business Bank ("CoBiz") made loans to SWCP, SWDMS and MDRA, LLC ("MDRA"), another Affiliate of Debtors, and was granted a first lien Deed of Trust on the Englewood Property, Johnstown Property, Bennett Property, as well as vacant land in Maricopa County, Arizona, owned by MDRA (the "Maricopa Property"), to secure such loans.  The loans were guaranteed by Debtors, among others, and as of the Petition Date totaled approximately about $1.9 million.  Wells (hereinafter defined) and GE (hereinafter defined), Debtors' two largest equipment lenders, have a second Deed of Trust on the Englewood Property up to the amount of $500,000.00.

In addition to the leases described above, as of the Petition Date, Central Concrete was a party to a certain Lease Agreement dated July 3, 2008, as amended, for the lease of 7080 West Augusta Avenue, Glendale Arizona; Phoenix Realty Partners Limited Partnership is the owner. This property was the primary place of business of SW Arizona, an Affiliate of Debtors, which went out of business prepetition.  Debtors filed a motion to reject this lease, and on July 13, 2012, the Court entered an order approving the rejection thereof, effective as of May 31, 2012.

*Projects*

Debtors' business includes both commercial and residential projects.  As of the Petition Date, approximately 25% consisted of residential projects and approximately 75% consisted of private commercial and public projects.  About one month prior to the Petition Date, Denver Transit Partners, the consortium of companies building the FasTracks light-rail project, awarded a contract for pumping concrete for bridges on the light-rail line to SW Concrete.

In general, AJ Concrete and SW Concrete do not have long term contracts for projects. Instead, these Debtors are contracted to supply concrete pumpers shortly before a pumper is needed.  Debtors would then supply pumpers and one operator per pumper.  The day after the concrete is pumped, AJ Concrete and SW Concrete then bill for the volume of the concrete pumped, plus the time spent.  While invoices are net 30 days, for many projects they agree to invoice only after all concrete has been pumped for the project.  Thus, on average, approximately 25% of invoices are paid within 30 days, 35% are paid within 60 days, 35% are paid within 90 days and the remaining 5% are paid in excess of 90 days or become uncollectible.

**4.      Affiliates and Intercompany Claims.**  Debtors have several Affiliates which are involved, either directly or indirectly, in their business operations.  Several of these Affiliates are described below, with the three (3) most important Affiliates described first:

- Southwest Payroll LLC - This Affiliate administers Debtors' common payroll system, as well as the payroll for Anderson Concrete Forming, another Affiliate. SW Concrete and AJ Concrete deposit funds prior to each payroll with SW Payroll, and this entity issues payroll checks.  It charges a 3% fee for its services.  It also pays the premiums for SW Concrete's and AJ Concrete's property, casualty and workers' compensation insurance. SW Payroll is owned in equal shares by the Partners.

7

- <u>SWCP Limited Liability Company</u> – As stated above, SWCP owns the Englewood Property and the Johnstown Property.  It leases these properties to SW Concrete.  SWCP is owned by in equal shares by the Partners.

- <u>SWDMS Properties, LLC</u> – As stated above, SWDMS owns the Bennett Property which it leases to SW Concrete.  It is owned 50% by DMS Leasing, LLC, and 50% by SWCP.

- <u>MDRA Properties, LLC</u> – As stated above, MDRA owns the Maricopa Property, which is vacant land.  It formerly leased this property to SW Arizona, until SW Arizona went out of business.  Tom Anderson owns 25% of this company, with the Partners each owning 25%.

- <u>Anderson Concrete Forming</u> – This company is located in St. Paul, Minnesota, and operates a concrete forming business. Michael Anderson is the president, and owns 20% of the company.  The other owners are Greg New and the Partners, whom each own 20%.

- <u>Patriot Leaseco, LLC</u> – This company ("Patriot Leaseco") leases concrete pumps to Patriot Concrete.  It is 50% owned by Central Concrete, and 50% owned by Pat Phares.  Per the Central Concrete Schedules, the value of Central Concrete's interest in this entity is estimated to be $0.00.

- <u>Patriot Concrete Pumping, LLC</u> – This company ("Patriot Concrete") is a concrete pumping company operating in Colorado.  It is owned 50% by Pat Phares, with the Partners each owning 16.6%.  While operating in Colorado, it does not have the size range and number of trucks to attract and service the large projects that SW Concrete does.  On occasion, SW Concrete sub-contracts work to this entity when SW Concrete is too busy to provide the service.

Since Debtors operate as a single economic enterprise, with a high degree of service integration, Debtors generate Intercompany Claims and affiliated company Claims in the normal course of business.  With respect to Debtors, these claims typically consist of transactions between AJ Concrete and SW Concrete, the operating companies, and (i) Central Concrete in connection with the equipment lease payments made pursuant to the Equipment Lease Agreements, and (ii) affiliated companies such as SW Payroll for payroll services, and SWCP and SWDMS in connection with real estate lease payments.  An historical "Intercompany Reconciliation" is kept, and at each month all the Intercompany Claim and affiliated company accounts are reconciled and offset, either directly or indirectly.

Since intercompany accounts are eliminated for consolidation purposes, separating out the financial statements for Debtors (and the affiliated companies) can produce some peculiar-looking balance sheets – at least to non-accountants.  For example, the SW Payroll Balance Sheet for the period ending April 30, 2012, has the following entries under Current Assets:  "Due from Southwest [meaning SW Concrete] - $2,798,641.01"; and "Due from AJ - $294,967.62."  These amounts are not actually due to SW Payroll.  They represent the historical amounts paid

by SW Payroll for AJ Concrete's and SW Concrete's employee payroll. These amounts have been paid to SW Payroll, generally by Central Concrete through payments made by AJ Concrete and SW Concrete to Central Concrete. The same balance sheet includes under Liabilities includes the following entry: "Due to Central - $5,604,287.30." This amount is not due to Central Concrete from SW Payroll; it represents the historical accumulation of lease payments made by SW Concrete and AJ Concrete.

Debtors are not part of a tax consolidation group. To the extent necessary when tax returns are filed, intercompany and Affiliate transactions may be shown as receivables or payables.

None of the non-Debtor Affiliates filed Claims against Debtors.

**B.    Debtors' Prepetition Financial Structure.**

**1.    Debtors' Prepetition Capital Structure**. Debtors are privately-held corporations. Both AJ Concrete and Central Concrete are owned in equal shares by the Principals. SW Concrete is 70% owned by Central Concrete, with the remaining 30% held in equal shares by the Principals. Central Concrete is also a "Subchapter S corporation," meaning that for federal tax purposes, it is not taxed as a separate entity but rather its profits and losses flow through to the shareholders.

**2.    Debtors' Principal Prepetition Assets.**

a.    *Central Concrete.* As of the Petition Date, Central Concrete's principal assets consisted of primarily forty-two (42) concrete pumps, six (6) leased concrete pumps, a placing boom, transportation and other heavy equipment, with an estimated fair market value of approximately $7,624,116.00.

Central Concrete owns minimal furniture and fixtures which were valued at $0.00 since they are fully depreciated. The only other assets as of the Petition Date consisted of Cash on hand of approximately $5,500.00 and rental income from the other two Debtors of, which were used to make debt service or lease payments on the equipment. However, since the Petition Date, AJ Concrete and SW Concrete have not been making the monthly rental payments.

Other assets listed by Central Concrete on its Schedules include a 50% ownership interest in Patriot Leaseco, valued at $0.00, as well as a 70% ownership interest in SW Concrete valued at $0.00.

b.    *SW Concrete.* As of the Petition Date, SW Concrete's principal assets consisted of (i) $110,917.00 of Cash in bank accounts; (ii) accounts receivable of $1,046,690.00 (face value); (iii) vehicles and equipment worth approximately $17,000.00; (iv) a retainer paid to Onsager, Staelin & Guyerson, LLC ("OSG"), Debtor's bankruptcy counsel,  in the amount of $38,815.00; (v) inventory with a book value of $419,704.74; and (vi) an insurance policy with a cash surrender value of $143,377.34, for a total of approximately $1,776,504.00.

Central Concrete owns minimal furniture and fixtures which were valued at $0.00 since they are fully depreciated.

        c.   *AJ Concrete.*  As of the Petition Date, AJ Concrete's principal assets consisted of (i) $28,192.00 of Cash in bank accounts; (ii) accounts receivable of $322,272.00 (face value); and (iii) vehicles, other equipment and furniture worth approximately $17,000.00, for a total of approximately $367,464.00.

        **3.**    **<u>Debtors' Prepetition Debt.</u>**  The Court established July 2, 2012, as the last day for all persons and entities (excluding governmental units) having Claims against Debtors to file proofs of claim in Debtors' cases.  Attached hereto as **Exhibit 3** is a list of all of the Claims scheduled and/or filed in the bankruptcy cases, segregated by Debtor, including a summary by total Claims for each Debtor in the Plan Classes.

Debtors are proposing to consolidate substantially all of their assets and liabilities for the purposes described in Article IV herein and in the Plan.  Pursuant thereto, among other things, each and every Claim filed or to be filed in any Debtor's case will be deemed filed against the all Debtors and will be deemed one Claim against and a single obligation of all Debtors, and Reorganized Debtors may file and the Court will sustain objections to Claims for the same liability that are filed against multiple Debtors.

Exhibit 3 also contains a list of claims as consolidated.  Debtors have consolidated the Claims by eliminating all duplicate Claims (i.e., identical claims filed against more than one Debtor, or identical claims filed against the same Debtor).  The summary contained in Exhibit 3 also contains a summary of the consolidated Claims, and identifies which Claims are duplicate Claims.

**PURSUANT TO THE PLAN AND UNLESS OTHERWISE SPECIFICALLY ALLOWED IN THIS PLAN, REORGANIZED DEBTORS MAY OBJECT TO ANY CLAIM LISTED ON EXHIBIT 3, AS WELL AS ANY CLAIMS SUBSEQUENTLY FILED.**

The text below provides more detail on the secured and unsecured debt and Claims.

        a.   *Secured Creditors – Introduction.*   Debtors currently have six (6) secured creditors:  General Electric Capital Corporation ("GE"); Wells Fargo Equipment Finance ("Wells"); FCC Equipment Financing, Inc., a division of Caterpillar Financial Services ("FCC"); All Points Capital Corporation ("APCC"), Ally Financial, Inc., formerly known as GMAC Bank ("Ally"), and the Colorado Department of Revenue ("CDR").  Debtors' primary secured creditors are GE, Wells and FCC.  As of the Petition Date, the total amount Debtors jointly owe to GE, Wells and FCC is approximately $16,169,245.00.  All of Central Concrete's pumping trucks are pledged as collateral, in separate groups, to FCC, GE, APCC and Wells, though Debtors have certain other secured debts.  Central Concrete entered into leases with Wells and FCC for the purpose of acquiring concrete pumping trucks manufactured and sold by Schwing America, Inc.

        b.   *GE Loan.*  On June 29, 2007, GE and Debtors entered into a Master Security Agreement, whereby they set forth the terms and conditions upon which future

loans would be made. Pursuant thereto, GE and Debtors entered into Collateral Schedules 001 through 004, the first three of which are dated June 29, 2007, and the final one dated August 20, 2007, through which GE loaned Debtors the principal amount of $7,151,330.00 for the purchase of certain vehicles and equipment described therein, with Central Concrete granting GE a first Lien in such vehicles and equipment. To further evidence the loan described in the Master Security Agreement, Debtors executed four (4) Promissory Notes, three of which are dated June 29, 2007, in the original face amounts of $1,260,000.00,  $2,190,000.00, $3,285,000.00, and one of which is dated August 20, 2007, in the original face amount of $416,330.00. A list of vehicles and equipment which, as of the Petition Date, was subject to the GE Lien is attached to the Plan as **Exhibit A** (the "Equipment List"). Debtors and GE also entered into a Cross-Collateral and Cross Default Agreement dated June 29, 2007. The Master Security Agreement, together with the schedules thereto, was amended on May 30, 2008.

Debtors and GE, among others, also entered into a Forbearance and Modification Agreement dated September 25, 2009, as amended by the First Amendment to Forbearance and Modification Agreement dated  June 1, 2010, and the Second Amendment to Forbearance and Modification Agreement dated February 24, 2011 (the "GE Forbearance Agreement"), in which, among others things, Debtors granted GE a Lien in certain additional collateral consisting of Accounts and any and all insurance and/or other proceeds (the "Additional Collateral"), with the Accounts called the "Cash Collateral."

The GE Loan was guaranteed by a number of Debtors' Affiliates, being the Principals, and related individuals and entities, including MDRA, Patriot Leaseco, SW Payroll and SWCP.

As of the Petition Date, GE has asserted the outstanding balance of the GE Loan totaled $6,167,583.98. Of this amount, $3,120,673.00 is secured and $3,469,911.00 is unsecured. See Exhibit 3 and **Exhibit 7**, Amortized Plan Distributions, which contain detailed information on the FCC, GE and Wells Claims**,** for information about the proposed treatment, categorization and amount of the GE Secured Claim in Class 2 and the GE Deficiency Claim (a General Unsecured Claim) in Class 8, as well as the monthly payment amounts.

       c.   *Wells Financing*. Central Concrete and Wells entered into the following transactions:

       (i)   *Wells Loan*s:  that promissory note dated December 2, 2004, made by Central Concrete in the face amount of $764,000.00, and the Security Agreement of same date, pursuant to which Central Concrete granted Wells a first Lien in certain equipment and vehicles described therein to secure its obligations to Wells under such note; that promissory note dated December 6, 2004, from Central Concrete to Wells, in the original principal amount of $1,184,000.00, and the Security Agreement of same date, pursuant to which Central Concrete granted Wells a first Lien in certain equipment and vehicles described therein to secure its obligations to Wells under such note; and that Revolving Loan Agreement dated August 28, 2006, made by Central Concrete to Wells, by assignment from CIT Group/Equipment Financing, in the face amount of $7,500,000.00, pursuant to which Central Concrete granted such lender a Lien in certain equipment and vehicles to be purchased with the loan proceeds to secure its obligations under such loan agreement; as such loans were modified by that certain Forbearance

and Modification Agreement dated September 25, 2009, as amended by the First Amendment to Forbearance and Modification Agreement dated  June 1, 2010, and the Second Amendment to Forbearance and Modification Agreement dated March 29, 2011 (the "Wells Forbearance Agreement") (which also modify the Wells Lease Documents), by and among Wells, Debtors and other parties, in which, among others things, Debtors granted Wells a Lien in the Additional Collateral to secure Debtors' obligations under the Wells Loan Documents (as well as the Lease Documents described below); and

(ii)    *Wells Lease Transactions*:   those certain Supplemental Master Leases dated April 6, 2005, May 26, 2006 and June 25, 2006, to acquire equipment with purchase prices of $700,000.00, $573,010.00 and $573,010.00, respectively, as described therein; which were also modified by Wells Forbearance Agreements and secured by the Additional Collateral.

All of the equipment subject to the Wells Loans and Wells Lease Transactions are described in the Equipment List.

The Wells Loans and Wells Lease Transactions were guaranteed by the Principals and several Affiliates, including SW Payroll and SWCP.

As of the Petition Date, Wells asserted the outstanding balance of the Wells Claims totaled $6,264,594.56, which includes amounts due under the Wells Loan Documents and Wells Lease Documents. See Exhibit 3 and Exhibit 7 for information about the proposed treatment, categorization and amount of the Wells Secured Claim in Class 3, and the Wells Deficiency Claim (a  General Unsecured Claim) in Class 8, as well as the payments due Wells under the Wells New Lease Documents.

d.    *FCC Financing*. Debtors and FCC entered into the following transactions:

(i)    *FCC Loans*:  that certain Master Security Agreement dated September 17, 2003, together with Schedules Nos. 3, 4, 4a and 5, pursuant to which FCC provided loans to Debtors for the purchase of certain equipment described therein, and pursuant to which Debtors granted FCC a first priority Lien in such equipment, described as follows: (a) Schedule 3 dated July 6, 2004, in the original amount (principal and interest) of $471,219.60; (b) Schedule 4 dated September 12, 2004, in the original amount (principal and interest) of $1,523,149.44; (c) Schedule 4a dated December 26, 2007, in the original amount (principal and interest) of $608,950.80; and (d) Schedule 5 dated September 12, 2004, in the original amount (principal and interest) of $636,580.20; as the Master Security Agreement and Schedules were modified by those two Modification Agreements dated November 22, 2010, and November 22, 2011 (the "FCC Modification Agreements") (which also modified the FCC Lease Documents); and

(ii)    *FCC Lease Transactions*:   that certain Master Lease Agreement dated March 31, 2006, together with the following schedules: (a) Schedule 1 dated April 7, 2006, to acquire equipment with a purchase price of $1,134,650.00, pertaining to certain

equipment described therein; (b) Schedule 2 dated February 5, 2007, to acquire equipment with a purchase price of $442,335.00; and (c) Schedule 3 dated April 20, 2007, to acquire equipment with a purchase price of $1,164,650.00, as the Master Lease Agreement and schedules are modified by the Modification.

All of the equipment and vehicles subject to the FCC Loan and FCC Lease Transactions are described in the Equipment List.

The FCC Loan and FCC Lease Transactions were guaranteed by the Principals and Patriot Leaseco.

As of the Petition Date, FCC asserted the outstanding balance of the FCC Loans totaled $1,200,798.70, and of that amount, FCC asserted that $899,481.00 was secured, and $301,317.70 was unsecured.  Further, also as of the Petition Date, FCC asserted that the outstanding balance due on the FCC Lease Transactions totaled $2,536,258.74.  See Exhibit 3 and Exhibit 7 for information about the proposed treatment, categorization and amount of the FCC Secured Claim in Class 1, and the FCC Deficiency Claim (a General Unsecured Claim) in Class 8, as well as the payments due FCC under the FCC New Lease Documents.

e.    *APCC Loan:*  That certain promissory note dated June 6, 2005, in the face amount of $411,190.00, made by Central Concrete, and that certain security agreement of the same date in which Central Concrete granted APCC a first Lien in certain equipment described therein to secure its obligations to APCC, which equipment is described in the Equipment List.  The note is guaranteed by SW Concrete, AJ Concrete, and the Principals.

As of the Petition Date, APCC has asserted that the aggregate outstanding balance of the APCC Loan totaled $19,797.15, all of which is secured.  See Exhibit 3 and Exhibit 7 for information about the proposed treatment, categorization and amount of the APCC Secured Claim in Class 5.

f.    *Ally Loans:*  those certain six (6) Retail Installment Sales Contracts between Ally and Central Concrete, described as follows: (i) that certain Retail Installment Sales Contract dated August 14, 2007, in the original amount of $29,535.00, for the purchase of a vehicle described therein and secured by a first Lien in such vehicle; (ii) that certain Retail Installment Sales Contract dated August 16, 2007, in the original amount of $33,405.80, for the purchase of a vehicle described therein and secured by a first Lien in such vehicle; (iii) that certain Retail Installment Sales Contract dated August 29, 2007, in the original amount of $29,470.25, for the purchase of a vehicle described therein and secured by a first Lien in such vehicle; (iv) that certain Retail Installment Sales Contract dated September 30, 2007, in the original amount of $22,408.70, for the purchase of a vehicle described therein and secured by a first Lien in such vehicle; (v) that certain Retail Installment Sales Contract dated August 17, 2007, in the original amount of $35,182.20, for the purchase of a vehicle described therein and secured by a first Lien in such vehicle; and (vi) that certain Retail Installment Sales Contract dated September 13,  2007, in the original amount of $32,298.80, for the purchase of a vehicle described therein and secured by a first Lien in such vehicle.  All of the vehicles subject to the Ally loans are described in the Equipment List.

As of the Petition Date, Ally has asserted that the aggregate outstanding balance of the Ally Loans totaled $15,025.15, all of which is secured. See Exhibit 3 and Exhibit 7 for information about the proposed treatment, categorization and amount of the Ally Secured Claims in Class 4.

    g. *CDR Secured Claim*.  This Secured Claim, in the amount of $70,819.20, arose by operation of law as a result of SW Concrete's failure to pay certain use taxes.  Prior to the Petition Date, SW Concrete had negotiated a payment plan with CDR, in which it was obligated to make monthly payments of $2,520.36.  SW Concrete made these monthly payments through March 2012.

    h. *TCI:*  Prior to the Petition Date, SW Concrete and AJ Concrete factored accounts with TCI Business Capital, Inc. ("TCI") pursuant to a Factoring, Security and Service Agreement dated March 1, 2011.  As of the Petition Date, TCI had advanced $244,668.00 to SW Concrete on accounts that TCI had not then collected, TCI held $86,449 in funds received on SW Concrete accounts in a reserve.

    i. *Unsecured Creditors*.  See Exhibit 3 for a detailed listing of all unsecured non-priority Unsecured Claims filed against Debtors, individually and as consolidated. The consolidated Claims in Class 7, Administrative Convenience Claims (Claims held by creditors totaling $3,000.00 or less in the aggregate), total $40,446.78, and the consolidated Claims in Class 8, General Unsecured Claims, total $10,023,224.61.

The summary contained in Exhibit 3 identifies the duplicate Claims and the proposed Claim amounts.  There are five (5) duplicate Claims, being the Deficiency Claims of FCC, GE and Wells, the Claim of Berenbaum Weinshienk PC for legal services, and the guaranty Claim of CoBiz in the amount of $1,945,833.52 which was filed in the SW Concrete and Central Concrete bankruptcy cases, but not the AJ Concrete bankruptcy case.

   **4.** **Debtors' Prepetition Financial Performance.**  In 2006, Debtors (and certain non-debtor Affiliates) had combined gross revenues of $17,739,853.00. Due to the financial crisis and recession which began in 2007 or 2008, Debtors' gross revenues dropped to approximately $7,075,254.00 in 2010.   See the following paragraph for more prepetition financial information.

   **5.** **Events Precipitating Bankruptcy.**  The world-wide financial crisis and recession hit the hit the construction industry particularly hard.  Prepetition, 60% of Debtors' business was tied to new residential construction.  When that industry crashed in 2008, Debtors' business was greatly affected.  Commercial construction also slowed dramatically.  As a result, the volume of Debtors' work shrank significantly.  Further, competitors cut prices in order to obtain more work, which also hurt Debtors' business.

Thus, starting in 2009, Debtors began to have difficulty servicing their debt, particularly the debt owed to their primary secured creditors.  Debtors entered into various agreements with GE, Wells and FCC to restructure their debt and business, including the GE

Forbearance Agreement, the Wells Forbearance Agreement and the FCC Modification Agreements.  Among the efforts Debtors took to meet their obligations, Debtors sold certain personal property and real property and paid the proceeds to such lenders.  Debtors also cut overhead and operating costs and received loans from Debtors' Principals.  Debtors also made financial covenants with projections in connection with the restructuring of the GE, Wells and FCC financings.

As the result of Debtors' efforts, Debtors increased their combined revenue in 2011 to $8,569,282.00.[2]  Notably, as part of Debtors' financial covenants and forecasting to GE, Debtors had projected that their 2011 combined revenue would be $7,520,000.00 (a $254,087 increase in net income). Debtors in fact achieved combined revenue that was approximately $1,049,282.00 above the projected combined revenue for 2011. The increase resulted from increased business in the second half of 2011.

Despite Debtors' successes from 2009 through 2011, Debtors were unable to negotiate a resolution with GE.  On March 16, 2012, GE filed a lawsuit against Debtors and the guarantors in the United States District Court of the District of Colorado at case number 12-cv-679, for breach of contract and seeking, among other things, an order compelling Debtors to surrender the GE Equipment Collateral to GE.  On April 2, 2012, the District Court entered a temporary restraining order and order of replevin which required Debtors to surrender the collateral to GE.  Subsequently, Debtors filed for protection under chapter 11 of the Bankruptcy Code on April 10, 2012.

### III.     EVENTS SINCE THE PETITION DATE

**A.      Operations.**  Debtors' operations have continued uninterrupted since the Petition Date.  Since the Petition Date, SW Concrete acquired the use of ten (10) additional concrete pumping trucks, and AJ Concrete acquired the use of one (1) additional concrete pumping truck.  The concrete pumping trucks were already owned by Central Concrete and used by SW Arizona prior to the closure of its business.  Upon such closure, Central Concrete transferred the equipment as stated above.

Debtors' business continues to include both commercial and residential projects.  As of the date hereof, approximately 60% consists of residential projects and approximately 40% consists of private commercial and public projects.  This is a significant change from the Petition Date allocation, when approximately 25% consisted of residential projects, and approximately 75% of private commercial and public projects, and reflects more housing starts (particularly multi-family housing) due to an upturn in the economy.

Since the Petition Date, Debtors' major projects have included the following:

---

[2] Combined revenue does not include the rent paid by SW Concrete and AJ Concrete to Central Concrete.

| Job Description | Yardage |
|---|---:|
| RTD Parking Structure | 11,000 |
| Morrison Water Treatment Plant | 6,000 |
| Brush CO Power Plant | 9,000 |
| Kersey CO Gas Plant | 5,500 |
| Boulder Hospital Addition | +4,000 |
| Denver Water Treatment Plant | 95,000 |
| RTD Light Rail Project (Downtown Denver to DIA) | 100,000-150,000 |
| CU Athletic Facility | 7,000 |
| Glendale Parking Structure | +10,000 |
| Niagara Water Bottling Plant | 8,0000 |
| E470-Jordan Rd. Lift Station | +5,000 |
| CSU Laurel Village | 4,600 |
| Sky Ridge Hospital | 12,000 |
| Village Ridge/Colorado Springs | 15,000 |
| VA Hospital Parking Structure | 6,000 |
| 13 Light Bridges from downtown Denver to DIA | 38,000 |

As of April 10, 2013, Debtors also had approximately 30 commercial and government jobs which are less than 4,000 yards.

Debtors' postpetition operations have not been noticeably adversely impacted by the bankruptcy filing. Debtors' have maintained their price structure. When appropriate, Debtors have been able to raise prices to reflect growing market demand and conditions. The 2012 year has been very good for concrete pumping in general in the markets serviced by Debtors, and both revenue and net income are up from what Debtors had forecasted. Debtors are currently running at the performance level they forecasted for 2016. So far, 2013 has continued the trend from 2012.

**B.    Financial Performance**. At the outset of these bankruptcy cases, Debtors requested and received permission to use Cash Collateral, in which GE, Wells and TCI had an interest, which permitted Debtors to continue their businesses without interruption.    In connection with their request, Debtors submitted monthly operating budgets through December 31, 2012, which was approved by the Bankruptcy Court and subsequently amended (the "Budget"). Debtors' financial performance since the Petition Date has exceeded the projections contained in the Budget.

On a consolidated basis, operating income through December 31, 2012, was $10,952,112.00, which exceeded the budgeted amount, $8,805,000, by approximately $2,147,112.00, or 20%. Gross profit[3] was $6,291,627.00, which exceeded the budgeted amount of $5,313,999.00 by approximately $977,628.00, or approximately 15.5%.

---

[3] Central Concrete's revenue comes exclusively from the payments SW Concrete and AJ Concrete pay to Central Concrete for the use of Central's concrete pumping trucks. As a result, Central Concrete's revenue is excluded from this analysis. Debtors' financials are prepared on an accrual basis, and the revenue amounts reflect actual sales through December 31, 2012, a portion of which Debtors had not been paid by December 31, 2012.

As noted above, Debtors' revenue has significantly exceeded the projections for 2012. While Debtors have certain fixed costs, a significant portion of Debtors' cost of sales and operating expenses are variable and tied directly to the amount of sales, such as fuel, repair and maintenance of the concrete pumping trucks, and wages. As a result, Debtors' expenses were higher than projected operating expenses and overhead expenses, totaling $4,534,173.00 in the aggregate, are up by $164,992.00, being approximately 9.6%.

As of December 31, 2012, net income was $1,757,445.00, an increase of $812,627.00 over the budgeted amount of $944,818.00, being an increase of 46%.

For the first three months of 2013, on a consolidated basis, gross revenue was $3,054,273.00, which exceeds the budgeted amount, $1,835,000.00, by approximately $1,219,273.00, or approximately 66%. Consolidated gross profit over the same period was $1,845,563.00, which exceeded the budgeted amount of $1,135,572.00 by approximately $709,991.00 or approximately 63%. As of April 26, 2013, Debtors' Cash on hand was $687,713.00.00.[4]

Attached as **Exhibit 4** are the balance sheet and profit and loss statements from each Debtor's monthly operating report for the month of March 2013 [most recent month after approval of this Disclosure Statement to be attached; March 2013 currently attached for illustrative purposes], as well as a consolidated profit and loss statement for all Debtors.

## C.    Chapter 11 Events.

**1.    Initial Proceedings.** Within the first month of the bankruptcy cases, various critical or key actions were taken, some on an expedited basis, to ensure that Debtors' operations could continue without interruption. On April 11, 2012, Debtors filed their Motion seeking Expedited Entry of Orders Pursuant to LBR 2081-1, which was granted by the Court. Set forth below are brief descriptions of some of these orders:

- Order Authorizing Joint Administration of Debtors' Bankruptcy Cases – the Court authorized joint administration of Debtors' bankruptcy cases, which saved time and expenses for Debtors, creditors and other parties in interest.

- Order Authorizing Payment of Prepetition Wages, Compensation and Employee Benefits – the Court authorized Debtors to, among other things, (i) to pay or perform all obligations to current employees, including accrued prepetition wages, salaries and commissions; (ii) continue employee benefit plans; (ii) pay prepetition withholdings and payroll-related taxes; (iv) continue vacation policies and pay Cash on account of vacation time upon termination.

- Orders Determining Adequate Assurance of Payment of Future Utility Services and Restraining Utility Companies from Discontinuing, Altering, or Refusing

---

[4] This amount is after (a) the payment to Wells pursuant to the Wells Stipulation of $739,416.00 in March and April, 2013, and the payment to GE pursuant to the GE Stipulation of $100,000.00 in March and April, 2013.

Service – this Order ensured that utility companies would continue to provide services to Debtors since they have assurance of payment.

- Order Authorizing Debtors to Pay Critical Vendors – the Court authorized Debtors to pay the prepetition debt of creditors who are sole-source suppliers or suppliers for which Debtors were not be able to find immediate substitutes.  As a result, Debtors were able to continue their operations uninterrupted.

2.     **Cash Collateral Orders**.   At the outset of these bankruptcy cases, Debtors requested permission to use Cash Collateral in which GE, Wells and TCI had an interest.  On April 11, 2012, Debtors filed their Motion to Use Cash Collateral.  After an evidentiary hearing conducted on April 12, 2012, the Court authorized Debtors to use Cash Collateral on an interim basis over the objections of GE and Wells.  On April 12, 2012, the Bankruptcy Court also set a subsequent hearing to receive evidence to make a final determination on Debtor's use of Cash Collateral.  The evidentiary hearing occurred April 30, 2012, and the Court entered its order permitting Debtors' use of Cash Collateral on a final basis on May 8, 2012.  Debtors' use of Cash Collateral was further modified in connection with Debtors' stipulation with FCC (the "FCC AP Stipulation"), by which Debtors retained the use of the FCC Loan Equipment and the FCC Leased Equipment so long as Debtors paid FCC $22,598.51 per month (the "FCC Initial AP") (all such orders are herein collectively called the "Cash Collateral Orders").

3.     **DIP Financing**.   At the outset of these bankruptcy cases, Debtors requested approval from the Court to continue factoring accounts receivable with TCI.  No party in interest objected to Debtors' request.  On April 13, the Court entered an order authorizing Debtors to continue factoring accounts receivable with TCI. Debtors continued factoring accounts with TCI until approximately June 2012.  Debtors have not factored accounts with TCI since that time because Debtors have generated sufficient Cash from operations.   As of September 28, 2012, TCI had collected substantially all of the postpetition accounts that were factored.  As a result, TCI has been fully paid.

4.     **Relief from Stay Motions, Motion to Compel Rejection of Leases and Motion to Extend Exclusivity Periods.**

*Initial Relief from Stay Motions and Lease Motion*

On April 24, 2012, both GE and Wells filed motions seeking relief from the automatic stay under §§ 362(d)(1) and (2).  Both lenders asserted essentially the same issues in support of their motions: (i) Debtors were in default under the respective financing agreements, (ii) Debtors either could not provide adequate protection in the form of monetary protection or they are not providing adequate protection payments in an amount customary in the industry, (iii) Debtors did not have equity in the collateral, and (iv) Debtors had not demonstrated a likelihood of successfully reorganizing.

On May 15, 2012, Debtors filed their Objections to both the GE and Wells relief from stay motions, arguing that (i) the concrete pumping trucks are essential to Debtors' business and, thus, their reorganization; and (ii) GE's and Wells' interests are adequately protected

because (a) Debtors maintain and repair the vehicles and equipment, (b) Debtors are making payments to GE and Wells, (c) the market price for the vehicles and equipment is neutral or increasing.  Further, with respect to the Wells relief from stay motion only, Debtors argued that the transactions that Wells denominated as leases are actually secured loans; this issue is discussed in more detail below.

On May 15, 2012, Wells filed its Motion to Compel, seeking to compel Debtors to either assume or reject the Wells Lease Documents as follows:  (i) reject two expired equipment leases; and (ii) assume or reject one unexpired equipment lease or, in the alternative, provide adequate protection (the "Lease Motion").  Wells argued that the two expired leases should be deemed rejected on their terms, and that the unexpired lease was in default and Debtors had neither cured nor provided adequate assurance that they would promptly cure the defaults or perform their obligations in the future.  Alternatively, Wells argued that in the event the Bankruptcy Court allowed more time for Debtors to assume or reject the unexpired lease, the equipment subject to such lease continues to depreciate and Wells could only be adequately protected by full, immediate payment of all postpetition amounts due.

On June 7, 2012, Debtors filed their Objection to Motion to Compel, arguing that the Wells Lease Documents create security interests, not leases, because, *inter alia*: (i) the total debt owed under the leases became due and owing immediately, thereby eliminating Debtors' ability to terminate the leases; (ii) upon execution of the Wells Forbearance Agreements, Debtors were bound to become the owners of the Wells Leased Equipment; and (iii) the economic realities dictate the transactions reflect security agreements, not true leases.

On June 12, 2012, the Court held an evidentiary hearing on the foregoing motions and objections.  On July 12, 2012, the Court issued its order, holding as follows:

- The Wells leases were and remain true leases.

- Debtors could not assume the two expired Wells equipment leases since those leases expired.

- Since the unexpired Wells lease is also a true lease, Debtors was required to assume or reject this lease by August 8, 2012.

- GE and Wells were not entitled to relief from stay since the vehicles and equipment at issue are necessary for an effective reorganization.

- GE and Wells were not entitled to relief from stay for the alleged lack of adequate protection as per the adequate protection payments established by the Cash Collateral Orders.

On June 26, 2012, Debtors filed their notice of appeal of the Court's order on the Lease Motion (the "Lease Order") to the Bankruptcy Appellate Panel for the Tenth Circuit (the "BAP"), Case No. CO-12-060. On July 27, 2012, Debtors filed their Motion for Stay Pending Appeal, requesting that the Court stay the Lease Order until the appeal of the Lease Order can be determined by the BAP.  Debtors further requested that the stay be granted without the posting of a *supersedeas* bond.  On August 23, 2012, the Court granted this motion, which stayed the Lease

Order, including Wells' right to enforce the Lease Order.  The Court conditioned the stay upon Debtors paying $17,500 to Wells no later than the last day of each month for the stay to remain in effect.

All briefs were filed in the Appeal, and the Court scheduled oral argument in December 2012.  However, the oral argument was vacated and the Appeal put on hold pending the approval of the Wells Stipulation (described below) which settles this matter.

*Motion to Extend Exclusivity Period and Second Relief from Stay Motions*

On July 27, 2012, Debtors filed a motion to extend the exclusivity period for filing a Plan (the "Exclusivity Extension Motion") from August 8, 2102, to October 8, 2012, a period of sixty-one (61) days, with a corresponding extension of the solicitation period from October 8, 2012 to December 6, 2012. Debtors requested the extension to fully analyze the impact of the Lease Order.

Specifically, to the extent that the Wells Leased Equipment was not secured financing, and the Wells Lease Documents expired, Debtors could not retain the Wells Leased Equipment absent the consent of Wells.  The Wells Leased Equipment is essential to Debtors' operations because Debtors do not have identical or similar concrete pumping trucks to the Wells Leased Equipment. As a result, Debtors required additional time to file their Plan to investigate whether replacement equipment was available in the marketplace, what effect losing the Wells Leased Equipment would have on Debtors' operations, and if Debtors could find replacement equipment, how Debtors would finance the acquisition of replacement equipment.  GE and Wells filed objections to this motion, and the Court conducted an evidentiary hearing on September 13, 2012, and on September 17, 2012, the Court granted the Exclusivity Extension Motion.

Also in response to the Exclusivity Extension Motion, on August 8, 2012, GE filed its second motion for relief from stay, and on August 10, 2012, Wells followed suit.

The preliminary hearings on these relief from stay motions were consolidated with the evidentiary hearing on the Exclusivity Extension Motion that was conducted on September 13, 2012.  The Court ruled that final hearings on second motions for relief from stay filed by Wells and GE would be conducted on the same dates that Court conducted hearings on the confirmation of the Plan.

### 5.    Settlements.

*FCC Stipulation*

This Plan implements the terms of a certain Stipulation between Debtors and FCC, settling certain disputes (the "FCC Second Stipulation"), which was filed May 8, 2013, and approved by Court order entered May __, 2013.  A copy of the FCC Second Stipulation[5] is

---

[5] This stipulation is called the "FCC Second Stipulation" because, as described herein in the section on the Cash Collateral Orders, the Debtors entered into a prior stipulation with FCC which required the Debtors to make certain adequate protection payments.

attached to the Plan as **Exhibit B**.  Among other things, the FCC Second Stipulation provides that:

- Debtors will stipulate that the FCC Lease Transactions are true leases.

- Debtors will continue to lease the FCC Leased Equipment, and Debtors will enter into FCC New Lease Documents, to be effective on the Effective Date, with monthly lease payments of $27,232.00.

- Upon the earlier of the execution of the FCC New Lease Documents or two (2) business days after the entry of an order approving the FCC Stipulation, Debtors shall pay FCC the sum of $150,000.00 as an inducement for FCC to enter into the FCC New Lease Documents.

- The FCC Secured Claim will be Allowed in the amount of $782,600.00, with monthly payments of $12,141.43.00.

- The FCC Deficiency Claim will be Allowed in the amount of $569,425.00, with monthly payments of $1,452.06.

- Debtors shall continue making the FCC Initial AP payments up to and through May 15, 2013, and thereafter shall make monthly adequate protection payments in the amount of $40,825.99 in lieu of the FCC Initial AP, commencing June 15, 2013, until a Plan is approved; these payments, called the "New FCC AP," shall be applied to the FCC Secured Claim, the FCC Deficiency Claim and the FCC New Lease Documents as though such payments were being made pursuant to the Plan.

*GE Stipulation*

This Plan implements the terms of a certain Stipulation between Debtors and GE, settling GE's Renewed Motion for Relief from Stay filed on August 10, 2012, the treatment of GE's Claims against Debtors, and GE's objection to the adequacy of Debtors' Disclosure Statement dated October 9, 2012 (the "GE Stipulation"), which was filed March 28, 2013, and approved by Court order entered April 17, 2013.  A copy of the GE Stipulation is attached to the Plan as **Exhibit C**.  Among other things, the GE Stipulation provides that:

- The GE Secured Claim will be Allowed in the amount of $2,800,000.00, with monthly payments in the amount of $43,440.00.

- The GE Deficiency Claim will be Allowed in the amount of $2,572,467.53, with monthly payments in the amount of $6,560.00.

- Debtors shall pay $200,000.00 to GE on or before June 1, 2013, as a resolution of GE's Administrative Claims against Debtors' estates.

- Debtors shall make monthly adequate protection payments to GE, in lieu of the initial adequate protection payments required by the Cash Collateral Orders, in the amount of $50,000.00, commencing on the date the Court approves the GE Stipulation, but accruing March 15, 2013, until a Plan is approved; these payments, called the "New GE AP," shall be applied to the GE Secured Claim and the GE Deficiency Claim as though such payments were being made pursuant to the Plan.

*Wells Stipulation*

This Plan implements the terms of a Stipulation between Debtors and Wells, settling Wells' Renewed Motion for Relief from Stay filed on August 10, 2012, the Lease Motion, Wells' Motion for Approval of Administrative Expense, and the treatment of Wells' prepetition Claims (the "Wells Stipulation"), which was filed on February 11, 2013, and approved by Court order entered March 5, 2013.  A copy of the Wells Stipulation is attached to the Plan as **Exhibit D**.  Among other things, the Wells Stipulation provides that:

- Debtors will stipulate that the Wells Lease Transactions are true leases as determined by the court in the Lease Order.

- The BAP Appeal will be dismissed after the Effective Date.

- Debtors will re-lease the Wells Leased Equipment, and Debtors will enter into the Wells New Lease Documents, to be effective on the Effective Date, with monthly lease payments of $23,273.00.

- Debtors shall, on March 15, 2013, pay Wells the sum of $600,000.00 as an inducement for Wells to enter into the Wells New Lease Documents.

- The Wells Secured Claim will be Allowed in the amount of $2,500,000.00, with monthly payments in the amount of $38,785.00.

- Debtors will enter into a modification of the Wells Loan Documents to be effective on the Effective Date.

- The Wells Deficiency Claim will be Allowed in the amount of $3,000,000.00, with monthly payments of $7,650.00.
- Debtors shall make monthly adequate protection payments to Wells, in lieu of the initial adequate protection payments required by the Cash Collateral Orders, in the amount of $69,708.00, commencing March 15, 2013, until a Plan is approved; these payments, called the "New Wells AP," shall be applied to the Wells Secured Claim, the Wells Deficiency Claim and the Wells New Lease Documents as though such payments were being made pursuant to the Plan.

- The Wells Administrative Claim will be deemed settled by the terms of the Wells Stipulation.

**6.** **Other Events.**  In addition to the events described above, the following events have occurred since the Petition Date:

a.    Debtors requested and obtained a Court approved deadline for filing prepetition proofs of claim.  The deadline to file proofs of claim was July 2, 2012;

b.    Debtors have maintained proper insurance in place, remained current on payroll, payroll taxes, withholdings, and all other postpetition obligations, have filed and are current with all Monthly Operating Reports and paid all U.S. Trustee fees to date;

c.    Debtors entered into a stipulation with FCC for adequate protection of the FCC Equipment Collateral, and performance under the FCC Lease Documents, which was approved by the Court;

d.    AJ Concrete held a prepetition claim against APEC in the face amount of $123,293.60.  AJ Concrete sued APEC and had been involved in litigation with APEC in state court in Georgia since 2009.  AJ Concrete and APEC entered into a settlement agreement on May 7, 2012 pursuant to which APEC would pay AJ Concrete $85,000.00.  Debtors filed a motion requesting approval of the settlement, the deadline for which passed.  As of October 9, 2012, the Bankruptcy Court had not ruled on the motion;

e.    On August 21, 2012, AJ Concrete filed its motion to employ and compensate Howe & Associates, which is the law firm that represented AJ Concrete in connection with its claim against APEC.  On September 20, 2012, the Bankruptcy Court approved the application to employ and compensate Howe & Associates;

f.    On September 10, 2012, Wells filed a motion for approval of administrative expense.  Docket No. 211.  In the motion, Wells sought to have approved a priority expense under 11 U.S.C. § 503(b)(1) for Debtors' use of the Wells Leased Equipment from April 1, 2012 through August 31, 2012 in the amount of $17,500 per month.  On October 3, 2012, Debtors filed their objection to the motion, in which Debtors asserted that (i) the motion was or should be stayed by the stay pending appeal; (ii) that Wells was not entitled to any administrative expense if Debtors are successful in the Appeal; (iii) that in no event was Wells entitled to an administrative expense prior to June 12, 2012; and (iv) that the amount of any administrative expense is limited to the damages calculated in accordance with the rights Wells possessed at maturity of the Wells Lease Documents; and

g.    On November 1, 2012, Debtors filed their motion to employ and compensate Michael G. Smith of Pinnacle Management and Consulting to assist in their restructuring efforts and negotiations with creditors, in particular its large secured creditors.  After the resolution of an objection by GE, the Court entered an Order approving his employment on December 27, 2012.

## IV.    PLAN OF REORGANIZATION

The following is a simplified description of the Plan. **REFERENCE SHOULD BE MADE TO THE PLAN FOR A FULL ANALYSIS OF ITS CONTENTS**.

**A.    Concept of the Plan.**  The primary purpose of the Plan is to repay creditors. Debtors believe that its Plan is in the best interests of the creditors and the Interest holders.  See LIQUIDATION ANALYSIS, Article XII, and PLAN FEASIBILITY AND RISK FACTORS, Article XIII.

**1.    Overview**.  The Plan provides for substantive consolidation of Debtors for purposes of implementing the Plan, voting on the Plan, and calculating and making Distributions under the Plan, as described below.  Payment of all Allowed Claims against Debtors will be made from Reorganized Debtors' future operations.  The Plan also constitutes the settlement and/or implementation of the settlement of the Claims of FCC, GE and Wells, as described in the previous section of this Disclosure Statement.  Distributions on Secured Claims in Classes 1-5 will be made monthly, beginning on the 1st or the 15th day of the month following the Effective Date, for a period of 78 months or until sooner paid in full.  The CDR Secured Claim in Class 6 will be paid monthly commencing on the Effective Date.  Holders of Administrative Convenience Claims (Unsecured Claims of $3,000.00 and under) will be paid 15% of their Claims on the 1st or the 15th day of the month following the Effective Date as payment in full. Distributions on General Unsecured Claims will be made quarterly or monthly, depending on the size of the Distribution, and will be paid 19.25% of the Allowed Claim amount over a period of 78 months.

**2.    Substantive Consolidation.**  Pursuant to the Confirmation Order, the Court will approve the substantive consolidation of Debtors for purposes of implementing the Plan, voting on the Plan, assessing whether Confirmation standards have been met, calculating and making Distributions under the Plan, and filing post-Confirmation reports and paying Quarterly UST Fees.  Pursuant to such Confirmation Order, as of the Effective Date: (i) all assets and liabilities of Debtors will be deemed merged except as provided in the Plan; (ii) all guarantees by one Debtor of the obligations of any other Debtor will be deemed eliminated so that any Claim against any Debtor and any guarantee thereof executed by any other Debtor and any joint or several liability of any of Debtors will be deemed to be one obligation of all Debtors; (iii) every Claim filed or to be filed in the chapter 11 case of any Debtor will be deemed filed against all Debtors and will be deemed one Claim against and a single obligation of all Debtors, and Debtors may file and the Court will sustain objections to Claims for the same liability that are filed against multiple Debtors; and (iv) Intercompany Claims among Debtors will be eliminated and extinguished except as provided in the Plan. Such substantive consolidation will not affect (1) the legal and corporate structures of Debtors; (2) the vesting of assets in Reorganized Debtors; (3) the right to distributions from any insurance policies or proceeds of such policies; or (4) the rights of Debtors or Reorganized Debtors to contest alleged setoff or recoupment efforts by creditors on the grounds of lack of mutuality under § 553 of the Bankruptcy Code and other applicable law.

The Plan serves as a motion seeking entry of an order substantively consolidating Debtors, as described and to the extent set forth above.  Unless an objection to such substantive

24

consolidation is made in writing by the holder of any Claim affected by the Plan or other party in interest, filed with the Court on or before the deadline for submitting ballots either to accept or reject the Plan in accordance with § 1126 of the Bankruptcy Code that is specified in the Disclosure Statement, the ballots or related solicitation documents approved by the Court, or such other date as may be fixed by the Court, Debtors will be substantively consolidated as provided by the Plan pursuant to the Confirmation Order. In the event any such objections are timely filed, a hearing with respect thereto will occur at the Confirmation Hearing.

Although Debtors are separate corporate entities, Debtors, like many modern business enterprises, have operated, together with the affiliated companies described in Article II.A.4, as an integrated commercial and corporate enterprise and economic unit despite their separate corporate existence, and fairness supports the substantive consolidation of Debtors on the terms proposed in the Plan.

Substantive consolidation is an equitable remedy that must be approved by the Court. Debtors seek that approval as part of the Confirmation of the Plan. In Debtors' view, the following facts involving Debtors and their operations support substantive consolidation: (i) the insolvency of Debtors, and (ii) the intertwined and dependent relationships among Debtors (and their affiliated companies whom provide various services and properties). Specific examples follow:

- Central Concrete is the majority Interest holder of SW Concrete.

- Debtors have operated as a single economic enterprise, with a high degree of service integration.

- The officers and directors of all Debtors are the same, and the meetings of Debtors' manager are jointly held.

- Debtors utilize a centralized payroll system through SW Payroll, who also purchases insurance for Debtors; SW Concrete and AJ Concrete have a joint blanket insurance policy.

- Debtors' employee polices are the same.

- SW Payroll keeps consolidated books and records for the other Debtors and their affiliated companies, and prepares consolidated financial statements.

Further, the ownership of the varying assets of Debtors, and Debtors' prepetition debts, illustrate the intertwined nature of Debtors. For example, almost all Cash (other than very minor amounts) is generated by AJ Concrete and SW Concrete. Almost all hard assets, in particular the concrete pumping trucks used to generate AJ Concrete's and SW Concrete's business, are owned by Central Concrete. Central Concrete obtains financing to purchase the equipment, and while in many cases AJ Concrete and SW Concrete are guarantors of the financing debt, this is not always the case. Central Concrete leases the equipment to the other Debtors, and they in turn make sufficient payments so that Central Concrete can pay debt service on the equipment.

No harm will result to creditors if Debtors are substantively consolidated as provided in the Plan; instead, creditors of all Debtors will benefit by such consolidation.  With respect to all the Secured Claims except the CDR Secured Claim, they are primarily secured by the equipment to which their respective Liens attach, which equipment is owned by Central Concrete. However, the FCC, Wells and GE Secured Claims are undersecured.  Since AJ Concrete and SW Concrete are either makers or accommodation parties on these debts, the FCC, Wells and GE Deficiency Claims would have Unsecured Claims against all Debtors.

In the Liquidation Analysis, Debtors estimate that the percentage recovery on Unsecured Claims under Chapter 7 liquidations would range from approximately 0% to 3% – see chart below and the Liquidation Analysis attached as **Exhibit 5**.  However the projected percentage recovery under this Plan which substantively consolidates Debtors is 19.25%.

| Recoveries for Unsecured Claims | AJ Concrete | Central Concrete | SW Concrete |
|---|---|---|---|
| Amount Available for Unsecured Claims after payment of Secured Claims and Administrative Expenses | $269,917.33 | $306,304.40 | $0.00 |
| Amount of Unsecured Claims | 9,450,150.74 | 12,802,810.98 | 11,709,327.01 |
| Percentage Recovery | 2.86% | 2.39% | 0.00% |

Further, those several creditors which hold Claims against more than one Debtor might very well find themselves litigating the same Claim against the various Chapter 7 estates.

The due process rights of all creditors, Interest holders and other interested parties will be protected.  All such interested parties received notice of the hearing on this Disclosure Statement and will receive notice of the Confirmation hearing on the Plan, and will be afforded the opportunity to review such documents and to object, if so desired.  Additionally, Debtors' creditors holding Allowed Claims will receive substantial benefits if the Plan is confirmed, since they will receive more in a consolidation than if Debtors' cases were either converted.

In summation, in the view of Debtors, substantive consolidation provides substantial benefits to the creditors and is in the best interest of the estates.  Debtors functioned as one economic unit, Moreover, Debtors believe that the prejudice to creditors resulting from the substantive consolidation, if any, is insignificant and is substantially outweighed by the benefits.

        **3.**      **Interests in Debtors**.  The Interests in Debtors will be cancelled, and Anderson NewCo, will purchase new equity interests in Debtors for the amount of $50,000.00. Anderson NewCo will be formed by Tom Anderson, but may be wholly or partially owned by related parties.  Mr. Anderson is not an insider, but is a guarantor of the GE Claims.  Mr. Anderson has done business with Debtors over the years, is experienced in the concrete pumping business, and is a 25% owner with the Principals in MDRA Properties and MDRA Land, LLC, a real estate investment vehicle.

**B.      Treatment of Unclassified Claims.**

      **1.      Administrative Claims.**  Administrative Claims are not designated as a Class pursuant to § 1123(a)(1) and are not entitled to vote, pursuant to the Bankruptcy Code. Unless otherwise agreed, these Claims (other than Allowed Operating Administrative Claims), shall receive payment in full (unless previously paid in full pursuant to Court orders), from Reorganized Debtors, as applicable, in Cash on the later of (a) the Effective Date, or (b) within twenty (20) business days after the date these Claims become Allowed Claims.   Allowed Operating Administrative Claims will be paid fully and in Cash in the ordinary course of business by Reorganized Debtors (including any payment terms applicable to such expenses), upon presentment or otherwise in accordance with the particular terms relating thereto.   All Administrative Claims (other than Operating Administrative Claims) shall be filed within sixty (60) days of the Effective Date or shall be forever barred.  Professional fees due as of September 28, 2012 are identified on the liquidation analysis.

      Professional fees will continue to accrue through the Effective Date of the Plan. The Court will ultimately review and determine the allowance of all fees paid or to be paid to Debtors' attorneys and the other professionals described above.   All fees of professionals approved by the Court will be paid by Debtors.

      Fees of the United States Trustee payable under 28 U.S.C. Section 1930 will be paid on confirmation in accordance with § 1129(a)(12) of the Bankruptcy Code.   Debtors have paid quarterly fees totaling $58,500.00 in the aggregate since the Petition Date through April 15, 2013. Debtors are current on payments of the quarterly fees to the United States Trustee and anticipate remaining current.  Debtors estimate that the total aggregate amount due to the United States Trustee will be approximately $17,000.00 as of the confirmation date of the Plan. The obligation to pay Quarterly UST Fees will continue until the chapter 11 case is dismissed, converted or closed.

      The estimated Administrative Claims of Debtors' professionals as of the Effective Date total $ 106,500.00, as set forth in Article XIII.

      **B.      Classified Claims and Interests - Overview.** The classification of Claims and Interests pursuant to this Plan follows.  **THE FOLLOWING SUMMARY AND THE OTHER DESCRIPTIONS IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PROVISIONS OF THE PLAN.  IT IS URGED THAT EACH HOLDER OF A CLAIM OR INTEREST CAREFULLY REVIEW THE TERMS OF THE PLAN.**

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1 | FCC Secured Claim | Impaired | Yes |
| 2 | GE Secured Claim | Impaired | Yes |
| 3 | Wells Secured Claim | Impaired | Yes |
| 4 | APCC Secured Claim | Impaired | Yes |
| 5 | Ally Secured Claims | Impaired | Yes |
| 6 | CDR Secured Claim | Impaired | Yes |
| 7 | Administrative Convenience Claims | Impaired | Yes |
| 8 | General Unsecured Claims | Impaired | Yes |
| 9 | Interests in AJ Concrete | Impaired | No |
| 10 | Interests in Central Concrete | Impaired | No |
| 11 | Interests in SW Concrete | Impaired | No |

Each holder of an Allowed Claim shall be entitled to vote to accept or reject the Plan. Classes 9 through 11 are impaired, and will receive nothing under the Plan. Therefore, they are not entitled to vote since they are presumed to have rejected the Plan.

## V.    TREATMENT OF CLAIMS

The following treatment of and consideration to be received by Claimants of Allowed Claims and Allowed Interests pursuant to the Plan shall be in full settlement, release and discharge of such Allowed Claims and Allowed Interests.

**A.    Treatment of Class 1.**  Class 1, the FCC Secured Claim, is impaired.  Unless otherwise agreed, this Claim shall be treated as follows:

(i)    it shall be Allowed in the amount of  $782,600.00;

(ii)    a portion of the New FC AP, in the monthly amount of $12,141.43, shall be applied to reduce this Claim as though such payments were being made pursuant to this Plan, which are estimated to be $24,282.86.00 through a projected Effective Date of July 31, 2013;

(iii)    FCC shall retain its Lien on the FCC Equipment Collateral to secure the payment of this Claim, and it shall also be secured by the FCC Leased Equipment;

(iv)    the Claim will be paid in full over the period of seventy-eight (78) months from the Effective Date, with interest from the Effective Date (subject to the application of the New FCC AP as described above) at the rate of 6% per annum, in monthly Cash payments of principal and interest in the amount of $12,141.43, with the first monthly payment commencing on the 15th day of the month following the Effective Date and continuing on the same day of each month thereafter until paid in full; there will be no prepayment discount or prepayment penalty, and Reorganized Debtors will be obligated to make all such seventy-eight (78) payments;

(v)     upon payment in full, FCC's Lien upon the FCC Equipment Collateral shall be discharged, and FCC will release  its lien on the FCC Equipment Collateral and deliver the titles thereto to Reorganized Debtors and Reorganized Debtors shall be authorized to file UCC-3 termination statement(s); and

(vi)     prior to the hearing confirming this Plan, FCC and Debtors shall enter into a modification of this Claim (and the Loan Documents evidencing same) to be effective as of the Effective Date, which shall contain, in addition to standard loan terms, the applicable provisions of the FCC Second Stipulation.

Since Class 1 is impaired, the holder of the Claim in this Class is entitled to vote to accept or reject the Plan.

**B.     Treatment of Class 2.**   Class 2, the GE Secured Claim, is impaired. Unless otherwise agreed, this Claim shall be treated set forth in the GE Stipulation, with the payment and Lien rights summarized as follows:

(i)     the Claim shall be Allowed in an amount equal to $2,800,000.00;

(ii)      a portion of the New GE AP, in the monthly amount of $43,440.00, shall be applied to reduce this Claim as though such payments were being made pursuant to this Plan, which are estimated to be $217,200.00 through a projected Effective Date of July 31, 2013;

(iii)     GE shall retain its Lien on the GE Equipment Collateral;

(iv)     GE shall have a Lien (pari passu with Wells) on the Post-Confirmation Cash Collateral of Reorganized SW Concrete in an amount not to exceed $331,719.00, and of Reorganized AJ Concrete in an amount not to exceed $102,025.50;

(v)     the Claim will be paid in full over the period of seventy-eight (78) months from the Effective Date (subject to the application of the New GE AP as described above), with interest from the Effective Date at the rate of 6% per annum, via amortized monthly Cash payments of principal and interest in the amount of $43,440.00, with the first monthly payment commencing on the 15th day of the month following the Effective Date and continuing on the same day of each month thereafter until paid in full;

(vi)     upon payment in full, GE's Liens upon the GE Equipment Collateral, the Post-Confirmation Cash Collateral and the Englewood Property shall be discharged, and GE shall release such Liens and deliver the titles to the GE Equipment Collateral to Reorganized Debtors and execute and file a Release of Deed of Trust on the Englewood Property, and Reorganized Debtors shall be authorized to file UCC-3 termination statement(s); and

(vii)      the GE Loan Documents shall be deemed modified to be consistent with the provisions of this Plan (including the GE Stipulation), but otherwise shall remain in full force and effect; provided however, within ten (10) days of any request by GE, Reorganized Debtors shall execute and deliver to GE (A) any and all additional documents deemed reasonably

necessary by GE to evidence the agreements in the GE Stipulation and the provisions of this Plan; and (B) all necessary documentation to evidence GE's continuing Lien in the GE Equipment Collateral and the Post-Confirmation Cash Collateral.

Since Class 2 is impaired, the holder of the Claim in this Class is entitled to vote to accept or reject the Plan.

  **C.**  **Treatment of Class 3**. Class 3, the Wells Secured Claim, is impaired. Unless otherwise agreed, this Claim shall be treated set forth in the Wells Stipulation, with the payment and Lien rights summarized as follows:

    (i)  the Claim shall be Allowed in an amount equal to $2,500,000.00;

    (ii)  a portion of the New Wells AP, in the monthly amount of $38,785.00, shall be applied to reduce this Claim as though such payments were being made pursuant to this Plan, which are estimated to be $193,925.00 through a projected Effective Date of July 31, 2013;

    (iii)  Wells shall retain its Lien on the Wells Equipment Collateral to secure the payment of this Claim, and Debtors' obligations hereunder shall also be secured by the Wells Leased Equipment;

    (iv)  Wells shall have a Lien (*pari passu* with GE) on the Post-Confirmation Cash Collateral of Reorganized SW Concrete in an amount not to exceed $331,719.00, and Reorganized AJ Concrete in an amount not to exceed $102,025.50;

    (v)  the Claim will be paid in full over the period of seventy-eight (78) months (subject to the application of the New Wells AP as described above) from the Effective Date, with interest from the Effective Date at the rate of 6% per annum, via amortized monthly Cash payments of principal and interest in the amount of $38,785.00, with the first monthly payment commencing on the on the 15th day of the month following the Effective Date and continuing on the same day of each month thereafter until paid in full;

    (vi)  upon payment in full, Wells' Liens upon the Wells Equipment Collateral, the Post-Confirmation Cash Collateral and the Englewood Property shall be discharged, and Wells shall release such Liens and deliver the titles to the Wells Equipment Collateral to Reorganized Debtors and execute and file a Release of Deed of Trust on the SWCP Property, and Reorganized Debtors shall be authorized to file UCC-3 termination statement(s); and

    (vii)  prior to the hearing confirming this Plan, Wells and Debtors shall enter into a modification of this Claim (and the Loan Documents evidencing same) to be effective as of the Effective Date, which shall contain, in addition to standard loan terms, the applicable provisions of the Wells Stipulation.

Since Class 3 is impaired, the holder of the Claim in this Class is entitled to vote to accept or reject the Plan.

**D.      Treatment of Class 4.**  Class 4, the APCC Secured Claim, is impaired.  Unless otherwise agreed, this Claim shall be treated as follows:

(i)      it shall be Allowed in the amount of $19,797.15, less an amount equal to the Initial AP made by Debtors to APCC as of the Effective Date which is estimated to be $8,565.00 through a projected Effective Date of July 31, 2013;

(ii)      APCC shall retain its Lien on the APCC Equipment Collateral; and

(iii)      the Claim will be paid in full in monthly installments of $8,131.57, with the first payment commencing on the 1st or the 15th day of the month following the Effective Date, as determined by Reorganized Debtors, and continuing on the same day of each month thereafter until paid in full, with interest to accrue after the Effective Date at the rate of 6.93% per annum;

(iv)      upon payment in full, APCC's Lien upon the APCC  Equipment Collateral shall be discharged, and APCC shall release such Lien on the APCC Equipment Collateral and deliver the titles thereto to Reorganized Debtors and Reorganized Debtors shall be authorized to file UCC-3 termination statement(s) (if applicable); and

(v)      the APCC Loan Documents shall be deemed modified to be consistent with the provisions hereof, but otherwise shall remain in full force and effect.

Since Class 4 is impaired, the holder of the Claim in this Class is entitled to vote to accept or reject the Plan.

**E.      Treatment of Class 5**.  Class 5, the Ally Secured Claims, is impaired. Unless otherwise agreed, these Claims shall be treated as follows:

(i)      they shall be Allowed in the aggregate amount of $15,025.15, less an amount equal to the Initial AP made by Central Concrete to Ally as of the Effective Date, which is estimated to be $1,140.00 through a projected Effective Date of July 31, 2013;

(ii)      Ally shall retain its Lien on the Ally Equipment Collateral;

(iii)      Ally will be paid in monthly installments at the monthly payment amounts provided in the Ally Loan Documents, with the first payment commencing on the 1st or the 15th day of the month following the Effective Date, as determined by Reorganized Debtors, and continuing on the same day of each month thereafter until paid in full; a

(iv)      upon payment in full, Ally's Lien upon the Ally Equipment Collateral shall be discharged, and Ally shall release  its Lien on the Ally Equipment Collateral and deliver the titles thereto to Reorganized Debtors and Reorganized Debtors shall be authorized to file UCC-3 termination statement(s) (if applicable);  and

(v)      the Ally Loan Documents shall be deemed modified to be consistent with the provisions hereof, but otherwise shall remain in full force and effect.

Since Class 5 is impaired, the holder of the Claims in this Class is entitled to vote to accept or reject the Plan.

**F.      Treatment of Class 6**.  Class 6, the CDR Secured Claim, is impaired.  Unless otherwise agreed, this Claim shall be treated as follows:

(i)      it shall be Allowed in the amount of  $70,819.20;

(ii)      CDR shall retain its Lien on the property securing the Claim;

(iii)      commencing on the Effective Date, Debtors shall commence making deferred Cash monthly payments in the amount of $2,520.36, being the amount stated in the CDR Settlement Agreement, and shall continue until the CDR Secured Claim is paid in full, which is estimated to be on or about thirty (30) months after the Effective Date;

(iv)      notwithstanding the foregoing payment provision, and in order to comply with § 1129(a)(9)(C)(iii) of the Bankruptcy Code, if the percentage of Pro Rata funds payable to holders of General Unsecured Claims is at any time greater than the percentage of funds paid to CDR, SW Concrete shall pay to CDR, within ten (10) days of such event, an amount of Cash equal to the difference between the percentage paid to the holders of General Unsecured Claims and the percentage paid to it; and

(v)      the CDR Settlement Agreement shall be deemed modified to be consistent with the provisions hereof but otherwise shall remain in full force and effect.

Since Class 6 is impaired, the holder of the Claim in this Class is entitled to vote to accept or reject the Plan.

**G.      Treatment of Class 7**.  Class 7, Administrative Convenience Claims, is impaired. The holders of Allowed Claims in this Class will be paid 15% of their Claims in Cash on the 1st or the 15th day of the month following the Effective Date, as determined by Reorganized Debtors, in full satisfaction of their Claims.  Any holder of a Claim in this Class may choose to voluntarily opt into Class 8, and must so indicate on its Plan ballot.  Since Class 7 is impaired, the holders of Claims in this Class are entitled to vote to accept or reject the Plan.

Total Claims in this Class are $40,446.78.  If all such Claims are Allowed, total Distributions in this Class would be $6,067.02.

**H.      Treatment of Class 8**.  Class 8, General Unsecured Claims, is impaired.  These Claims shall be treated as follows:

(i)      The holders of Allowed Claims in this Class, as well as holders of Allowed Claims in Class 7 who choose to opt into Class 8, shall be paid 19.25% of their Allowed

Claims over a period of seventy-eight (78) months with interest from the Effective Date at the rate of 1% per annum;

        (ii)     as per the FCC Second Stipulation, (A) a portion of the New FCC AP, in the monthly amount of $1,452.06, shall be applied to reduce FCC's Deficiency Claim as though such payments were being made pursuant to this Plan, which are estimated to be $2,904.12 through a projected Plan Effective Date of July 31, 2013, and (B) prior to the hearing on the confirmation of this Plan, the Debtors and FCC shall execute a promissory note in the principal amount of 19.25% of the FCC Deficiency Claim, in form and content acceptable to FCC;

        (iii)    as per the GE Stipulation, a portion of the New GE AP, in the monthly amount of $6,560.00, shall be applied to reduce GE's Deficiency Claim as though such payments were being made pursuant to this Plan, which are estimated to be $32,800.00 through a projected Plan Effective Date of July 31, 2013;

        (iv)    as per the Wells Stipulation, (A) a portion of the New Wells AP, in the monthly amount of $7,560.00, shall be applied to reduce Wells' Deficiency Claim as though such payments were being made pursuant to this Plan, which are estimated to be $37,800.00 through a projected Plan Effective Date of July 31, 2013, and (B) prior to the hearing on the confirmation of this Plan, Debtors and Wells shall execute a promissory note for this Claim, in form and content acceptable to Wells;

        (v)     amortized Cash payments of principal and interest shall be made Pro Rata quarterly, commencing in October, 2013, on either the 1st or the 15th day of the month following the Effective Date as determined by Reorganized Debtors, and continuing on the same day of the first month in each successive quarter until all Allowed Class 8 Claims are paid as set forth in subsection (i) above; and notwithstanding the foregoing, Reorganized Debtors shall make monthly Pro Rata Distributions to holders of Allowed Claims in Class 8 for any payment that exceeds $1,000.00 on a monthly basis, commencing on the 1st or the 15th day of the month following the Effective Date as determined by Reorganized Debtors, and continuing on the same day of each month thereafter until paid in full;

        (vi)    there will be no prepayment discount or prepayment penalty on any Class 8 Claims, and Reorganized Debtors will be obligated to timely make all scheduled payments; and

        (vii)   any holder of a Claim(s) in this Class may elect to voluntary reduce to its Claim(s) to $3,000.00 in the aggregate and opt into Class 7, by so indicating on its Plan ballot.

Since Class 8 is impaired, the holders of Allowed Claims in this Class are entitled to vote to accept or reject the Plan.

    Total Claims in this Class are $10,023,224.61. If all such Claims are Allowed, total Distributions in this Class, calculated on a monthly basis, would be $25,559.76.

**I.     Treatment of Class 9**.  Class 9, Interests in AJ Concrete, is impaired.  Holders of these Interests shall receive nothing under the Plan, and on the Effective Date, all such Interests will be cancelled and extinguished.  This Class is impaired but the holders of Interests in this Class are not entitled to vote to accept or reject the Plan since they are deemed to reject the Plan pursuant to § 1126(g) of the Bankruptcy Code.

**J.     Treatment of Class 10**.  Class 10, Interests in Central Concrete, is impaired.  Holders of these Interests shall receive nothing under the Plan, and on the Effective Date, all such Interests will be cancelled and extinguished.  This Class is impaired but the holders of Interests in this Class are not entitled to vote to accept or reject the Plan since they are deemed to reject the Plan pursuant to § 1126(g) of the Bankruptcy Code.

**K.     Treatment of Class 11.**  Class 11, Interests in SW Concrete, is impaired.  Holders of these Interests shall receive nothing under the Plan, and on the Effective Date, all such Interests will be cancelled and extinguished.  This Class is impaired but the holders of Interests in this Class are not entitled to vote to accept or reject the Plan since they are deemed to reject the Plan pursuant to § 1126(g) of the Bankruptcy Code.

## VI.     MEANS OF IMPLEMENTATION OF PLAN

**A.     Continued Corporate Existence and Vesting of Assets in Reorganized Debtors.**  Except as may be otherwise provided in the Plan, (i) each Debtor will, as a Reorganized Debtor, continue to exist after the Effective Date as a separate legal entity, with all of the powers of such a legal entity under applicable law and without prejudice to any right to alter or terminate such existence (whether by merger, conversion, dissolution or otherwise) under applicable state law; and (ii) on the Effective Date, all property of the estate of a Debtor will vest in such Reorganized Debtor free and clear of all Claims, Liens, Interests and other interests. On and after the Effective Date, each Reorganized Debtor may operate its business and may use, acquire and dispose of property and compromise or settle any claims without supervision or approval by the Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan or the Confirmation Order.  Without limiting the foregoing, each Reorganized Debtor may pay the charges that it incurs on or after the Confirmation Date for appropriate professionals' fees, disbursements, expenses or related support services (including fees relating to the preparation of professional fee applications) without application to, or the approval of, the Court.

**B.     Cancellation of Existing Interests**.  On the Effective Date, all of the existing and outstanding Interests of Debtors shall be extinguished and cancelled.

**C.     Issuance of New Equity**.  On the Effective Date, Anderson NewCo, pursuant to the terms and conditions set forth in the Subscription Agreements attached to the Plan as **Exhibit F**, shall subscribe for and be issued new shares of Post-Confirmation Common Stock in each Reorganized Debtor in exchange for consideration of $50,000.00.  This amount shall be divided among Reorganized Debtors as follows: 10% to Reorganized Central Concrete 66% to Reorganized SW Concrete; and 24% to Reorganized AJ Concrete.  The Certificate of Incorporation and Bylaws (if applicable) of each Reorganized Debtor shall be amended (i) to

provide for the inclusion in the Articles of Incorporation of a provision prohibiting the issuance of nonvoting equity securities, and (ii) as necessary to satisfy the provisions of the Plan, substantially in the form and substance of the Amended Articles of Incorporation attached to the Plan as **Exhibit G**. Such Amended Articles of Incorporation shall govern each Reorganized Debtor after the Effective Date. Any and all existing shareholder agreements shall be deemed terminated and cancelled as of the Effective Date. Any and all existing shareholder agreements shall be deemed terminated and cancelled as of the Effective Date. Exhibit F and Exhibit G will be filed as part of the Plan Supplement.

      **D.    Management**. From and after the Confirmation Date and until the Effective Date, DeGrood and Moll, the senior executive officers of Debtors that served prior to the Confirmation Date, shall continue to serve as such on behalf of Reorganized Debtors. After confirmation of the Plan, DeGrood and Moll will serve as Reorganized Debtors' officers in the same capacity. Following the Effective Date, the combined salaries of DeGrood and Moll shall not exceed $350,000.00 in total per calendar year exclusive of benefit plans applicable generally to Debtors' employees, and such aggregate salaries shall not be increased until Wells and FCC are paid in full pursuant to the Plan. Further, following the Effective Date, without the prior written consent of Wells, (i) Reorganized Debtors shall not create any subsidiaries, (ii) Reorganized Debtors shall not enter materially different line of business; and (iii) there shall be no change in the ownership of Reorganized Debtors (other than by bequest), following Anderson NewCo's purchase of the equity in Reorganized Debtors; and (iv) there shall be no change in senior management of any Reorganized Debtor, which shall mean Moll and DeGrood. With respect to subsections (iii) and (iv), Wells' and FCC's consent shall not be unreasonably withheld.

      After confirmation of the Plan, the following persons will serve on Reorganized Debtors' respective Boards of Directors until the next election pursuant to their respective Bylaws:

| Director | Interest | Compensation |
|---|---|---|
| Jeff Moll | None | None |
| Peter DeGrood | None | None |
| Tom Anderson | None | None |

      **E.    Source of Plan Distributions.** The funds necessary for Reorganized Debtors to make Distributions shall be obtained from the operations of Debtors and Reorganized Debtors.

      **F.    Litigation and Adversary Proceedings**. Reorganized Debtors shall have the right to commence litigation adversary proceedings to enforce any claim or interest belonging to Reorganized Debtors. Any recoveries therefrom, after payment of legal fees and expenses associated with such actions, shall be added to Reorganized Debtors' Capital Reserve. Any Reorganized Debtors is authorized to employ counsel to represent it in litigation or any cause of action or claims held by any Reorganized Debtor.

      **G.    Post-Confirmation Financing**. To the extent necessary to provide operating funds, any one or more of Reorganized Debtors, on or after the Effective Date, may obtain financing from TCI Business Capital, Inc., or such other third-party lender approved by Wells and GE in their reasonable discretion. In connection with such financing, the Liens of Wells and GE in

the Post-Confirmation Cash Collateral may be primed by a lien in favor of such third-party lender up to an amount not to exceed $500,000.00.

**H.     Capital Reserve.**  Reorganized Debtors may establish a fund for capital expenses, whether or not in a segregated account, to the extent Excess Cash is available, and except to the extent Reorganized Debtors elect to make prepayments to any Class of Claims which they may do in their sole discretion.  Excess Cash is Cash not used to make Distributions required by the Plan or for the ordinary operations of Reorganized Debtors' business.  The line items labeled "Large Repairs" and "Equipment Replacement" in **Exhibit 8**, the Projections, constitute the capital reserve.

**I.     FCC, GE and Wells Stipulations.**   On the Effective Date, or as soon as reasonably practicable thereafter, Reorganized Debtors shall take such steps as may be necessary to fully implement the terms of the FCC Second Stipulation, the GE Stipulation and the Wells Stipulation.  Without limiting the foregoing, Reorganized Debtors shall execute a confession of judgment for replevin permitting GE to immediately take possession of the GE Equipment Collateral and other tangible collateral, if any, upon the occurrence of an uncured default by Reorganized Debtors under the terms of the GE Stipulation.

**J.     Intercompany Rental Agreements.**   In order to preserve the most favorable federal income tax treatment for Debtors, any Intercompany Claims arising out of the Intercompany Rental Agreements shall be preserved and not substantially consolidated pursuant to this Plan.   In the event Debtors decide to assume the Intercompany Rental Agreements, the agreements shall be modified, among other things, to provide for monthly rental payments with respect to (i) Reorganized AJ Concrete, in an amount equal to the portion of Reorganized Debtors' monthly payments on the FCC Secured Claim, GE Secured Claim and the Wells Secured Claim applicable to the AJ Concrete Leased Equipment; and (ii)  Reorganized SW Concrete, in an amount equal to the portion of Reorganized Debtors' monthly payments on the Ally Secured Claim, the APCC Secured Claim, FCC Secured Claim, GE Secured Claim, the Wells Secured Claim, the FCC New Lease Documents and the Wells New Lease Documents applicable to the SW Concrete Leased Equipment.  If Debtors decide to assume the Intercompany Rental Agreements, a copy of the agreements as amended will be filed with the Plan Supplement as **Exhibit H**.

**K.     Enforcement.**   Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and the Bankruptcy Rules), the laws applicable to contracts will govern the construction and implementation of this Plan and any agreements, documents and instruments executed in connection with this Plan.

## VII.     EXECUTORY CONTRACTS AND LEASES.

**A.     Rejection and Acceptance.**  Upon the Effective Date, all executory contracts and unexpired leases which were entered into prior to the Petition Date which were not assumed prior to the Confirmation Date will be deemed rejected, except those described on **Exhibit E** to the Plan and subparagraph D below which will be assumed.  Exhibit E shall contain the proposed cure amount, if any, for any executory contract or unexpired leases so assumed.  The listing of a document on Exhibit E shall not constitute an admission by Debtors that such document is an

executory contract or an unexpired lease or that Debtors have any liability thereunder. Holders of Claims arising as a result of rejection under the Plan will have until thirty (30) days from the Confirmation Date within which to file proofs of claim for such rejected Claims, or will otherwise be barred. Rejection shall be deemed to have occurred on the earlier of: (i) the date the property was returned to the holder thereof or abandoned, or (ii) the Confirmation Date.

**B.    FCC New Lease Documents**. Prior to the hearing on the confirmation of this Plan and  in accordance with the FCC Second Stipulation, Debtors will enter into the FCC New Lease Documents, to be effective on the Effective Date, with the payment and Lien rights summarized below as follows:

(i)     Reorganized Debtors shall pay FCC monthly lease payments of $27,232.50 for a period of seventy-eight (78) months from the Effective Date (subject to the application of the New FCC AP as described below), with the first monthly payment commencing on the 15th day of the month following the Effective Date and continuing on the same day of each month thereafter until the end of the payment period;

(ii)     a portion of the New FCC AP, in the monthly amount of $27,232.50, shall be applied to the payments due under the FCC New Lease Documents as described above, as though such payments were being made pursuant to this Plan, which are estimated to be $54,465.00 through a projected Effective Date of July 31, 2013;

(iii)    FCC shall retain its Lien on the FCC Leased Equipment to secure Reorganized Debtors' obligations under the FCC New Lease Documents, and Reorganized Debtors' obligations thereunder shall also be secured by the FCC Equipment Collateral; and

(iv)    Reorganized Debtors shall have the option to purchase the FCC Leased Equipment at the end of the term for the combined purchase price of $1.00, provided that Reorganized Debtors are not in default as described in the FCC Second Stipulation.

**C.    Wells New Lease Documents**. Prior to the hearing on the confirmation of this Plan and  in accordance with the Wells Stipulation, Debtors will enter into the Wells New Lease Documents, to be effective on the Effective Date, with the payment and Lien rights summarized below as follows:

(i)     Reorganized Debtors shall pay Wells monthly lease payments of $23,272.00 for a period of seventy-eight (78) months from the Effective Date (subject to the application of the New Wells AP as described below), with the first monthly payment commencing on the 15th day of the month following the Effective Date and continuing on the same day of each month thereafter until the end of the payment period;

(ii)     a portion of the New Wells AP, in the monthly amount of $23,272.00, shall be applied to the payments due under the Wells New Lease Documents as described above, as though such payments were being made pursuant to this Plan, which are estimated to be $116,360.00 through a projected Effective Date of July 31, 2013;

(iii)    Wells shall retain its Lien on the Wells Leased Equipment to secure Reorganized Debtors' obligations under the Wells New Lease Documents, and Reorganized Debtors' obligations thereunder shall also be secured by the Wells Equipment Collateral; and

(iv)    Reorganized Debtors shall have the option to purchase the Wells Leased Equipment at the end of the term for the combined purchase price of $1.00, provided that Reorganized Debtors are not in default as described in the Wells Stipulation.

**D.    Compensation and Benefit Programs.**  Except as otherwise expressly provided in the Plan, all employment and severance policies and all compensation and benefit plan policies and programs of any one or more of the Debtors applicable to their respective current employees and retirees, including, without limitation, any and all savings plans, retirement plans, health care plans, disability plans, severance benefit plans, incentive plans and life, accidental, death and dismemberment insurance plans, are treated as executory contracts under the Plan and on the Effective Date will be assumed and assigned to the applicable Reorganized Debtor pursuant to the provisions of §§ 365 and 1123 of the Bankruptcy Code.

## VIII.   ALLOWANCE OF CLAIMS AND DISTRIBUTIONS

**A.    Allowance of Claims.**

**1.    Disputed Claims.**    Objections to Claims shall be made only by Reorganized Debtors, as applicable.  Reorganized Debtors may, at any time up to the six (6) month anniversary of the Effective Date, file objections to any Claim that in their opinion should be rejected in whole or in part.  The period within which to file such objections may be extended with Court approval.  The objection procedure will apply, without limitation, to Claims arising from the rejection of executory contracts and unexpired leases.  Upon the filing of such an objection, such Claim will be considered a Disputed Claim.

**2.    Reserve for Disputed Claims**. With each Distribution, Reorganized Debtors shall make an adequate reserve for all Claims that are still Disputed Claims.  The reserve amounts shall equal the amounts that would otherwise be paid on such Claims if they were Allowed in full. **IF YOU BELIEVE THAT A RESERVE EQUAL TO THE FACE AMOUNT OF YOUR CLAIM IS INSUFFICIENT, YOU MUST HAVE THE UNLIQUIDATED PORTION OF YOUR CLAIM ESTIMATED BY THE COURT.**

**3.    Allowance of Disputed Claims**.  Upon the allowance of a Disputed Claim, by either settlement or by Final Order, Reorganized Debtors, as applicable, shall promptly distribute from the amounts reserved in the above paragraph to the holder of such Allowed Claim any Cash distributions to which such holder would have been entitled had the Allowed Claim been an Allowed Claim as of the Effective Date of the Plan, without interest.  No holder of a Disputed Claim shall be entitled to recover any Distributions made to other holders of Allowed Claims regardless of any delay in obtaining an order allowing or estimating a Disputed Claim or unliquidated Claim.

4.     **Estimation of Disputed Claims**.  Any Disputed Claim may be estimated by the Court at any time, regardless of whether such Claim has been Allowed by the Court or another court, and regardless of whether any judgment or order with respect to such Claim is on appeal, for purposes of voting on the Plan.

B.     **Distributions**.  On the Effective Date, Reorganized Debtors will pay the existing Allowed Administrative Claims (other than Operating Administrative Claims) and commence installment payments on the CDR Secured Claim.  On either the 1st or the 15th day of the month following the Effective Date, as determined by Reorganized Debtors, Reorganized Debtors will pay the Allowed Administrative Convenience Claims in Class 7.  All Quarterly UST Fees shall be made when due, which payment obligation shall continue until Reorganized Debtors' chapter 11 cases are closed.  Reorganized Debtors shall also comply with all reporting requirements of the Office of the U.S. Trustee.

On either the 1st or 15th day of the month following the Effective Date, Reorganized Debtors shall commence monthly (i) Distributions in the amounts specified in Article V to holders of Allowed Claims in Classes 1-5; and (ii) Pro Rata Distributions to holders of Allowed Claims in Class 8 to the extent that any payment exceeds $1,000.00 on a monthly basis. Commencing in October, 2013, Reorganized Debtors shall also make quarterly Pro Rata Distributions to holders of Allowed Claims in Class 8 for any payment that equals or is less than $1,400.00 on a monthly basis.

Distributions shall be made by Reorganized Debtors at the addresses set forth in the following documents: (i) the proof of claim filed by a holder of an allowed Claim (or at the last known addresses of such holder if no proof of Claim is filed); (ii) a written notice of address change delivered to Reorganized Debtors after the date of any related proof of claim; or (iii) at the addresses reflected in Debtors' Bankruptcy Schedules if no proof of Claim has been filed and Debtors and/or Reorganized Debtors have not received a written notice of change of address. Reorganized Debtor may require any holder of an Allowed Claim entitled to a Distribution to furnish an Employee Identification Number or Federal Tax Identification Number as assigned by the Internal Revenue Service, and Reorganized Debtors may condition any Distribution to such Claim holder upon receipt of such identification number.

Any Distribution payable under this Plan to a holder of an Allowed Claim will be sent by first class United States Mail, postage prepaid, to the address of the holder of the Allowed Claim. If any such money or property is returned to or by the United States Postal Service undelivered and is not claimed by the holder of the Allowed Claim within ninety (90) days from the date the Distribution was made, it will become Cash available for distribution free and clear of any Claim by such holder and Reorganized Debtors' obligation to make that Distribution will be deemed satisfied in full.  Further, if any check mailed to a holder of an Allowed Claim is not cashed, deposited or otherwise negotiated within ninety (90) days of its mailing, the check will be void, the funds on deposit to cover that check will become Cash available for distribution free and clear of any Claim of such holder, and Reorganized Debtors' obligation to make the Distribution represented by that check will be deemed satisfied in full.  No further distributions shall be made or reserves held on such Allowed Claim unless and until Reorganized Debtors are notified of a current address.

## IX.    FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

**A.    Introduction.** The following discussion summarizes certain expected federal income tax consequences of the implementation of the Plan. No opinion of counsel has been obtained and no ruling has been requested or obtained from the Internal Revenue Service with respect to any of the tax aspects of the Plan, and the discussion set forth herein is not binding upon the Internal Revenue Service. CREDITORS AND HOLDERS INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE CONSEQUENCES TO THEM UNDER FEDERAL AND APPLICABLE STATE AND LOCAL TAX LAWS, OF THE CONFIRMATION AND CONSUMMATION OF THE PLAN.

**B.    Tax Consequences to Creditors.**    Creditors may be required to recognize income or may be entitled to a deduction as the result of the implementation of the Plan. The exact tax treatment will depend on each creditor's method of accounting and the nature of each Claim in the hands of the creditor.

Generally, a creditor will recognize gain or loss equal to the difference between the amount of Cash received and the creditor's tax basis in the Claim or the Interest held. Such gain or loss may be a capital gain or loss depending upon the creditor's particular tax situation and the nature of the creditor's Claim. Gain recognized by a creditor with respect to a Claim for which a bad debt deduction has been claimed generally will be treated as ordinary income to the extent of any such prior deduction. Gain or loss on a form of security, e.g. warrants, will generally be a capital gain or loss depending on the holder's basis.  The gain or loss will be short term or long term depending on the holder's holding period.

Notwithstanding anything to the contrary above or in this Disclosure Statement, Debtors cannot opine regarding the tax consequence to any particular creditor or interest holder, and each creditor and interest holder should not rely on this summary in determining how to vote on the Plan.

**C.    Tax Consequences to Debtors.**    Debtors do not believe they will incur "discharge of indebtedness" income.  However, their net operating loss carry-forwards may be reduced as a result. Further, because the reorganization of its capital structure results in a "change of control," the ability to carry forward its operating losses for tax purposes may be restricted.

Central Concrete is a subchapter S corporation.  As an S corporation, Central Concrete passes through to its shareholders its taxable income and loss, and each shareholder reports his share of Central Concrete's income, gain, loss deduction and credit on his own federal income tax return; provided, however, that the losses passed through to a shareholder are only useable by that shareholder to the extent of the shareholder's tax basis in his stock and debt investments in Central Concrete. Central Concrete pays no federal income tax on its earnings.

The consequence of Anderson NewCo purchasing the Interests in Central will be the termination of Central Concrete's subchapter S status for tax purposes. From and after the termination of Central Concrete's subchapter S status, Reorganized Central Concrete will be subject to entity-level tax on all of their income and gains at corporate income tax rates.

**D.     Reservation of Rights.**  This tax section is subject to change based on subsequent changes to other provisions of the Plan.  Debtors and their advisors reserve the right to further modify, revise or supplement this Article and the other tax related sections of the Plan up to ten days prior to the date by which objections to Confirmation of the Plan must be filed and served.

## X.     SECURITIES LAW CONSEQUENCES OF THE PLAN

The planned issuance of securities in connection with the Plan raises legal issues under the Bankruptcy Code and securities laws.  Since the Post-Confirmation Common Stock is not being issued in exchange for a Claim or Interest (or principally in such exchange and partly for Cash or property) concerning Debtors and their estates, such issuance is not exempt under §1145(a) of the Bankruptcy Code. Rather, the Post-Confirmation Common Stock will be issued pursuant to another exemption under section 5 of the Securities Act of 1933 and exemptions under applicable state securities law.

**ANY RECIPIENT OF PLAN SECURITIES MUST CONSULT WITH ITS OWN ADVISORS FOR THE FEDERAL, STATE OR LOCAL SECURITIES CONSEQUENCES TO IT UNDER THE PLAN.  NEITHER DEBTOR NOR THEIR PROFESSIONALS ARE PURPORTING IN ANY MANNER TO GIVE SECURITIES LAW RELATED ADVICE TO ANY RECIPIENT OF ANY SECURITIES ISSUED OR RETAINED PURSUANT TO THE PLAN.**

**EACH RECIPIENT OF PLAN SECURITIES SHOULD SATISFY ITSELF THROUGH CONSULTATION WITH ITS OWN LEGAL ADVISORS AS TO WHETHER RESALES OR OTHER TRANSACTIONS IN PLAN SECURITIES ARE LAWFUL UNDER THE FEDERAL AND STATE SECURITIES LAWS.  NEITHER DEBTORS NOR CURRENT MANAGEMENT HAS RECEIVED ADVICE OR APPROVALS FROM THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION WITH RESPECT TO ANY MATTER DISCUSSED HEREIN.   THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE SECURITIES AND EXCHANGE COMMISSION, ANY STATE SECURITIES COMMISSION NOR HAS THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.**

## XI.     AVOIDANCE ACTIONS AND OTHER LITIGATION

**A.     Claims Under 11 U.S.C. § 547.**  In the ninety (90) days prior to the Petition Date, Debtors generally paid their debts in the ordinary course of business.  As a result, Debtors do not anticipate pursuing any preference claims under 11 U.S.C. § 547.  In addition, the Liens in prepetition Cash Collateral held by Wells and GE are likely avoidable to the extent that the value of the accounts receivable and Cash increased from January 11, 2012, to April 10, 2012. However, pursuant to the GE Stipulation and the Wells Stipulation, Debtors released their claims against GE and Wells.

**B.     Claims Under 11 U.S.C. §§ 544 and 548**.  Debtors have conducted a preliminary investigation of the bases for potential claims under 11 U.S.C. §§ 544 and 548.  Based on the

preliminary investigation, Debtors do not believe that they hold any claims under §§ 544 and 548. However, Debtors reserve the right to further investigate, and, to the extent a basis for such a claim becomes known, the Plan preserves the rights of Reorganized Debtors to commence such claims.

**REGARDLESS OF DEBTORS' ANALYSIS, ANY OF THE RECIPIENTS OF TRANSFERS LISTED ON DEBTORS' STATEMENTS OF FINANCIAL AFFAIRS AND ANY OTHER PARTIES WHO RECEIVED PAYMENTS DIRECTLY OR INDIRECTLY FROM DEBTORS MAY BE SUBJECT TO AVOIDANCE LITIGATION (UNLESS DEBTORS HAVE RELEASED ANY OF ITS CLAIMS UNDER CHAPTER 5 OF THE BANKRUPTCY CODE PURSUANT TO A COURT APPROVED SETTLEMENT).**

## XII.   LIQUIDATION ANALYSIS

**A.     Introduction.**   To confirm the Plan, the Court must determine (with certain exceptions) that the Plan provides to each member of each impaired class of Allowed Claims a recovery at least equal to the distribution that such member would receive if each Debtor were liquidated under chapter 7 of the Bankruptcy Code. As described below, Debtors have concluded that under the Plan each holder of a Claim will receive or retain property of a value that is equal to or greater than the amount that such holder would receive or retain if the estates of Debtors were liquidated under chapter 7.

**B.     Liquidation Analysis.** As previously stated, Exhibit 5 sets forth Debtors' liquidation analysis. The footnotes are an essential part of the Liquidation Analysis; please review the analysis in conjunction these footnotes.

## XIII.   PLAN FEASIBILITY AND RISK FACTORS

**A.     Plan Feasibility.**   The Court must find that the Plan is feasible. The feasibility requirement also contemplates that Reorganized Debtors establish the wherewithal to make the required Plan Distributions to creditors. The sources of funds for Reorganized Debtors' Distributions under the Plan will come from (i) Cash and Accounts accumulated or acquired prior to the Effective Date; and (ii) Reorganized Debtors' operations following the Effective Date.

The following table summarizes Distributions and other payments required by the Plan on the Effective Date (estimated to occur on or about July 31, 2013) or in the following month:

| Class | Creditor | Payment Date | Estimated Payments |
|-------|----------|--------------|--------------------|
| N/A | OSG Administrative Claim | Effective Date, or when Allowed | $81,000.00 |
| N/A | Berenbaum Weinshienk PC Administrative Claim | Effective Date, or when Allowed | 28,500.00 |
| N/A | UST Postpetition Quarterly Fees | Effective Date | 17,000.00 |

| Class | Creditor | Payment Date | Estimated Payments |
|---|---|---|---|
| 1 | FCC Secured Claim | 15th day of the month following the Effective Date | 12,141.43 |
| 2 | GE Secured Claim | 15th day of the month following the Effective Date | 43,440.00 |
| 3 | Wells Secured Claim | 15th day of the month following the Effective Date | 38,785.00 |
| 4 | APCC Secured Claim | 1st or 15th day of the month following the Effective Date | 8,131.57 |
| 5 | Ally Secured Claims | 1st or 15th day of the month following the Effective Date | 2,500.00 |
| 6 | CDR Secured Claim | Effective Date | 2,520.36 |
| 7 | Administrative Convenience Claims | 1st or 15th day of the month following the Effective Date, or when Allowed | 6,067.02 |
| 8 | General Unsecured Claims payable monthly (monthly payments exceed $1,000.00)[6] | 1st or 15th day of the month following the Effective Date, or when Allowed | 23,964.37 |
| N/A | Initial FCC Lease Payment | 15th day of the month following the Effective Date | 27,232.50 |
| N/A | Initial Wells Lease Payment | 15th day of the month following the Effective Date | 23,273.00 |
| | **Maximum Total Funds (other than funds for operations) required during Period of July 31 to August 31, 2013** | | **$314,555.25** |

Debtors anticipate that they will have the Cash necessary to make (or reserve, as necessary) the above initial Distributions from Cash accumulated prior to the Effective Date – See **Exhibit 8,** Debtors' Projections (hereinafter defined), for more detail. In addition, attached hereto as **Exhibit 6** is the cash collateral report for the period ending April 26, 2013 [to be updated with most current report after approval of Disclosure Statement], which identifies the face value of Debtors' accounts and the Cash in Debtors' bank accounts. As shown on the report, Debtors have sufficient Cash and Accounts to pay all Allowed Claims or other payments identified above.

With regard to subsequent periodic payments on Classes 1-6 and 8, as well as the FCC and Wells lease payments, Debtors anticipate having sufficient Cash to make the required monthly and quarterly Distributions from operations following the Effective Date. As previously described, attached hereto as Exhibit 7 are the amounts of the fully amortized payments provided for in the Plan. Further, attached hereto as Exhibit 8 is Reorganized Debtors' operating projections for eighty-four months (seven (7) years) commencing January 1, 2013, and ending December 31, 2019 (the "Projections"). Since the Effective Date is projected to be July 31,

---

[6] There are six (6) Class 8 Claims whose payments would exceed $1,000.00, although not all of these may be Allowed at the claimed amount: CoBiz, FCC, GE, Wells, Western Walsch and AJ Concrete Services.

2013, this leaves seventy eight (78) months of Plan payments, with the projected final Plan payments due in January 2020.

The Projections consist of the following:

- Monthly detailed projections for 2013 for AJ Concrete and SW Concrete.

- Yearly detailed projections for AJ Concrete and SW Concrete, 2013-2019.[7]

- Forecast assumptions.

- Forecast of Cash Flows, 2013-2019.

Since Central Concrete does not generate revenue, no projections are included for this entity.

The Projections are based on Debtors' historical performance, and in particular their actual performance in 2012 and for the first three (3) months in 2103. With respect to pumping income, Debtors have been very conservative in their estimates. Debtors' combined operating income (also sometimes called sales or gross revenue) for 2012 was $10,952,112.00, and Debtors estimate their operating income for 2103 as $10,315,000.00, which is slightly below their 2012 income. As noted in Article III.B above, Debtors have exceeded their projected operating income for the first three (3) months of 2103 by 66%, with combined actual operating income of $3,054,273.00. Debtors have projected their combined operating income for 2019 as $12,550,000.00, which is an increase of 121.67% from 2013, with small, incremental increases each year between.

Thus, while the Projections are inherently uncertain, Debtors are cautiously optimistic that they can meet and exceed their Projections.

The professional fees associated with the bankruptcy case will cease in large part post-confirmation; UST Fees will continue on a quarterly basis until the Plan is substantively consummated, which the Debtors anticipate will be on or before September 30, 2013.

**B.    Risk Factors.**    The risk factors associated with the Plan are described below:

Debtors currently face direct competition in the concrete pumping services market. Some of these competitors have greater financial, marketing and operating resources. Further, there can be no assurance that new competitors will not begin to offer competing services. Although Debtors believe that they can compete effectively in a highly competitive environment, there can be no assurance that they will be successful in pursuing its business plan or achieving profitable operation.

---

[7] Even though the last Plan payments are due January 2020, Debtors have not included a projection for this month. First, all Plan payments are projected to be completed by the December 2019, except for approximately $36,000 in Class 8 payments (other than GE, FCC and Wells Class 8 payments, which will be completed by November 2019). The Forecast of Cash Flows demonstrates that there will be sufficient Cash to make the final Class 8 payment.

The United States is still recovering from a very severe recession.  There is no guarantee that the economic recovery will continue.  If the recovery slows down or the economy goes into another recession, this will most likely impact Debtors' business, since construction generally decreases in tandem with such economic events.

Debtors believe that its success depends on the services of its present senior management.  If Reorganized Debtors lose the services of its key executives, then their business could be materially adversely affected.  There can be no assurance that, if replacement of these key executives became necessary, Debtors would be able to employ suitable replacements or that a replacement could be hired on terms that are acceptable to Debtors.

Debtors' business and the 8-year projections rely on the use of all the concrete pumping trucks in Central's fleet.  The loss of a sizeable number of concrete pumping trucks or concrete pumping trucks for which Debtors do not have identical units may affect their ability to attract the jobs necessary to achieve the revenue forecasted in the projections.  Certain risks exist for Debtors' ability to keep all of Central's concrete pumping trucks operational for the life of the Plan:

The concrete pumping trucks in Central's fleet range in vintage from 1998 through 2007.  Central has eleven (11) concrete pumping trucks of the 1998 – 2000 vintage.  While Debtors believe the useful economic life of concrete pumping trucks is twenty (20) to twenty five (25) or more years, it is possible that one or more of the concrete pumping trucks becomes inoperable and economically un-repairable.  However, as Debtors perform under their Plan, they will create equity in Central's concrete pumping trucks.  In addition, as the liquidation analysis shows, Debtors have certain unencumbered property and two concrete pumping trucks in which Debtors estimate they have approximately $240,000 in equity.  Finally, as the result of market forces caused the liquidation and reorganization of the largest and second largest concrete pumping operations in the country, concrete pumping trucks dropped drastically in value from 2009 through 2011.  Debtors believe that concrete pumping trucks may appreciate in value in the future.  Thus, it may become possible for Debtors to borrow against the equity in equipment or other assets to finance the acquisition or lease of replacement equipment.  Moreover, Debtors have budgeted for "large repairs" and "equipment replacement" in the projections, which are essentially a reserve for major repairs or replacement of equipment.

The effect, if any, that Debtors' chapter 11 cases may have upon any continued operations of Reorganized Debtors cannot be accurately predicted or quantified.  Although Debtors' reorganization and emergence from bankruptcy will eliminate some uncertainty about their future operations, some entities, at least initially, may be uncomfortable doing business with companies that recently emerged from chapter 11 process.  The chapter 11 cases could have harmed Debtors' relationships with its clients and employees, resulting in a materially adverse impact on Reorganized Debtors' operations.  However, to date, Debtors have been able to successfully manage issues with its clients and employees during the chapter 11 cases.

The fundamental premise of the Plan is the successful implementation of Debtors' business plan as reflected in the Projections. The Projections are inherently uncertain and are dependent upon the successful implementation of the business plan and the reliability of the other assumptions contained therein. The Projections reflect numerous assumptions, including

confirmation and consummation of the Plan in accordance with its terms, the anticipated future performance of Reorganized Debtors, industry performance, general business and economic conditions and other matters, most of which are beyond the control of Reorganized Debtors and some of which may not materialize.  In addition, unanticipated events and circumstances occurring subsequent to the date of this Disclosure Statement, including unanticipated changes in applicable regulations or accounting procedures, may affect the actual financial condition, results of operations and Cash flows of Reorganized Debtors in the future.

## XIV.   SOLICITATION OF ACCEPTANCE OF PLAN

Debtors hereby solicit acceptance of its Plan and urges their creditors to vote to accept the Plan.

Dated: May 7, 2013.

SOUTHWEST CONCRETE PUMPING, INC.     CENTRAL CONCRETE PUMPING, INC.

By: /s/ Jeffrey C. Moll                                    By: /s/ Jeffrey C. Moll
   Jeffrey C. Moll                                          Jeffrey C. Moll
   President                                                President

                                                    AJ CONCRETE PUMPING II, INC.

                                              By: /s/ Jeffrey C. Moll
                                                Jeffrey C. Moll
                                                President

ONSAGER, STAELIN & GUYERSON, LLC

By: /s/ Andrew D. Johnson
   Christian C. Onsager, #6889
   Michael J. Guyerson, #11279
   Andrew. D. Johnson, #36879
1873 S. Bellaire St., Suite 1401
Denver, Colorado 80222
Telephone: (303) 512-1123
Fax: (303) 512-1129
consager@osglaw.com
mguyerson@osglaw.com
ajohnson@osglaw.com

Counsel for Debtors

## LIST OF EXHIBITS

Exhibit 1 – Plan

Exhibit 2 – Flow Chart of Debtors' Operational Structure

Exhibit 3 – Claims

Exhibit 4 – Financials

Exhibit 5 – Liquidation Analysis

Exhibit 6 – Cash Collateral Report

Exhibit 7 – Amortized Plan Distributions

Exhibit 8 – Projections

## EXHIBIT 1
## Plan of Reorganization

[To be appended upon approval of the Disclosure Statement]

## **EXHIBIT 2**
## **Flow Chart of Debtors' Operational Structure**

See attached.

Central Concrete Pumping, Inc
Southwest Concrete Pumping Inc
AJ Concrete Pumping II Inc



**<u>EXHIBIT 3</u>**
**<u>Claims</u>**

See attached.

DISCLOSURE STATEMENT
EXHIBIT 3
CLAIMS

**ALL CLAIMS SUMMARY:**

| Name of Debtor | Secured Claims Classes 1-6 as Applicable | Class 7 Administrative Convenience Claims | Class 8 General Unsecured Claims | Class 8 Claims Filed Against More than One Debtor (Duplicate Claims) | Non-Duplicate Class 8 Claims |
|---|---|---|---|---|---|
| AJ Concrete | $ 204,051.00 | $ 11,630.97 | $ 6,262,162.35 | $ 6,159,035.03 | $ 103,127.32 |
| Central Concrete | $ 6,117,422.30 | $ 585.00 | $ 9,591,046.26 | $ 8,104,868.55 | $ 1,486,177.71 |
| SW Concrete | $ 1,025,533.20 | $ 28,230.81 | $ 8,991,908.03 | $ 8,662,857.00 | $ 329,051.03 |
| Consolidated - All Debtors | $ 6,188,241.50 | $ 40,446.78 | $ 10,023,224.61 | | $ 1,918,356.06 |

**SECURED CLAIMS SUMMARY:**

| Name of Debtor | Class 1 FCC Secured Claim | Class 2 GE Secured Claim | Class 3 Wells Secured Claim | Class 4 Ally Secured Claims (Aggregate) | Class 5 APCC Secured Claim | Class 6 CDR Secured Claims |
|---|---|---|---|---|---|---|
| AJ Concrete | $ - | $ 102,025.50 | $ 102,025.50 | $ - | $ - | $ - |
| Central Concrete | $ 782,600.00 | $ 2,800,000.00 | $ 2,500,000.00 | $ 15,025.15 | $ 19,797.15 | $ - |
| SW Concrete | $ - | $ 477,357.00 | $ 477,357.00 | $ - | $ - | $ 70,819.20 |
| Consolidated - All Debtors | $ 782,600.00 | $ 2,800,000.00 | $ 2,500,000.00 | $ 15,025.15 | $ 19,797.15 | $ 70,819.20 |

**CLASS 8, GENERAL UNSECURED CLAIMS, MULTI-DEBTOR (DUPLICATE) CLAIM PAYMENTS:**

| Name of Creditor | Mult-Debtor Class 8 General Unsecured (Duplicate) Claims | 19.25% of Claim | Monthly payment over 78 months at 1.0% |
|---|---|---|---|
| Berenbaum Weinshienk PC | $ 17,142.50 | $ 3,299.93 | $43.71 |
| Colorado Business Bank | $ 1,945,833.52 | $ 374,572.95 | $4,961.98 |
| FCC Deficiency Claim | $ 569,425.00 | $ 109,614.31 | $1,452.06 |
| GE Deficiency Claim | $ 2,572,467.53 | $ 495,200.00 | $6,559.93 |
| Wells Deficiency Claim | $ 3,000,000.00 | $ 577,500.00 | $7,650.16 |
| **Totals** | **$ 8,104,868.55** | **$ 1,560,187.20** | **$20,667.85** |

**CLASS 8, GENERAL UNSECURED CLAIMS, ALL CLAIM PAYMENTS:**

| Claims | Total | 19.25% of total | Monthly payment |
|---|---|---|---|
| Multi-Debtor Class 8 General Duplicate Claims | $ 8,104,868.55 | $ 1,560,187.20 | $20,667.85 |
| AJ Class 8 Non-Duplicate Claims | $ 103,127.32 | $ 19,852.01 | $262.98 |
| CC Class 8 Non-Duplicate Claims | $ 1,486,177.71 | $ 286,089.21 | $3,789.83 |
| SW Class 8 Non-Duplicate Claims | $ 329,051.03 | $ 63,342.32 | $839.10 |
| **Total Class 8 Monthly Payment** | **$ 10,023,224.61** | **$ 1,929,470.74** | **$25,559.76** |
| | | | |
| **All Class 8 Non-Duplicate Claims** | **$ 1,918,356.06** | **$ 369,283.5416** | **$4,891.91** |

DISCLOSURE STATEMENT
EXHIBIT 3
CLAIMS

**SUMMARY OF FCC, GE AND WELLS CLAIMS:**

| Claim/Lease Information | FCC | GE | Wells |
|---|---|---|---|
| Secured Claim | $ 782,600.00 | $2,800,000.00 | $2,500,000.00 |
| Deficiency Claim (Class 8) | $ 569,425.00 | $ 2,572,467.53 | $3,000,000.00 |
| **Total Claim Amounts** | **$1,352,025.00** | **$5,372,467.53** | **$5,500,000.00** |

DISCLOSURE STATEMENT EXHIBIT 3 CON'T
CLAIMS - AJ CONCRETE PUMPING II, INC.

| Name of Creditor | Total POC or Scheduled Amount (1) | POC No. or S | POC/Secured Amt | POC/Gen. Unsec. Amt | GE & Wells Secured Claims Classes 2 &3 (as applicable) | Class 7 Administrative Convenience Claims | Class 8 General Unsecured Claims | Claims Filed Against More than One Debtor in Class 8 (Duplicate Claims) | Non-Duplicate Class 8 Claims | Comments |
|---|---|---|---|---|---|---|---|---|---|---|
| 9 North Tire, Inc. | $ 1,077.52 | S | | $ 1,077.52 | | $ 1,077.52 | | | | |
| Apex Concrete Pumping | $ 485.68 | S | | $ 485.68 | | $ 485.68 | | | | |
| Atlanta Commercial Tire | $ 1,448.96 | S | | $ 1,448.96 | | $ 1,448.96 | | | | |
| Atlanta Gear & Axel | $ 21,725.06 | | | $ 21,725.06 | | | $ 21,725.06 | | $ 21,725.06 | POC #29 misfiled in CC case |
| Atlanta Safety Brake Service | $ 221.40 | S | | $ 221.40 | | $ 221.40 | | | | |
| Berenbaum Weinshienk PC | $ 17,142.50 | 8 | | $ 17,142.50 | | | $ 17,142.50 | $ 17,142.50 | | Also filed in CC and SW cases |
| C Moll, LLC | $ 31,429.00 | S | | $ 31,429.00 | | | $ 31,429.00 | | $ 31,429.00 | |
| Cbeyond | $ 473.97 | S | | $ 473.97 | | $ 473.97 | | | | |
| CBIZ MHM, LLC | $ 5,091.00 | S | | $ 5,091.00 | | | $ 5,091.00 | | $ 5,091.00 | |
| Cintas Kennesaw | $ 207.82 | S | | $ 207.82 | | $ 207.82 | | | | |
| Cobb County Water | $ 686.28 | S | | $ 686.28 | | $ 686.28 | | | | |
| Constructions Forms, Inc. | $ 16,463.31 | 4 | | $ 16,463.31 | | | $ 16,463.31 | | $ 16,463.31 | |
| Dilmar Oil Company | $ 1,810.17 | S | | $ 1,810.17 | | $ 1,810.17 | | | | |
| FCC Equipment Financing | $ 1,200,798.70 | 10 | $ 899,481.00 | $ 301,317.70 | | | $ 569,425.00 | $ 569,425.00 | | Also filed in CC and SW cases; see Disclosure Statement for explanation of treatment, categorization and amount |
| FCC Equipment Financing | $ 2,536,268.74 | 9 | $ 965,635.00 | $ 1,570,633.74 | | | | | | Claim based on equipment lease. Also filed in CC and SW cases; see Disclosure Statement for explanation of treatment |
| Federal Express | $ 105.56 | S | | $ 105.56 | | $ 105.56 | | | | |
| Ford Credit | $ 524.70 | S | | $ 524.70 | | $ 524.70 | | | | |
| General Electric Cap. Corp | $ 6,167,583.98 | 11 | $ 2,535,000.00 | $ 3,632,583.98 | $ 102,025.50 | | $ 2,572,467.53 | $ 2,572,467.53 | | Also filed in CC and SW cases; see Disclosure Statement for explanation of treatment, categorization and amount |
| Georgia Power | $ 39.04 | S | | $ 39.04 | | $ 39.04 | | | | |
| HSBC Business Solution | $ 122.38 | S | | $ 122.38 | | $ 122.38 | | | | |
| NAPA Atlanta | $ 39.04 | S | | $ 39.04 | | $ 39.04 | | | | |

DISCLOSURE STATEMENT EXHIBIT 3 CONT
CLAIMS - AJ CONCRETE PUMPING II, INC.

| Name of Creditor | Total POC or Scheduled Amount (1) | POC No. or S | POC/Secured Amt | POC/Gen. Unsec. Amt | GE & Wells Secured Claims Classes 2 &3 (as applicable) | Class 7 Administrative Convenience Claims | Class 8 General Unsecured Claims | Claims Filed Against More than One Debtor in Class 8 (Duplicate Claims) | Non-Duplicate Class 8 Claims | Comments |
|---|---|---|---|---|---|---|---|---|---|---|
| Nextel | $ 640.42 | S | | $ 640.42 | | $ 640.42 | | | | |
| Nextran Truck Center | $ 3,309.17 | 6 | | $ 3,309.17 | | | $ 3,309.17 | | $ 3,309.17 | |
| Pitney Bowes, Inc. | $ 101.76 | S | | $ 101.76 | | $ 101.76 | | | | |
| Praxtair Distribution | $ 490.33 | S | | $ 490.33 | | $ 490.33 | | | | |
| QT FleetMaster | $ 1,600.00 | S | | $ 1,600.00 | | $ 1,600.00 | | | | |
| SA White Oil Co | $ 13,961.56 | S | | $ 13,961.56 | | | $ 13,961.56 | | $ 13,961.56 | |
| Schwing America Inc. | $ 5,148.22 | 5 | | $ 5,148.22 | | | $ 5,148.22 | | $ 5,148.22 | |
| Shell Fleet | $ 6,000.00 | S | | $ 6,000.00 | | | $ 6,000.00 | | $ 6,000.00 | |
| Tifco | $ 201.31 | S | | $ 201.31 | | $ 201.31 | | | | |
| Tmobile | | 2 | | | | | | | | Withdrew POC |
| Verizon Wireless | $ 134.81 | S | | $ 134.81 | | $ 134.81 | | | | |
| Wells Fargo Eqpt Finance | $ 6,264,594.56 | 3 | $ 2,571,500.00 | $ 3,204,594.56 | $ 102,025.50 | | $ 3,000,000.00 | $ 3,000,000.00 | | Also filed in CC and SW cases; see Disclosure Statement for explanation of treatment, categorization and amount |
| Western Equipment Finance | | | | | | | | | | Listed Debtor as SW but filed with AJ case no. |
| Wood Ace | $ 84.97 | S | | $ 84.97 | | $ 84.97 | | | | |
| Yancey Bros Co. | $ 1,134.85 | 7 | | $ 1,134.85 | | $ 1,134.85 | | | | |
| **Totals** | **$ 16,301,146.77** | | **$ 6,971,616.00** | **$ 8,841,030.77** | **204,051.00** | **$ 11,630.97** | **$ 6,262,162.35** | **6,159,035.03** | **$ 103,127.32** | |

(1) For scheduled amounts listed, no POC was filed and the Claim not scheduled as contingent, disputed or unliquidated

DISCLOSURE STATEMENT EXHIBIT 3 CON'T
CLAIMS - CENTRAL CONCRETE PUMPING, INC.

| Name of Creditor | Total POC or Scheduled Amount (1) | POC No. or S | POC/Secured Amt | POC/Gen. Unsec. Amt. | Ally, APCC, FCC, GE & Wells Secured Classes 1-5 as applicable (2) | Class 7 Administrative Convenience Claims | Class 8 General Unsecured Claims | Class 8 Claims Filed Against More than One Debtor (Duplicate Claims) | Non-Duplicate Class 8 Claims | Comments |
|---|---|---|---|---|---|---|---|---|---|---|
| AJ Concrete Services, Inc. | $ 754,310.05 | 32 | $ 754,310.05 | | | | $ 754,310.05 | | $ 754,310.05 | Not secured by property of CC or any other Debtor |
| All Points Capital Corp. | $ 19,797.15 | 28 | $ 19,797.15 | $ 19,797.15 | | | | | | |
| Ally Financial | $ 2,461.25 | 3 | $ 2,461.25 | $ 2,461.25 | | | | | | |
| Ally Financial | $ 2,783.65 | 4 | $ 2,783.65 | $ 2,783.65 | | | | | | |
| Ally Financial | 2455.9 | 5 | $ 2,455.90 | $ 2,455.90 | | | | | | |
| Ally Financial | $ 1,867.85 | 6 | $ 1,867.85 | $ 1,867.85 | | | | | | |
| Ally Financial | $ 2,276.62 | 7 | $ 2,276.62 | $ 2,276.62 | | | | | | |
| Ally Financial | $ 3,179.88 | 8 | $ 3,179.88 | $ 3,179.88 | | | | | | |
| Atlanta Gear & Axle, Inc. | | 29 | | | | | | | | AJ POC/misfiled in CC case |
| Berenbaum Weinshienk PC | $ 17,142.50 | 18 | | $ 17,142.50 | | | $ 17,142.50 | $ 17,142.50 | | Also filed in AJ and SW cases |
| CBIZ MHM, Inc. | $ 31,240.00 | S | | | | | $ 31,240.00 | | $ 31,240.00 | |
| Colorado Business Bank | $ 1,945,833.52 | 12 | | $ 1,945,833.52 | | | $ 1,945,833.52 | $ 1,945,833.52 | | Also filed in SW case |
| Concrete Pump Repair | $ 25,427.68 | 19 | | $ 25,427.68 | | | $ 25,427.68 | | $ 25,427.68 | |
| FCC Equipment Financing | $ 1,200,798.70 | 20 | $ 899,481.00 | $ 301,317.70 | $ 782,600.00 | | $ 569,425.00 | $ 569,425.00 | | Also filed in AJ and SW cases; see Disclosure Statement for explanation of treatment, categorization and amount |
| FCC Equipment Financing | $ 2,536,268.74 | 21 | $ 965,635.00 | $ 1,570,633.74 | | | | | | Claim based on equipment lease. Also filed in AJ and SW cases; see Disclosure Statement for explanation of treatment, categorization and amount |
| FCC Equipment Financing | | 22 | | | | | | | | AJ POC duplicate/misfiled in CC case |
| FCC Equipment Financing | | 23 | | | | | | | | AJ POC duplicate/misfiled in CC case |
| FCC Equipment Financing | | 24 | | | | | | | | SW POC duplicate/misfiled in CC case |
| FCC Equipment Financing | | 25 | | | | | | | | SW POC duplicate/misfiled in CC case |
| First National Bank of Omaha | $ 11,679.94 | 13 | | $ 11,679.94 | | | $ 11,679.94 | | $ 11,679.94 | |
| First National Bank of Omaha | $ 3,099.91 | 14 | | $ 3,099.91 | | | $ 3,099.91 | | $ 3,099.91 | |
| First National Bank of Omaha | $ 2,751.60 | 15 | | $ 2,751.60 | | | $ 2,751.60 | | $ 2,751.60 | |
| First National Bank of Omaha | $ 5,623.10 | 16 | | $ 5,623.10 | | | $ 5,623.10 | | $ 5,623.10 | |
| First National Bank of Omaha | $ 6,027.24 | 17 | | $ 6,027.24 | | | $ 6,027.24 | | $ 6,027.24 | |

DISCLOSURE STATEMENT EXHIBIT 3 CONT
CLAIMS - CENTRAL CONCRETE PUMPING, INC.

| Name of Creditor | Total POC or Scheduled Amount (1) | POC No. or S | POC/Secured Amt | POC/Gen. Unsec. Amt. | Ally, APCC, FCC, GE & Wells Secured Classes 1-5 as applicable (2) | Class 7 Administrative Convenience Claims | Class 8 General Unsecured Claims | Class 8 Claims Filed Against More than One Debtor (Duplicate Claims) | Non-Duplicate Class 8 Claims | Comments |
|---|---|---|---|---|---|---|---|---|---|---|
| General Electric Cap. Corp | $ 6,167,583.98 | 27 | $ 2,535,000.00 | $ 3,632,583.98 | $ 2,800,000.00 | | $ 2,572,467.53 | $ 2,572,467.53 | | Also filed in AJ and SW cases; see Disclosure Statement for explanation of treatment, categorization and amount |
| General Electric Capital Corp. | | 30 | | | | | | | | AJ POC duplicate/misfiled in CC case |
| General Electric Capital Corp. | | 31 | | | | | | | | SW POC duplicate/misfiled in CC case |
| Internal Revenue Service | $ 585.00 | 1 | | $ 585.00 | | $ 585.00 | | | | |
| TCF Equipment Finance, Inc. | $ 55,130.19 | 9 | | $ 55,130.19 | | | $ 55,130.19 | | $ 55,130.19 | |
| Wells Fargo Eqpt Finance | $ 6,264,594.56 | 2 | $ 2,571,500.00 | $ 3,204,594.56 | $ 2,500,000.00 | | $ 3,000,000.00 | $ 3,000,000.00 | | Also filed in AJ and SW cases; see Disclosure Statement for explanation of treatment, categorization and amount |
| Western Fleet Services, Inc. | | 10 | | | | | | | | SW POC; misfiled in CC case |
| Western Wasatch Concrete Pumping | $ 590,888.00 | 26 | | $ 590,888.00 | | $ - | $ 590,888.00 | | $ 590,888.00 | |
| **Totals** | **$ 19,653,807.01** | | **$ 7,760,748.35** | **$ 11,373,318.66** | **$ 6,117,422.30** | **$ 585.00** | **$ 9,591,046.26** | **8,104,868.55** | **$ 1,486,177.71** | |

(1) For scheduled amounts listed, no POC was filed and the Claim not scheduled as contingent, disputed or unliquidated

(2) Amounts stated are prior to the application of certain Adequate Protection Payments - see Plan

DISCLOSURE STATEMENT EXHIBIT 3 (Cont.)
CLAIMS - SOUTHWEST CONCRETE PUMPING, INC.

| Name of Creditor | Total POC or Scheduled Amount (1) | POC No. or S | POC/Secured Amt | POC/Gen. Unsec. Amt. | GE, Wells & CDR Secured Claims Classes 2, 3 & 6 (as applicable) | Class 7 Administrative Convenience Claims | Class 8 General Unsecured Claims | Class 8 Claims Filed Against More than One Debtor (Duplicate Claims) | Non-Duplicate Class 8 Claims | Comments |
|---|---|---|---|---|---|---|---|---|---|---|
| A&T Trading Post | $ 1,055.18 | S | | | | $ 1,055.18 | | | | |
| Adams County Clerk | $ 3,382.02 | S | | | | $ - | $ 3,382.02 | | $ 3,382.02 | |
| American Express Bank | $ 22,984.19 | 12 | | $ 22,984.19 | | | $ 22,984.19 | | $ 22,984.19 | |
| Ameritas Life Insurance | $ 451.25 | S | | | | $ 451.25 | | | | |
| Arapahoe County Clerk | $ 1,704.01 | S | | | | $ 1,704.01 | | | | |
| AT&T | $ 834.38 | S | | | | $ 834.38 | | | | |
| Berenbaum Weinshienk PC | $ 17,142.50 | 19 | | $ 17,142.50 | | | $ 17,142.50 | $ 17,142.50 | | Also filed in AJ and CC cases |
| Buckeye Welding | $ 49.34 | S | | | | $ 49.34 | | | | |
| C Moll LLC | $ 68,571.00 | 24 | | $ 68,571.00 | | | $ 68,571.00 | | $ 68,571.00 | |
| Cbeyond | $ 565.34 | 15 | | $ 565.34 | | $ 565.34 | | | | |
| CBIZ MHM, LLC | $ 15,283.00 | S | | | | | $ 15,283.00 | | $ 15,283.00 | |
| Century Link | $ 317.00 | S | | | | $ 317.00 | | | | |
| Colorado Business Bank | $ 1,945,833.52 | 18 | | $ 1,945,833.52 | | | $ 1,945,833.52 | $ 1,945,833.52 | | Guaranty claim; also filed in CC case |
| Colorado Department of Revenue | $ 70,819.20 | 1 | $ 70,819.20 | | $ 70,819.20 | | | | | |
| Colorado Mack Sales & Svcs | $ 3,853.90 | S | | $ 3,853.90 | | | $ 3,853.90 | | $ 3,853.90 | |
| Colorado Security Alarm | $ 105.00 | S | | | | $ 105.00 | | | | |
| Constructions Forms, Inc. | $ 13,553.61 | 8 | | $ 13,553.61 | | | $ 13,553.61 | | $ 13,553.61 | |
| Douglas County Clerk | $ 2,281.72 | S | | | | $ 2,281.72 | | | | |
| DRC Companies | $ 114.90 | S | | | | $ 114.90 | | | | |
| Englewood Lock | $ 543.20 | S | | | | $ 543.20 | | | | |
| FCC Equipment Financing | $ 1,200,798.70 | 20 | $ 899,481.00 | $ 301,317.70 | | | $ 569,425.00 | $ 569,425.00 | | Also filed in AJ and SW cases; see Disclosure Statement for explanation of treatment, categorization and amount |
| FCC Equipment Financing | $ 2,536,268.74 | 21 | $ 965,635.00 | $ 1,570,633.74 | | | | | | Claim based on equipment lease. Also filed in AJ and SW cases; see Disclosure Statement for explanation of treatment, categorization and amount |
| General Electric Cap. Corp | $ 6,167,583.98 | 22 | $ 2,535,000.00 | $ 3,632,583.98 | $ 477,357.00 | | $ 3,130,455.98 | $ 3,130,455.98 | | Also filed in AJ and SW cases; see Disclosure Statement for explanation of treatment, categorization and amount |
| Home Depot | $ 443.00 | S | | | | $ 443.00 | | | | |
| Kaiser Permanente | $ 14,156.00 | S | | | | | $ 14,156.00 | | $ 14,156.00 | |
| Lawson Products | $ 532.07 | 4 | | $ 532.07 | | $ 532.07 | | | | |
| Lawson Products | $ 219.93 | 11 | | $ 219.93 | | $ 219.93 | | | | |
| Lubrication Engineers Inc. | $ 2,886.60 | 17 | | $ 2,886.60 | | $ 2,886.60 | | | | |
| Mack Sales & Services | $ 7,844.80 | S | | | | | $ 7,844.80 | | $ 7,844.80 | |
| McCoy Sales Corporation | $ 278.03 | 6 | | $ 278.03 | | $ 278.03 | | | | |
| Midwest Truck Parts | $ 4,872.27 | S | | | | | $ 4,872.27 | | $ 4,872.27 | |
| Mile High Pressure Washers | $ 1,172.06 | 13 | | $ 1,172.06 | | $ 1,172.06 | | | | |
| Mobile Mini Inc | $ 95.41 | 10 | | $ 95.41 | | $ 95.41 | | | | |
| Offen Petroleum | $ 2,342.26 | S | | | | $ 2,342.26 | | | | |
| Oxford Recycling | $ 748.00 | S | | | | $ 748.00 | | | | |
| Painters Supply | $ 350.69 | S | | | | $ 350.69 | | | | |
| Patriot Concrete Pumping | $ 8,866.25 | S | | | | | $ 8,866.25 | | $ 8,866.25 | |

**DISCLOSURE STATEMENT EXHIBIT 3 (CONT)**

**CLAIMS - SOUTHWEST CONCRETE PUMPING, INC.**

| Name of Creditor | Total POC or Scheduled Amount (1) | POC No. or S | POC/Secured Amt | POC/Gen. Unsec. Amt. | GE, Wells & CDR Secured Claims Classes 2, 3 & 6 (as applicable) | Class 7 Administrative Convenience Claims | Class 8 General Unsecured Claims | Class 8 Claims Filed Against More than One Debtor (Duplicate Claims) | Non-Duplicate Class 8 Claims | Comments |
|---|---|---|---|---|---|---|---|---|---|---|
| Phillips 66 | $ 10,550.00 | S | | | | | $ 10,550.00 | | $ 10,550.00 | |
| Poudre Valley Electric | $ 289.00 | S | | | | $ 289.00 | | | | |
| Public Service Company of Co | $ 3,889.71 | 7 | | $ 3,889.71 | | | $ 3,889.71 | | $ 3,889.71 | |
| Pure Technologies Group | $ 123.08 | S | | | | $ 123.08 | | | | |
| Rampart Network Consulting | $ 388.80 | S | | | | $ 388.80 | | | | |
| Roger Anderson | $ 25,500.00 | 16 | | $ 25,500.00 | | | $ 25,500.00 | | $ 25,500.00 | |
| Schreirer, Greg & Jane | $ 50,000.00 | 23 | | $ 50,000.00 | | | $ 50,000.00 | | $ 50,000.00 | |
| Schwing America Inc. | $ 9,168.94 | 9 | | $ 9,168.94 | | | $ 9,168.94 | | $ 9,168.94 | |
| Service Uniforms | $ 169.54 | S | | | | $ 169.54 | | | | |
| Shell | $ 1,650.00 | S | | | | $ 1,650.00 | | | | |
| Sprint | $ 2,764.00 | S | | | | $ 2,764.00 | | | | |
| Ten Peaks | $ 403.66 | S | | | | $ 403.66 | | | | |
| Tire Distribution Systems | $ 9,641.97 | S | | | | | $ 9,641.97 | | $ 9,641.97 | |
| Town of Johnstown | $ 234.96 | S | | | | $ 234.96 | | | | |
| Varsity Distributing | $ 1,138.27 | 14 | | $ 1,138.27 | | $ 1,138.27 | | | | |
| Verizon Wireless | $ 928.16 | S | | | | $ 928.16 | | | | |
| Waste Connection | $ 98.50 | S | | | | $ 98.50 | | | | |
| Wells Fargo Eqpt Finance | $ 6,264,594.56 | 3 | $ 2,571,500.00 | $ 3,204,594.56 | $ 477,357.00 | | $ 3,000,000.00 | $ 3,000,000.00 | | Also filed in AJ and SW cases; see Disclosure Statement for explanation of treatment, categorization and amount |
| Wells Fargo Financial Leasing | $ 9,524.39 | 2 | | $ 9,524.39 | | | $ 9,524.39 | | $ 9,524.39 | |
| Western Finance | $ 319.65 | S | | | | $ 319.65 | | | | |
| Western Equipment Finance | $ 5,927.85 | 1 (in AJ case) | | $ 5,927.85 | | | $ 5,927.85 | | $ 5,927.85 | POC listed SW as debtor, but used AJ case number |
| Western Fleet Services | $ 41,481.13 | S | | $ 41,481.13 | | | $ 41,481.13 | | $ 41,481.13 | Misfiled in CC case as CC POC#10 |
| Xcel Energy | $ 2,633.82 | S | | | | $ 2,633.82 | | | | |
| **Totals** | **$ 18,560,323.04** | | **$ 7,042,435.20** | **$ 10,933,448.43** | **$ 1,025,533.20** | **28,230.81** | **$ 8,991,908.03** | **$ 8,662,857.00** | **$ 329,051.03** | |

(1) For scheduled amounts listed, no POC was filed and the Claim not scheduled as contingent, disputed or unliquidated

DISCLOSURE STATEMENT EXHIBIT 3 CON'T
CONSOLIDATED CLAIMS

| Name of Creditor (1) | Debtor Filed Against | Total POC or Scheduled Amount (2) | POC No. or S | POC/Secured Amt | POC/Gen. Unsec. Amt | All Secured Classes 1-6, as applicable (3) | Class 7 Administrative Convenience Claims | Class 8 General Unsecured Claims | Comments |
|---|---|---|---|---|---|---|---|---|---|
| 9 North Tire, Inc. | AJ | $ 1,077.52 | S | | $ 1,077.52 | | $ 1,077.52 | | |
| A&T Trading Post | SW | $ 1,055.18 | S | | | | $ 1,055.18 | | |
| Adams County Clerk | SW | $ 3,382.02 | S | | | | | $ 3,382.02 | |
| AJ Concrete Services, Inc. | CC | $ 754,310.05 | 32 | $ 754,310.05 | | | | $ 754,310.05 | Not secured by property of CC or any other Debtor |
| All Points Capital Corp. | CC | $ 19,797.15 | 28 | $ 19,797.15 | | $ 19,797.15 | | | |
| Ally Financial | CC | $ 2,461.25 | 3 | $ 2,461.25 | | $ 2,461.25 | | | |
| Ally Financial | CC | $ 2,783.65 | 4 | $ 2,783.65 | | $ 2,783.65 | | | |
| Ally Financial | CC | 2455.9 | 5 | $ 2,455.90 | | $ 2,455.90 | | | |
| Ally Financial | CC | $ 1,867.85 | 6 | $ 1,867.85 | | $ 1,867.85 | | | |
| Ally Financial | CC | $ 2,276.62 | 7 | $ 2,276.62 | | $ 2,276.62 | | | |
| Ally Financial | CC | $ 3,179.88 | 8 | $ 3,179.88 | | $ 3,179.88 | | | |
| American Express Bank | SW | $ 22,984.19 | 12 | | $ 22,984.19 | | | $ 22,984.19 | |
| Ameritas Life Insurance | SW | $ 451.25 | S | | | | $ 451.25 | | |
| Apex Concrete Pumping | AJ | $ 485.68 | S | | $ 485.68 | | $ 485.68 | | |
| Arapahoe County Clerk | SW | $ 1,704.01 | S | | | | $ 1,704.01 | | |
| AT&T | SW | $ 834.38 | S | | | | $ 834.38 | | |
| Atlanta Commercial Tire | AJ | $ 1,448.96 | S | | $ 1,448.96 | | $ 1,448.96 | | |
| Atlanta Gear & Axel | AJ | $ 21,725.06 | | | $ 21,725.06 | | | $ 21,725.06 | POC #29 misfiled in CC case |
| Atlanta Safety Brake Service | AJ | $ 221.40 | S | | $ 221.40 | | $ 221.40 | | |
| Berenbaum Weinshienk PC | AJ; CC; SW | $ 17,142.50 | 8; 18; 19 | | $ 17,142.50 | | | $ 17,142.50 | |
| Buckeye Welding | SW | $ 49.34 | S | | | | $ 49.34 | | |
| C Moll LLC | SW | $ 68,571.00 | 24 | | $ 68,571.00 | | | $ 68,571.00 | |
| C Moll, LLC | AJ | $ 31,429.00 | S | | $ 31,429.00 | | | $ 31,429.00 | |
| Cbeyond | AJ | $ 473.97 | S | | $ 473.97 | | $ 473.97 | | |
| Cbeyond | SW | $ 565.34 | 15 | | $ 565.34 | | $ 565.34 | | |
| CBIZ MHM, Inc. | CC | $ 31,240.00 | S | | | | | $ 31,240.00 | |
| CBIZ MHM, LLC | AJ | $ 5,091.00 | S | | $ 5,091.00 | | | $ 5,091.00 | |
| CBIZ MHM, LLC | SW | $ 15,283.00 | S | | | | | $ 15,283.00 | |
| Century Link | SW | $ 317.00 | S | | | | $ 317.00 | | |
| Cintas Kennesaw | AJ | $ 207.82 | S | | $ 207.82 | | $ 207.82 | | |
| Cobb County Water | AJ | $ 686.28 | S | | $ 686.28 | | $ 686.28 | | |
| Colorado Business Bank | CC; SW | $ 1,945,833.52 | 12; 18 | | $ 1,945,833.52 | | | $ 1,945,833.52 | Guaranty claim |

DISCLOSURE STATEMENT EXHIBIT 3 CON'T
CONSOLIDATED CLAIMS

| Creditor | Case | Amount | Claim # | | | | | | Notes |
|---|---|---|---|---|---|---|---|---|---|
| Colorado Department of Revenue | SW | $ 70,819.20 | 1 | $ 70,819.20 | $ 70,819.20 | | | | |
| Colorado Mack Sales & Svcs | SW | $ 3,853.90 | 5 | $ 3,853.90 | | | | $ 3,853.90 | |
| Colorado Security Alarm | SW | $ 105.00 | S | | $ 105.00 | | | | |
| Concrete Pump Repair | CC | $ 25,427.68 | 19 | $ 25,427.68 | | | | $ 25,427.68 | |
| Constructions Forms, Inc. | AJ | $ 16,463.31 | 4 | $ 16,463.31 | | | | $ 16,463.31 | |
| Constructions Forms, Inc. | SW | $ 13,553.61 | 8 | $ 13,553.61 | | | | $ 13,553.61 | |
| Dilmar Oil Company | AJ | $ 1,810.17 | S | $ 1,810.17 | | $ 1,810.17 | | | |
| Douglas County Clerk | SW | $ 2,281.72 | S | | | $ 2,281.72 | | | |
| DRC Companies | SW | $ 114.90 | S | | | $ 114.90 | | | |
| Englewood Lock | SW | $ 543.20 | S | | | $ 543.20 | | | |
| FCC Equipment Financing | AJ; CC; SW | $ 1,200,798.70 | 10; 20; 20 | $ 899,481.00 | $ 301,317.70 | $ 782,600.00 | | $ 569,425.00 | Filed in all cases; see Disclosure Statement for explanation of treatment, categorization and amount |
| FCC Equipment Financing | AJ; CC; SW | $ 2,536,268.74 | 9; 21; 21 | $ 965,635.00 | $ 1,570,633.74 | | | | Claim based on equipment lease. Also filed in CC and SW cases; see Disclosure Statement for explanation of treatment |
| Federal Express | AJ | $ 105.56 | S | $ 105.56 | | $ 105.56 | | | |
| First National Bank of Omaha | CC | $ 11,679.94 | 13 | $ 11,679.94 | | | | $ 11,679.94 | |
| First National Bank of Omaha | CC | $ 3,099.91 | 14 | $ 3,099.91 | | | | $ 3,099.91 | |
| First National Bank of Omaha | CC | $ 2,751.60 | 15 | $ 2,751.60 | | | | $ 2,751.60 | |
| First National Bank of Omaha | CC | $ 5,623.10 | 16 | $ 5,623.10 | | | | $ 5,623.10 | |
| First National Bank of Omaha | CC | $ 6,027.24 | 17 | $ 6,027.24 | | | | $ 6,027.24 | |
| Ford Credit | AJ | $ 524.70 | S | $ 524.70 | | $ 524.70 | | | |
| General Electric Cap. Corp | AJ; CC; SW | $ 6,167,583.98 | 11; 27; 22 | $ 2,535,000.00 | $ 3,632,583.98 | $ 2,800,000.00 | | $ 2,572,467.53 | Filed in all cases; see Disclosure Statement for explanation of treatment, categorization and amount |
| Georgia Power | AJ | $ 39.04 | S | $ 39.04 | | $ 39.04 | | | |
| Home Depot | SW | $ 443.00 | S | | | $ 443.00 | | | |
| HSBC Business Solution | AJ | $ 122.38 | S | $ 122.38 | | $ 122.38 | | | |

DISCLOSURE STATEMENT EXHIBIT 3 CON'T
CONSOLIDATED CLAIMS

| Creditor | | | | | | | |
|---|---|---|---|---|---|---|---|
| Internal Revenue Service | CC | $ 585.00 | 1 | $ 585.00 | | $ 585.00 | |
| Kaiser Permanente | SW | $ 14,156.00 | S | | | | $ 14,156.00 |
| Lawson Products | SW | $ 532.07 | 4 | $ 532.07 | | $ 532.07 | |
| Lawson Products | SW | $ 219.93 | 11 | $ 219.93 | | $ 219.93 | |
| Lubrication Engineers Inc. | SW | $ 2,886.60 | 17 | $ 2,886.60 | | $ 2,886.60 | |
| Mack Sales & Services | SW | $ 7,844.80 | S | | | | $ 7,844.80 |
| McCoy Sales Corporation | SW | $ 278.03 | 6 | $ 278.03 | | $ 278.03 | |
| Midwest Truck Parts | SW | $ 4,872.27 | S | | | | $ 4,872.27 |
| Mile High Pressure Washers | SW | $ 1,172.06 | 13 | $ 1,172.06 | | $ 1,172.06 | |
| Mobile Mini Inc | SW | $ 95.41 | 10 | $ 95.41 | | $ 95.41 | |
| NAPA Atlanta | AJ | $ 39.04 | S | $ 39.04 | | $ 39.04 | |
| Nextel | AJ | $ 640.42 | S | $ 640.42 | | $ 640.42 | |
| Nextran Truck Center | AJ | $ 3,309.17 | 6 | $ 3,309.17 | | | $ 3,309.17 |
| Offen Petroleum | SW | $ 2,342.26 | S | | | $ 2,342.26 | |
| Oxford Recycling | SW | $ 748.00 | S | | | $ 748.00 | |
| Painters Supply | SW | $ 350.69 | S | | | $ 350.69 | |
| Patriot Concrete Pumping | SW | $ 8,866.25 | S | | | | $ 8,866.25 |
| Phillips 66 | SW | $ 10,550.00 | S | | | | $ 10,550.00 |
| Pitney Bowes, Inc. | AJ | $ 101.76 | S | $ 101.76 | | $ 101.76 | |
| Poudre Valley Electric | SW | $ 289.00 | S | | | $ 289.00 | |
| Praxtair Distribution | AJ | $ 490.33 | S | $ 490.33 | | $ 490.33 | |
| Public Service Company of Co | SW | $ 3,889.71 | 7 | $ 3,889.71 | | | $ 3,889.71 |
| Pure Technologies Group | SW | $ 123.08 | S | | | $ 123.08 | |
| QT FleetMaster | AJ | $ 1,600.00 | S | $ 1,600.00 | | $ 1,600.00 | |
| Rampart Network Consulting | SW | $ 388.80 | S | | | $ 388.80 | |
| Roger Anderson | SW | $ 25,500.00 | 16 | $ 25,500.00 | | | $ 25,500.00 |
| SA White Oil Co | AJ | $ 13,961.56 | S | $ 13,961.56 | | | $ 13,961.56 |
| Schreirer, Greg & Jane | SW | $ 50,000.00 | 23 | $ 50,000.00 | | | $ 50,000.00 |
| Schwing America Inc. | AJ | $ 5,148.22 | 5 | $ 5,148.22 | | | $ 5,148.22 |
| Schwing America Inc. | SW | $ 9,168.94 | 9 | $ 9,168.94 | | | $ 9,168.94 |
| Service Uniforms | SW | $ 169.54 | S | | | $ 169.54 | |
| Shell | SW | $ 1,650.00 | S | | | $ 1,650.00 | |
| Shell Fleet | AJ | $ 6,000.00 | S | $ 6,000.00 | | | $ 6,000.00 |
| Sprint | SW | $ 2,764.00 | S | | | $ 2,764.00 | |

DISCLOSURE STATEMENT EXHIBIT 3 CON'T
CONSOLIDATED CLAIMS

| Creditor | Debtor | Amount | POC# | | | | | | Notes |
|---|---|---|---|---|---|---|---|---|---|
| TCF Equipment Finance, Inc. | CC | $ 55,130.19 | 9 | | $ 55,130.19 | | | $ 55,130.19 | |
| Ten Peaks | SW | $ 403.66 | S | | | | $ 403.66 | | |
| Tifco | AJ | $ 201.31 | S | | $ 201.31 | | $ 201.31 | | |
| Tire Distribution Systems | SW | $ 9,641.97 | S | | | | | $ 9,641.97 | |
| Tmobile | AJ | | 2 | | | | | | Withdrew POC |
| Town of Johnstown | SW | $ 234.96 | S | | | | $ 234.96 | | |
| Varsity Distributing | SW | $ 1,138.27 | 14 | | $ 1,138.27 | | $ 1,138.27 | | |
| Verizon Wireless | AJ | $ 134.81 | S | | $ 134.81 | | $ 134.81 | | |
| Verizon Wireless | SW | $ 928.16 | S | | | | $ 928.16 | | |
| Waste Connection | SW | $ 98.50 | S | | | | $ 98.50 | | |
| Wells Fargo Eqpt Finance | AJ; CC; SW | $ 6,264,594.56 | 3; 2; 3 | $ 2,571,500.00 | $ 3,204,594.56 | $ 2,500,000.00 | | $ 3,000,000.00 | Also filed in CC and SW cases; see Disclosure Statement for explanation of treatment, categorization and amount |
| Wells Fargo Financial Leasing | SW | $ 9,524.39 | 2 | | $ 9,524.39 | | | $ 9,524.39 | |
| Western Equipment Finance | SW | $ 5,927.85 | 1 (in AJ case) | | $ 5,927.85 | | | $ 5,927.85 | POC listed SW as debtor, but used AJ case number |
| Western Finance | SW | $ 319.65 | S | | | | $ 319.65 | | Duplicate of Western Equip. Finance? |
| Western Fleet Services | SW | $ 41,481.13 | S | | $ 41,481.13 | | | $ 41,481.13 | Misfiled in CC case as CC POC#10 |
| Western Fleet Services, Inc. | CC | | 10 | | | | | | SW POC; misfiled in CC case |
| Western Wasatch Concrete Pumping | CC | $ 590,888.00 | 26 | | $ 590,888.00 | | $ - | $ 590,888.00 | |
| Wood Ace | AJ | $ 84.97 | S | | $ 84.97 | | $ 84.97 | | |
| Xcel Energy | SW | $ 2,633.82 | S | | | | $ 2,633.82 | | |
| Yancey Bros. Co. | AJ | $ 1,134.85 | 7 | | $ 1,134.85 | | $ 1,134.85 | | |
| **Totals** | | $ 20,196,666.34 | | $ 7,831,567.55 | $ 11,749,419.38 | $ 6,188,241.50 | $ 40,446.78 | $ 10,023,224.61 | |

(1) Certain creditors filed claims against more than one debtor.  These are NOT duplicate claims unless so indicated.

(2) For scheduled amounts listed, no POC was filed and the Claim not scheduled as contingent, disputed or unliquidated

(3) Amounts stated are prior to the application of certain Adequate Protection Payments - see Plan

## **EXHIBIT 4**
### **Financials**

See attached.

## AJ CONCRETE PUMPING, INC
**2004**

# Balance Sheet
04/02/13

Balance Sheet

*Period = 3*
*. At March 2013*

---

## Assets

**Current Assets**

| | | |
|---|---|---|
| DIP CASH | 476,787.47 | |
| ACCOUNTS RECEIVABLE | 395,429.83 | |
| ALLOWANCE FOR BAD DEBT | (20,472.63) | |
| **Total Current Assets:** | | **$851,744.67** |

**Long Term Assets**

| | | |
|---|---|---|
| VEHICLES & TRUCKS | 140,454.44 | |
| BUILDING | 124,575.67 | |
| **Total Long Term Assets:** | **265,030.11** | |

**Accumulated Depreciation**

| | | |
|---|---|---|
| ʻACCUM DEPR - VEHICLES/TRUCKS | (139,960.96) | |
| ACCUM DEPR - BUILDING | (40,567.08) | |
| **Total Accumulated Depreciation:** | **(180,528.04)** | |
| **Net Long Term Assets:** | | 84,502.07 |
| **Total Assets:** | | **$936,246.74** |

## Liabilities

**Current Liabilities**

| | | |
|---|---|---|
| ACCOUNTS PAYABLE | 45,144.30 | |
| DUE TO PAYROLL PARTNERS | 280,027.79 | |
| DUE TO CAROLYN MOLL | 31,428.60 | |
| **Total Current Liabilities:** | | 356,600.69 |

**AJ CONCRETE PUMPING, INC**
**2004**

# Income Statement
04/02/13

### Income Statement

*Period 1 to 3*
*. For 3 Months Ending March 2013*

**Operating Income**

| | | |
|---|---|---|
| PUMPING INCOME | $663,481.07 | |
| **Total Operating Income:** | | **$663,481.07** |

**Direct Expense**

| | | |
|---|---|---|
| OUTSIDE PUMPS EXPENSE | 3,262.64 | |
| DIRECT LABOR | 156,385.36 | |
| D/L PAYROLL TAXES | 17,384.55 | |
| **Total Direct Expense:** | 177,032.55 | |

**Equip/Shop Expense**

| | | |
|---|---|---|
| LICENSE PLATES | 15,591.49 | |
| OIL & FILTERS | 8,687.60 | |
| OUTSIDE PUMP TRUCK REPAIR | 4,208.71 | |
| PERMITS & TOLLS | 3,208.00 | |
| PUMP PARTS | 25,201.41 | |
| PUMP TRUCK PARTS | 8,358.27 | |
| SYSTEM PARTS | 3,383.24 | |
| TIRES | 3,740.35 | |
| **Total Equip/Shop Expense:** | 72,379.07 | |
| **Total Direct & Equip/Shop Expense:** | | 249,411.62 |
| **Gross Profit:** | | 414,069.45 |

**Overhead Expense**

| | | |
|---|---|---|
| SHOP SUPPLIES | 13,009.33 | |
| RENTAL UNIFORMS | 959.56 | |
| WRECKER SERVICE | 907.00 | |
| FUEL | 79,388.21 | |
| DOT REQUIREMENTS | 503.68 | |
| SHOP LABOR | 31,758.04 | |
| SHOP PAYROLL TAXES | 3,789.93 | |

# Income Statement

04/02/13

Continued...

| | | |
|---|---:|---:|
| **Total Overhead Expense:** | 130,315.75 | |
| **Administrative Expense** | | |
| CONTRIBUTIONS | 300.00 | |
| HEALTH INSURANCE | 3,455.90 | |
| LEGAL | 18,064.25 | |
| MEALS AND ENTERTAINMENT | 358.64 | |
| OFFICE SUPPLIES | 2,145.69 | |
| P & C INSURANCE | 12,501.00 | |
| RENT | 7,950.00 | |
| TELEPHONE | 3,993.52 | |
| UTILITIES | 4,152.98 | |
| U.S. Trustee Fees | 4,875.00 | |
| OFFICE LABOR | 37,177.27 | |
| ADMIN PAYROLL TAXES | 11,390.80 | |
| **Total Administrative Expense:** | **106,365.05** | |
| **Total Indirect Expense:** | | 236,680.80 |
| **Income from Operations:** | | 177,388.65 |
| **Net Income Before Tax:** | | 177,388.65 |
| **After Tax Expense** | | |
| CORPORATE INCOME TAX EXP | 60.00 | |
| **Total After Tax Expense:** | | 60.00 |
| **Net Income:** | | **$177,328.65** |

## AJ CONCRETE PUMPING, INC
**2004**

# Income Statement
04/02/13

## Income Statement

*Period 3 to 3*
*, For 1 Month Ending March 2013*

---

**Operating Income**

| | | |
|---|---:|---:|
| PUMPING INCOME | $285,245.43 | |
| **Total Operating Income:** | | **$285,245.43** |

**Direct Expense**

| | | |
|---|---:|---:|
| OUTSIDE PUMPS EXPENSE | 792.13 | |
| DIRECT LABOR | 66,426.83 | |
| D/L PAYROLL TAXES | 5,713.02 | |
| **Total Direct Expense:** | **72,931.98** | |

**Equip/Shop Expense**

| | | |
|---|---:|---:|
| OIL & FILTERS | 3,810.17 | |
| OUTSIDE PUMP TRUCK REPAIR | 2,299.94 | |
| PUMP PARTS | 2,804.55 | |
| PUMP TRUCK PARTS | 6,062.33 | |
| SYSTEM PARTS | 1,364.86 | |
| TIRES | 1,703.56 | |
| **Total Equip/Shop Expense:** | **18,045.41** | |
| **Total Direct & Equip/Shop Expense:** | | **90,977.39** |
| **Gross Profit:** | | **194,268.04** |

**Overhead Expense**

| | | |
|---|---:|---:|
| SHOP SUPPLIES | 2,634.28 | |
| RENTAL UNIFORMS | 189.74 | |
| WRECKER SERVICE | 314.00 | |
| FUEL | 36,184.63 | |
| DOT REQUIREMENTS | 75.92 | |
| SHOP LABOR | 12,397.40 | |
| SHOP PAYROLL TAXES | 990.35 | |
| **Total Overhead Expense:** | **52,786.32** | |

## Income Statement

04/02/13

Continued...

**Administrative Expense**

| | | |
|---|---:|---:|
| HEALTH INSURANCE | 1,085.30 | |
| LEGAL | 11,338.49 | |
| MEALS AND ENTERTAINMENT | 137.76 | |
| OFFICE SUPPLIES | 917.72 | |
| P & C INSURANCE | 4,167.00 | |
| RENT | 2,650.00 | |
| TELEPHONE | 1,333.78 | |
| UTILITIES | 1,376.15 | |
| OFFICE LABOR | 14,699.79 | |
| ADMIN PAYROLL TAXES | 4,375.32 | |
| **Total Administrative Expense:** | **42,081.31** | |
| **Total Indirect Expense:** | | **94,867.63** |
| **Income from Operations:** | | **99,400.41** |
| **Net Income Before Tax:** | | **99,400.41** |

**After Tax Expense**

| | | |
|---|---:|---:|
| CORPORATE INCOME TAX EXP | 60.00 | |
| **Total After Tax Expense:** | | **60.00** |
| **Net Income:** | | **$99,340.41** |

# CENTRAL CONCRETE PUMPING, INC
**2004**

# Balance Sheet
04/03/13

Balance Sheet

*Period = 3*
*. At March 2013*

## Assets

**Current Assets**

| | | |
|---|---:|---:|
| CBB OPERATING ACCOUNT | 3,091.82 | |
| INVESTMENT IN SWCP | 86,638.46 | |
| INVESTMENTS IN SUB-PATRIOT | 424,751.36 | |
| DUE FROM PAYROLL PARTNERS | 5,605,579.30 | |
| **Total Current Assets:** | | **$6,120,060.94** |

**Long Term Assets**

| | | |
|---|---:|---:|
| CONCRETE PUMPS | 18,303,942.30 | |
| VEHICLES & TRUCKS | 481,916.37 | |
| **Total Long Term Assets:** | **18,785,858.67** | |

**Accumulated Depreciation**

| | | |
|---|---:|---:|
| ACCUM DEPR - CONCRETE PUMPS | (9,129,204.84) | |
| ACCUM DEPR - EQUIPMENT | (2,848.84) | |
| ACCUM DEPR - VEHICLES/TRUCKS | (479,823.58) | |
| **Total Accumulated Depreciation:** | **(9,611,877.26)** | |
| **Net Long Term Assets:** | | **9,173,981.41** |
| **Total Assets:** | | **$15,294,042.35** |

## Liabilities

**Current Liabilities**

| | | |
|---|---:|---:|
| ACCOUNTS PAYABLE | 4,812.50 | |
| DUE TO SOUTHWEST | 650,000.00 | |
| CIT LOC - ST | 3,967,941.37 | |
| AZ 2007 #2 C1500 CHEVY - ST | 3,709.86 | |

## Balance Sheet

Continued...

04/03/13

| | | |
|---|---:|---:|
| AZ 2007 C2500 CHEVY-ST | 2,953.50 | |
| AZ 2007 C1500 CHEVY-ST | 2,291.40 | |
| CO SPRNGS 2007 CHEVY-ST | 2,455.90 | |
| CO SWCP 2007 CHEVY - ST | 1,867.85 | |
| AZ GE NOTE #1 - ST | 2,044,277.23 | |
| AZ GE NOTE #2 - ST | 1,074,554.76 | |
| AZ GE NOTE #3 - ST | 2,086,678.50 | |
| CO 2007 39M - ST | 394,573.07 | |
| AZ 2007 CHEVY - ST | 2,265.36 | |
| 12/2007 PB EQUIP - ST | 64,745.48 | |
| FCC 31M - ST | 42,844.61 | |
| FCC 4,76,77 ST | 131,719.45 | |
| WF 78 & 79 - ST | 255,091.48 | |
| WF AJ 130 - ST | 383,823.21 | |
| AP #80 - ST | 15,698.50 | |
| FCC #131 - ST | 44,483.82 | |
| **Total Current Liabilities:** | | **11,176,787.85** |

**Long Term Liabilities**

| | | |
|---|---:|---:|
| 12/2007 PB EQUIP - LT | 155,702.65 | |
| FCC 31M - LT | 51,942.45 | |
| FCC 4,76,77 LT | 256,591.78 | |
| FCC #131 - LT | 216,426.63 | |
| **Total Long Term Liabilities:** | | **680,663.51** |
| **Total Liabilities:** | | **11,857,451.36** |

# Equity

**Equity/Capital**

| | | |
|---|---:|---:|
| COMMON STOCK | 3,000.00 | |
| ADDITIONAL PAID IN CAPITAL | 1,942,294.38 | |
| RETAINED EARNINGS | 2,143,189.94 | |
| **Subtotal Equity/Capital:** | 4,088,484.32 | |
| **Current Profit (Loss):** | (651,893.33) | |
| **Total Equity/Capital:** | | **3,436,590.99** |
| **Total Liabilities + Equity:** | | **$15,294,042.35** |

# CENTRAL CONCRETE PUMPING, INC
**2004**

# Income Statement
04/03/13

## Income Statement

*Period 1 to 3*
*, For 3 Months Ending March 2013*

---

**Operating Income**

| | | |
|---|---|---|
| LEASE INCOME | 207,000.00 | |
| **Total Operating Income:** | | **$207,000.00** |

**Equip/Shop Expense**

| | | |
|---|---|---|
| PUMP LEASE EXPENSE | 69,708.00 | |
| **Total Equip/Shop Expense:** | 69,708.00 | |
| **Total Direct & Equip/Shop Expense:** | | 69,708.00 |
| **Gross Profit:** | | 137,292.00 |

**Administrative Expense**

| | | |
|---|---|---|
| INTEREST EXPENSE | 779,993.56 | |
| LEGAL | 7,526.77 | |
| U.S. Trustee Fees | 1,625.00 | |
| **Total Administrative Expense:** | 789,145.33 | |
| **Total Indirect Expense:** | | 789,145.33 |
| **Income from Operations:** | | (651,853.33) |
| **Net Income Before Tax:** | | (651,853.33) |

**After Tax Expense**

| | | |
|---|---|---|
| CORPORATE INCOME TAX EXP | 40.00 | |
| **Total After Tax Expense:** | | 40.00 |
| **Net Income:** | | $(651,893.33) |

# CENTRAL CONCRETE PUMPING, INC
**2004**

# Income Statement
04/03/13

## Income Statement

*Period 3 to 3*
*. For 1 Month Ending March 2013*

**Operating Income**

| | | |
|---|---|---|
| LEASE INCOME | 95,000.00 | |
| **Total Operating Income:** | | **$95,000.00** |

**Equip/Shop Expense**

| | | |
|---|---|---|
| PUMP LEASE EXPENSE | 69,708.00 | |
| **Total Equip/Shop Expense:** | **69,708.00** | |
| **Total Direct & Equip/Shop Expense:** | | **69,708.00** |
| **Gross Profit:** | | **25,292.00** |

**Administrative Expense**

| | | |
|---|---|---|
| INTEREST EXPENSE | 677,992.52 | |
| LEGAL | 4,724.37 | |
| **Total Administrative Expense:** | **682,716.89** | |
| **Total Indirect Expense:** | | **682,716.89** |
| **Income from Operations:** | | **(657,424.89)** |
| **Net Income Before Tax:** | | **(657,424.89)** |

**After Tax Expense**

| | | |
|---|---|---|
| CORPORATE INCOME TAX EXP | 40.00 | |
| **Total After Tax Expense:** | | **40.00** |
| **Net Income:** | | **$(657,464.89)** |

## SOUTHWEST CONCRETE PUMPING, INC
**2004**

# Balance Sheet
04/02/13

Balance Sheet

*Period = 3*
*. At March 2013*

## Assets

**Current Assets**

| | | |
|---|---:|---:|
| DIP CASH | 342,816.24 | |
| ACCOUNTS RECEIVABLE | 1,321,021.06 | |
| ALLOWANCE FOR BAD DEBT | (17,732.00) | |
| ONSAGER TRUST ACCNT | 50,000.00 | |
| DUE FROM CENTRAL | 600,000.00 | |
| DUE FROMSWDMS | 520.18 | |
| Allowance For Obsolete | (60,000.00) | |
| INVENTORY | 479,704.74 | |
| **Total Current Assets:** | | **$2,716,330.22** |

**Long Term Assets**

| | | |
|---|---:|---:|
| EQUIPMENT | 87,712.56 | |
| VEHICLES & TRUCKS | 5,659.50 | |
| LEASEHOLD IMPROVEMENTS | 53,972.69 | |
| **Total Long Term Assets:** | **147,344.75** | |

**Accumulated Depreciation**

| | | |
|---|---:|---:|
| ACCUM DEPR - EQUIPMENT | (87,565.04) | |
| ACCUM DEPR - VEHICLES/TRUCKS | (3,490.02) | |
| ACCUM DEPR - L/H IMPROVEMENTS | (23,407.90) | |
| **Total Accumulated Depreciation:** | **(114,462.96)** | |
| **Net Long Term Assets:** | | **32,881.79** |

**Other Assets**

| | | |
|---|---:|---:|
| CASH SURRENDER VALUE LIFE IN | 143,377.34 | |
| **Total Other Assets:** | | **143,377.34** |
| **Total Assets:** | | **$2,892,589.35** |

Report  2-2-0-21
Supervisor

Page  1

04/02/13
01:31 PM

## Balance Sheet

04/02/13

Continued...

## Liabilities

**Current Liabilities**

| | | |
|---|---:|---:|
| ACCOUNTS PAYABLE | 128,232.29 | |
| DUE TO PAYROLL PARTNERS | 2,759,965.95 | |
| DUE TO CAROLYN MOLL | 158,000.10 | |
| SALES TAX PAYABLE | 5,089.13 | |
| **Total Current Liabilities:** | | 3,051,287.47 |
| **Total Liabilities:** | | 3,051,287.47 |

## Equity

**Equity/Capital**

| | | |
|---|---:|---:|
| COMMON STOCK | 10.00 | |
| ADDITIONAL PAID IN CAPITAL | 111,483.04 | |
| RETAINED EARNINGS | (518,141.28) | |
| **Subtotal Equity/Capital:** | (406,648.24) | |
| **Current Profit (Loss):** | 247,950.12 | |
| **Total Equity/Capital:** | | (158,698.12) |
| **Total Liabilities + Equity:** | | $2,892,589.35 |

## SOUTHWEST CONCRETE PUMPING, INC
**2004**

# Income Statement
04/02/13

Income Statement

*Period 1 to 3*
*For 3 Months Ending March 2013*

---

### Operating Income

| | | |
|---|---|---|
| PUMPING INCOME | $2,390,791.46 | |
| **Total Operating Income:** | | **$2,390,791.46** |

### Direct Expense

| | | |
|---|---|---|
| OUTSIDE PUMPS EXPENSE | 52,080.20 | |
| DIRECT LABOR | 461,660.74 | |
| D/L PAYROLL TAXES | 45,000.59 | |
| **Total Direct Expense:** | **558,741.53** | |

### Equip/Shop Expense

| | | |
|---|---|---|
| LICENSE PLATES | 10,110.55 | |
| OIL & FILTERS | 32,593.66 | |
| OUTSIDE BOOM REPAIRS | 11,555.00 | |
| OUTSIDE PUMP TRUCK REPAIR | 20,353.63 | |
| PERMITS & TOLLS | 15,489.55 | |
| PUMP PARTS | 109,984.75 | |
| PUMP TRUCK PARTS | 104,947.27 | |
| SYSTEM PARTS | 68,953.02 | |
| TIRES | 26,567.89 | |
| PUMP LEASE EXPENSE | 207,000.00 | |
| **Total Equip/Shop Expense:** | **607,555.32** | |
| **Total Direct & Equip/Shop Expense:** | | 1,166,296.85 |
| **Gross Profit:** | | 1,224,494.61 |

### Overhead Expense

| | | |
|---|---|---|
| SHOP SUPPLIES | 66,871.38 | |
| RENTAL UNIFORMS | 361.84 | |
| WRECKER SERVICE | 1,131.00 | |
| FREIGHT | 303.02 | |
| FUEL | 219,762.85 | |
| DOT REQUIREMENTS | 2,118.34 | |

## Income Statement

04/02/13

Continued...

| | | |
|---|---:|---:|
| SHOP LABOR | 63,148.29 | |
| SHOP PAYROLL TAXES | 9,508.20 | |
| **Total Overhead Expense:** | **363,204.92** | |
| **Administrative Expense** | | |
| ACCOUNTING | 11,500.00 | |
| ADVERTISING | 540.00 | |
| BANK CHARGES | 3,913.45 | |
| COMPUTER EXPENSE | 6,306.58 | |
| CONTRIBUTIONS | 550.00 | |
| DUES & SUBSCRIPTIONS | 480.00 | |
| HEALTH INSURANCE | 45,449.65 | |
| INTEREST EXPENSE | 491.35 | |
| LEGAL | 50,514.00 | |
| MEALS AND ENTERTAINMENT | 3,263.35 | |
| OFFICE SUPPLIES | 14,996.20 | |
| OFFICER LIFE INSURANCE | 12,000.00 | |
| P & C INSURANCE | 75,200.00 | |
| RENT | 59,141.82 | |
| SALES TAX EXPENSE | 3,840.89 | |
| TELEPHONE | 16,346.11 | |
| TRAVEL | 2,796.70 | |
| UTILITIES | 19,340.17 | |
| US Trustee Fees | 9,750.00 | |
| OFFICER SALARY | 112,500.18 | |
| OFFICE LABOR | 69,644.46 | |
| SALES SALARY | 70,750.68 | |
| ADMIN PAYROLL TAXES | 24,023.98 | |
| **Total Administrative Expense:** | **613,339.57** | |
| **Total Indirect Expense:** | | **976,544.49** |
| **Income from Operations:** | | **247,950.12** |
| **Net Income Before Tax:** | | **247,950.12** |
| **Net Income:** | | **$247,950.12** |

# SOUTHWEST CONCRETE PUMPING, INC
**2004**

# Income Statement
04/02/13

## Income Statement

*Period 3 to 3*
*. For 1 Month Ending March 2013*

---

**Operating Income**

| | | |
|---|---:|---:|
| PUMPING INCOME | $871,427.79 | |
| **Total Operating Income:** | | **$871,427.79** |

**Direct Expense**

| | | |
|---|---:|---:|
| OUTSIDE PUMPS EXPENSE | 6,203.14 | |
| DIRECT LABOR | 190,444.94 | |
| D/L PAYROLL TAXES | 16,990.89 | |
| **Total Direct Expense:** | **213,638.97** | |

**Equip/Shop Expense**

| | | |
|---|---:|---:|
| OIL & FILTERS | 8,063.98 | |
| OUTSIDE BOOM REPAIRS | 2,210.00 | |
| OUTSIDE PUMP TRUCK REPAIR | 14,470.72 | |
| PERMITS & TOLLS | 2,895.35 | |
| PUMP PARTS | 34,722.03 | |
| PUMP TRUCK PARTS | 26,508.12 | |
| SYSTEM PARTS | 28,566.88 | |
| TIRES | 5,696.38 | |
| PUMP LEASE EXPENSE | 95,000.00 | |
| **Total Equip/Shop Expense:** | **218,133.46** | |
| **Total Direct & Equip/Shop Expense:** | | **431,772.43** |
| **Gross Profit:** | | **439,655.36** |

**Overhead Expense**

| | | |
|---|---:|---:|
| SHOP SUPPLIES | 21,437.97 | |
| RENTAL UNIFORMS | (57.65) | |
| WRECKER SERVICE | 586.00 | |
| FUEL | 84,886.50 | |
| DOT REQUIREMENTS | 695.98 | |
| SHOP LABOR | 26,140.83 | |
| SHOP PAYROLL TAXES | 3,185.59 | |

## Income Statement

04/02/13

Continued...

| | | |
|---|---:|---:|
| **Total Overhead Expense:** | **136,875.22** | |
| **Administrative Expense** | | |
| ADVERTISING | 540.00 | |
| BANK CHARGES | 1,277.83 | |
| COMPUTER EXPENSE | 1,384.00 | |
| CONTRIBUTIONS | 500.00 | |
| HEALTH INSURANCE | 15,502.62 | |
| INTEREST EXPENSE | 491.35 | |
| LEGAL | 31,207.07 | |
| MEALS AND ENTERTAINMENT | 318.87 | |
| OFFICE SUPPLIES | 2,713.48 | |
| OFFICER LIFE INSURANCE | 4,000.00 | |
| P & C INSURANCE | 27,400.00 | |
| RENT | 19,971.00 | |
| SALES TAX EXPENSE | 1,271.00 | |
| TELEPHONE | 5,742.39 | |
| TRAVEL | 1,432.00 | |
| UTILITIES | 10,555.09 | |
| OFFICER SALARY | 43,269.30 | |
| OFFICE LABOR | 27,584.77 | |
| SALES SALARY | 27,211.80 | |
| ADMIN PAYROLL TAXES | 8,025.09 | |
| **Total Administrative Expense:** | **230,397.66** | |
| **Total Indirect Expense:** | | **367,272.88** |
| **Income from Operations:** | | **72,382.48** |
| **Net Income Before Tax:** | | **72,382.48** |
| **Net Income:** | | **$72,382.48** |

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 1 | | Southwest/ Georgia Concrete Pumping/Central Concrete Pumping | | | | |
| 2 | | Statement of Operations | | | | |
| 3 | | Three Months Ended March 2013 | | | | |
| 4 | | Southwest | AJ | Central | Eliminations | Total |
| 5 | Operating Income | | | | | |
| 6 | Pumping Income | $2,390,792 | $663,481 | | | $3,054,273 |
| 7 | Lease Income | | | $207,000 | -$207,000 | $0 |
| 8 | Total Operating Income | 2,390,792 | 663,481 | 207,000 | -207,000 | 3,054,273 |
| 9 | Cost of Sales | | | | | |
| 10 | Outside Pump Expense | 52,080 | 3,263 | | | 55,343 |
| 11 | Direct Labor | 461,661 | 156,385 | | | 618,046 |
| 12 | Payroll Taxes | 45,001 | 17,385 | | | 62,386 |
| 13 | License Plates | 10,111 | 15,591 | | | 25,702 |
| 14 | Oil and Filters | 32,593 | 8,687 | | | 41,280 |
| 15 | Outside Boom Repairs | 11,555 | | | | 11,555 |
| 16 | Outside Pump Truck Repair | 20,354 | 4,209 | | | 24,563 |
| 17 | Permits and Tolls | 15,489 | 3,208 | | | 18,697 |
| 18 | Pump Parts | 109,984 | 25,202 | | | 135,186 |
| 19 | Large Repairs | | | | | 0 |
| 20 | Pump Truck parts | 104,947 | 8,358 | | | 113,305 |
| 21 | System Parts | 68,953 | 3,383 | | | 72,336 |
| 22 | Tires | 26,568 | 3,741 | | | 30,309 |
| 23 | Total Cost of Sales | 959,296 | 249,412 | 0 | 0 | 1,208,708 |
| 24 | Gross Profit | 1,431,496 | 414,069 | 207,000 | -207,000 | 1,845,565 |
| 25 | Operating Expenses | | | | | |
| 26 | Shop Supplies | 66,871 | 13,009 | | | 79,880 |
| 27 | Vehicle Repairs and Maintenance | | | | | 0 |
| 28 | Uniforms | 362 | 960 | | | 1,322 |
| 29 | Wrecker Service | 1,131 | 907 | | | 2,038 |
| 30 | Rentals | | | | | 0 |
| 31 | Freight | 303 | | | | 303 |
| 32 | Fuel | 219,764 | 79,388 | | | 299,152 |
| 33 | DOT Requirements | 2,118 | 504 | | | 2,622 |
| 34 | Shop Labor | 63,149 | 31,758 | | | 94,907 |
| 35 | Payroll Taxes | 9,509 | 3,790 | | | 13,299 |
| 36 | Total Operating Expenses | 363,207 | 130,316 | 0 | 0 | 493,523 |
| 37 | Overhead Expense | | | | | |
| 38 | Accounting | 11,500 | | | | 11,500 |
| 39 | Advertising | 540 | | | | 540 |
| 40 | Bank Charges | 3,914 | | | | 3,914 |
| 41 | Computer Expense | 6,307 | | | | 6,307 |
| 42 | Contributions | 550 | 300 | | | 850 |
| 43 | Dues and subscriptions | 480 | | | | 480 |
| 44 | Interest Expense | 491 | | 0 | | 491 |
| 45 | Health Insurance | 45,450 | 3,455 | | | 48,905 |
| 46 | Professional and Trustee Fees | 60,264 | 22,939 | 9,152 | | 92,355 |
| 47 | Meals and Entertainment | 3,263 | 358 | | | 3,621 |
| 48 | Office Supplies | 14,995 | 2,146 | | | 17,141 |
| 49 | P&C Insurance | 87,200 | 12,501 | | | 99,701 |
| 50 | Rent | 59,142 | 7,950 | | | 67,092 |
| 51 | Sales Expense | 3,842 | | | | 3,842 |
| 52 | Telephone | 16,346 | 3,994 | | | 20,340 |
| 53 | Travel | 2,797 | | | | 2,797 |
| 54 | Utilities | 19,340 | 4,153 | | | 23,493 |
| 55 | Officer Salaries | 112,499 | | | | 112,499 |
| 56 | Office Labor | 69,645 | 37,178 | | | 106,823 |
| 57 | Sales Salary | 70,750 | | | | 70,750 |
| 58 | Payroll Taxes | 24,024 | 11,391 | | | 35,415 |
| 59 | Other Expenses | | 60 | 40 | | 100 |
| 60 | Total Overhead Expense | 613,339 | 106,425 | 9,192 | 0 | 728,956 |
| 61 | Income from operations | 454,950 | 177,328 | 197,808 | -207,000 | 830,086 |
| 62 | Other Payments | | | | | |
| 63 | GE Plan Payments | | | 50,000 | | 50,000 |
| 64 | Wells Plan Payments | | | 669,708 | | 669,708 |
| 65 | Adaquate Protection Payments | 207,000 | | 129,994 | -207,000 | 129,994 |
| 66 | Total Other Payments | 207,000 | 0 | 849,702 | -207,000 | 1,056,702 |
| 67 | Income before taxes | $247,950 | $177,328 | -$651,894 | $0 | -$226,616 |

**EXHIBIT 5**
**Liquidation Analysis**

See attached.

| | Description | Central Concrete | | AJ Concrete | | SW Concrete | |
|---|---|---|---|---|---|---|---|
| | | Line Item Amounts | Subtotals/Totals | Line Item Amounts | Subtotals/Totals | Line Item Amounts | Subtotals/Totals |
| | **1. Assets (as of 5/1/2013)** | | | | | | |
| | Cash | 11,922.00 | | 537,671.00 | | 138,120.00 | |
| | Recoverable Accounts Receivable | | | | | | |
| A | Operating (90 days old and fewer) | 0.00 | | 236,710.00 | | 1,171,595.00 | |
| B | Inventory | | | | | 167,881.90 | |
| | Insurance Policy -Cash Surrender Value | | | | | 143,377.34 | |
| C | Prepaids | | | | | | |
| | Machinery, Equipment and Vehicles | | | | | | |
| D1 | Concrete Pumps - APCC | 192,584.00 | | | | | |
| D1 | Concrete Pumps - FCC | 1,349,916.56 | | | | | |
| D1 | Concrete Pumps - GE | 1,883,838.60 | | | | | |
| D1 | Concrete Pumps - Wells | 2,151,366.20 | | | | | |
| D2 | Vehicles-Ally | 24,000.00 | | | | | |
| D2 | Vehicles-Other | 40,000.00 | | 12,000.00 | | 2,000.00 | |
| D3 | Other Heavy Equipment | 5,000.00 | | | | 10,000.00 | |
| | Furniture & Miscellaneous | 0.00 | | 5,000.00 | | 5,000.00 | |
| | Building/Leasehold Improvements | | | 0.00 | | 0.00 | |
| E | Equity Interests | | | | | | |
| | 50% interest in Patriot Leasco | 0.00 | | | | | |
| | 70% interest in SW Concrete | 0.00 | | | | | |
| F | Recoverable Retainer - OSG | | | | | 18,815.00 | |
| | Other | | | | | | |
| G1 | Estimated Avoidance Action Recoveries | 256,000.00 | | 0.00 | | 0.00 | |
| G2 | Intercompany | 0.00 | | 0.00 | | 0.00 | |
| | **TOTAL** | | 5,914,627.36 | | 791,381.00 | | 1,656,789.24 |
| | | | | | | | |
| | **2. Secured Claims** | | | | | | |
| | TCI | 0.00 | | 0.00 | | 0.00 | |
| H1 | Ally | 15,025.15 | | | | | |
| H2 | APCC | 19,797.15 | | | | | |
| H2 | FCC | 1,349,916.56 | | | | | |
| H2 | GE | 1,950,505.27 | | 168,692.17 | | 398,385.67 | |
| H2 | Wells | 2,151,366.20 | | 102,025.50 | | 331,719.00 | |
| | Colorado Department of Revenue | | | | | 70,819.20 | |
| | **SUBTOTAL** | | 5,486,610.33 | | 270,717.67 | | 800,923.87 |
| | | | | | | | |
| | **3. Assets less Secured Claims** | | 428,017.03 | | 520,663.33 | | 855,865.37 |
| | | | | | | | |
| | **4. Unpaid Administrative Claims (as of 4/1/2013)** | | | | | | |
| | Sales Tax | | | | | 3,662.63 | |
| | Accounts Payable-Operations | 0.00 | | 160,000.00 | | 600,000.00 | |
| I | Professional Fees - Estimated | 8,795.63 | | 30,000.00 | | 78,117.41 | |
| | UST Fees | 217.00 | | 1,625.00 | | 3,467.00 | |
| J | Other-Intercompany | | | 0.00 | | 0.00 | |
| | **SUBTOTAL** | | 9,012.63 | | 191,625.00 | | 685,247.04 |

| | Description | Central Concrete | | AJ Concrete | | SW Concrete | |
|---|---|---|---|---|---|---|---|
| | | Line Item Amounts | Subtotals/Totals | Line Item Amounts | Subtotals/Totals | Line Item Amounts | Subtotals/Totals |
| | **5. Chapter 7 Projected Expenses** | | | | | | |
| K | Trustee Commission | 20,900.00 | | 20,450.00 | | 53,750.00 | |
| L | Admin Expenses - Ch. 7 Liquidation & Claims Objections | 5,000.00 | | 5,000.00 | | 5,000.00 | |
| M | Legal Fees - Ch. 7 Liquidation, Claims Objections, Litigation (other than Preference Actions) | 10,000.00 | | 33,671.00 | | 127,159.50 | |
| N | Legal Fees & Expenses - Preference Actions | 76,800.00 | | | | | |
| | **SUBTOTAL** | | 112,700.00 | | 59,121.00 | | 185,909.50 |
| | **6. Amount Available for Unsecured Creditor Claims** | | 306,304.40 | | 269,917.33 | | 0.00 |
| O | **7. Unsecured Claims** | | | | | | |
| | FCC Deficiency Claim - 100% | 2,387,150.88 | | 2,387,150.88 | | 2,387,150.88 | |
| P | GE Deficiency Claim - 100% | 3,716,667.54 | | 3,716,667.54 | | 3,716,667.54 | |
| P | Wells Deficiency Claim - 100% | 3,214,431.52 | | 3,214,431.52 | | 3,214,431.52 | |
| | All Other Unsecured Claims | 3,484,561.03 | | 131,900.79 | | 2,391,077.06 | |
| | **SUBTOTAL** | | 12,802,810.97 | | $ 9,450,150.73 | | $ 11,709,327.00 |
| | **8. Recovery Percentage for Unsecured Claims based on 100% of FCC, GE and Wells Deficiency Claims** | | 2.39% | | 2.86% | | 0.00% |

**Amounts of projected allowed claims are estimates only, and do not constitute an admission by any Debtor as to the validity or amount of any particular claim.**

| FN Ref | Explanation |
|--------|-------------|
| A | No value is assigned to accounts receivable older than 90 days, except that the net amount AJ anticipates receiving under the settlement agreement with APEC ($35,352.00) is included. |
| B | SW:  Book value of inventory is $479,704.74; liquidation value calculated at 40% . |
| C | Insurance is paid monthly. Debtors assume a trustee would keep insurance in place for the remainder of the month in which conversion occurred to investigate and determine an appropriate course of action with the Debtors' assets. |

D1  Debtors estimate the liquidation value at 76% of the fair market value, given an orderly liquidation.  The values for Wells Fargo and FCC include the value of concrete pumps subject to transactions which may be true leases, but Debtors assert are secured financings.  In arriving at the value of the equipment, all Adequate Protection  Payments made, and estimated to be made, during the course of the bankruptcy have been subtracted from the fair market value, as follows:

APCC:  $571 x 5 months = $2,855; $761.00 x 5 months = $6,660; FMV: $260,000 - $6,600 = $253,400.
FCC:  $8,891 x 10 months = $88,910; FMV: $1,865,116 - $88,190 = $1,776,206.
GE:  $4,823 x 5 months = $24,115; $6,430 x 5 months= $32,150; FMV: $2,535,000 - $56,265 = $2,478,735.
Wells: $5,508 x 5 months = $27,540; $7,343 x 5 months= $36,715; FMV: $2,895,000 - $64,255 = $2,830,745.

| D2 | Liquidation value is estimated |
| D3 | Liquidation value is estimated |

E  Per CC Schedule B, equity interests are valued at $0.00.   The CC Balance Sheet states (1) $424,751.36 for an investment in sub-Patriot (same as Patriot leasing) and (2) $86,638.46 for an investment in SWCP, LLC, an affiliate of Debtors.  However, these are amounts invested and do not reflect the value thereof; further, CC does not have an equity interest in SWCP, LLC.

| FN Ref | Explanation |
|---|---|
| F | As of 5/3/13, OSG retainer balance is approximately $18,815.00. |
| G1 | CC:  Face amount of the payments Central made to FCC, FCC, Wells and GE, who were undersecured in the 90 days prior to the Petition Date. The value identified also reflects payments on the FCC Lease Transactions and the Wells Lease Transactions, which Debtors assert are secured financing, but which Wells and FCC may assert are true leases. Thus, the values identified are estimated to be the maximum possible recoveries.  The values reflected are also without regard to what portion of such recoveries FCC, Wells, and GE would be entitled to as creditors. |
| G2 | Other:  (1) See Disclosure Statement, section on "Assets" as to why amounts due to CC from Payroll Partners, and amount due from SWDMS to SW are not included herein; and (2) see Disclosure Statement, section on "Liquidation Analysis" as to why equipment finance/lease payments made prepetition by AJ and SW to CC, and estimated avoidance action recoveries, are not included herein. |
| H1 | Ally and APCC are oversecured, thus claim amounts are based upon amounts stated in POCs. |
| H2 | Since FCC, GE & Wells are undersecured, amounts stated are equal to value of equipment, except GE - see FN D1.  For GE Debtors assumed that the $200,000 payment due June 1, 2013 pursuant to the stipulation with GE will either be made or GE will assert that amount as an administrative expense if that payment is not made. |
| I | Amounts due professionals: (1) OSG (Bankruptcy Counsel) - $87,956.30; (2) BW (Special Counsel) - $20,066.25; (3) H&A (Special Litigation counsel) - $ 0.00. |
| J | The AJ and SW Balance sheet show amounts due to Payroll Partners.  See Disclosure Statement, section on "Liquidation Analysis," as to why these amounts are not included herein. |

| FN Ref | Explanation |
|---|---|
| K | Fee based on following statutory formula:<br>    25% of amount disbursed up to $5,000<br>    10% of the amount disbursed $5,001 to $50,000<br>    5% of the amount disbursed from $50,001 to $1,000,000<br>    3% of the amount disbursed in excess of $1,000,000 |
| L | Presumes that secured creditors would file relief from stay actions, and thus a trustee will not bear expenses of sale. Sale expenses, such as commissions and transfer fees and taxes, would of course lower the amounts recoverable on the secured claims and make the deficiency claims larger. |
| M | Estimated fees to sell assets in which Debtors have equity (estimated $10,000), and to collect on accounts receivable (10% of accounts receivable face value) |
| N | Based on 30% of estimated recoveries. |
| O | Calculation of FCC, GE and Wells Unsecured Claims:  see attached. |
| P | Debtors assume the unsecured claim amounts of GE and Wells Fargo in a liquidation are not limited to the stipulated amounts |

**Calculation of FCC, GE and Wells Deficiency Claims:**

| | | | |
|---|---|---|---|
| **FCC:** | | 3,737,067.44 | Total claims |
| | less | 1,349,916.56 | Liquidation value for all equipment |
| | | 2,387,150.88 | Deficiency Claim |

| | | | |
|---|---|---|---|
| **GE:** | | 6,167,583.98 | Total claims |
| | less | 1,883,838.60 | Liquidation value for all equipment |
| | less | 168,692.17 | AJ Liquidation value for Accounts - 100% |
| | less | 398,385.67 | SW liquidation value for Accounts - 100% |
| | | 3,716,667.54 | Deficiency Claim |

| | | | |
|---|---|---|---|
| **Wells** | | 6,264,594.56 | Total claims |
| | less | 2,483,085.20 | Liquidation value |
| | less | 168,692.17 | AJ Liquidation value for Accounts - $100% |
| | less | 398,385.67 | SW liquidation value for Accounts - 100% |
| | | 3,214,431.52 | Deficiency Claim |

**<u>EXHIBIT 6</u>**
**<u>Cash Collateral Report</u>**

See attached.

Accounts Recievable

AJ

| 4/10/2012 | Current | 31-60 | 61-90 | over 90 | Total |
|---|---|---|---|---|---|
| | $164,088 | $32,213 | $7,750 | $148,985 | $353,036 |

Southwest

| 4/10/2012 | Current | 31-60 | 61-90 | over 90 | Total |
|---|---|---|---|---|---|
| | $661,947 | $247,846 | $70,083 | $83,423 | $1,063,299 |
| Total A/R | $826,035 | $280,059 | $77,833 | $232,408 | $1,416,335 |
| Cash-AJ | | | | | $29,238 |
| Cash- SWCP | | | | | $110,917 |
| Cash Central | | | | | $5,483 |
| Total | $826,035 | $280,059 | $77,833 | $232,408 | $1,561,973 |
| Due to TCI | | | | | -$244,668 |
| Due from TCI holdback | | | | | $86,449 |
| AJ over 90 A/R | | | | | -$148,985 |
| SW over 90 AR | | | | | -$83,423 |
| Wells and GE net cash collateral | | | | | $1,171,346 |

AJ

| 4/28/2013 | Current | 31-60 | 61-90 | over 90 | Total |
|---|---|---|---|---|---|
| | $188,823 | $41,384 | $6,503 | $111,672 | $348,382 |

Southwest

| 4/28/2013 | Current | 31-60 | 61-90 | over 90 | Total |
|---|---|---|---|---|---|
| | $699,129 | $349,522 | $122,994 | $148,017 | $1,319,662 |
| Total A/R | $887,952 | $390,906 | $129,497 | $259,689 | $1,668,044 |
| Cash-AJ | | | | | 537671 |
| Cash- SWCP | | | | | 138120 |
| Cash-Central | | | | | 11922 |
| Total | $887,952 | $390,906 | $129,497 | $259,689 | $2,355,757 |
| | | | | | 0 |
| | | | | | 0 |
| AJ over 90 A/R | | | | | -$111,672 |
| SW over 90 AR | | | | | -$148,017 |
| Net cash collateral | | | | | $2,096,068 |

## EXHIBIT 7
## Amortized Plan Distributions

See attached.

## DISCLOSURE STATEMENT
## EXHIBIT 7
## AMORTIZED PLAN DISTRIBUTIONS

| FCC | Monthly payment |
|---|---|
| Leases 78 months | $27,232.50 |
| Secured 78 months | 12,141.43 |
| 19.25% of Unsecured 78 months | $1,452.06 |
| Total FCC Payment | 40,825.99 |

| GE | |
|---|---|
| Secured 120 months | $43,440.00 |
| 19.25% of Unsecured 78 months | $6,560.00 |
| Total GE Payment | 50,000.00 |

| Wells | |
|---|---|
| Leases 78 months | 23,273.00 |
| Secured 78 months | 38,785.00 |
| 19.25% of Unsecured 78 months | 7,650.00 |
| Total Wells Payment | 69,708.00 |

| Summary | Monthly Amount |
|---|---|
| FCC | $40,825.99 |
| GE | $50,000.00 |
| Wells | $69,708.00 |
| Berenbaum Weinshenk | $43.71 |
| Colorado Business Bank* | $4,961.98 |
| AJ Unsecured | $262.98 |
| CC Unsecured | $3,789.83 |
| SW Concrete Unsecured | $839.10 |
| Colo. Dept. Rev. | $2,520.36 |
| APPC (2 months at this payment) | $8,131.57 |
| Ally (4 months at this payment) | $2,500.00 |
| **Total** | **$183,583.53** |

*This is the maximum amount payable to Cobiz, it being the intent that Cobiz shall
receive an amount equal to the payments required under its existing loans
to Debtors' affiliates.
**Debtors do not waive the right to object to the allowance of any claim.**
**Pursuant to the Plan, not all unsecured claims will receive distributions on a monthly basis.  This**
**analysis is provided for convenience and does not contradict or modify the terms of the Plan.**

## __EXHIBIT 8__
### __Projections__

See attached.

| | A | B | C | D | E | F | G | H |
|---|---|---|---|---|---|---|---|---|
| 1 | | Southwest and AJ Concrete Pumping | | | | | | |
| 2 | | Forecast of Cash Flows | | | | | | |
| 3 | | For theYear Ends of December, 2013 through December, 2019 | | | | | | |
| 4 | | Combined | | | | | | |
| 5 | | | | | | | | |
| 6 | | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
| 7 | Operating Income | | | | | | | |
| 8 | Pumping Income-Colorado | $8,050,000 | $8,520,000 | $8,600,004 | $8,800,000 | $9,000,000 | $9,200,000 | $9,500,000 |
| 9 | Pumping Income-Georgia | 2,265,000 | 2,475,000 | 2,750,004 | 2,800,000 | 2,900,000 | 3,000,000 | 3,050,000 |
| 10 | Total Revenue | 10,315,000 | 10,995,000 | 11,350,008 | 11,600,000 | 11,900,000 | 12,200,000 | 12,550,000 |
| 11 | Cost of Sales | | | | | | | |
| 12 | Cost of Sales-Colorado | 2,965,834 | 3,132,130 | 3,214,366 | 3,287,600 | 3,359,000 | 3,518,800 | 3,625,750 |
| 13 | Cost of Sales-Georgia | 878,342 | 953,106 | 1,056,528 | 1,074,400 | 1,113,100 | 1,156,500 | 1,177,625 |
| 14 | Total Cost of Sales | 3,844,176 | 4,085,236 | 4,270,894 | 4,362,000 | 4,472,100 | 4,675,300 | 4,803,375 |
| 15 | Gross Profit | 6,470,824 | 6,909,764 | 7,079,114 | 7,238,000 | 7,427,900 | 7,524,700 | 7,746,625 |
| 16 | Operating Expenses | | | | | | | |
| 17 | Operating Expenses-Colorado | 1,530,326 | 1,619,659 | 1,699,356 | 1,738,880 | 1,778,400 | 1,817,920 | 1,877,200 |
| 18 | Operating Expenses-Georgia | 471,574 | 515,298 | 587,004 | 597,660 | 619,005 | 647,850 | 658,648 |
| 19 | Total Operating Expenses | 2,001,900 | 2,134,957 | 2,286,360 | 2,336,540 | 2,397,405 | 2,465,770 | 2,535,848 |
| 20 | Overhead Expenses | | | | | | | |
| 21 | Overhead Expenses-Colorado | 2,133,613 | 2,006,298 | 2,060,628 | 2,115,404 | 2,124,404 | 2,177,404 | 2,177,404 |
| 22 | Overhead Expenses-Georgia | 374,896 | 374,896 | 468,700 | 473,700 | 489,700 | 489,950 | 502,450 |
| 23 | Total Overhead Expenses | 2,508,509 | 2,381,194 | 2,529,328 | 2,589,104 | 2,614,104 | 2,667,354 | 2,679,854 |
| 24 | | | | | | | | |
| 25 | Income From Operations | 1,960,415 | 2,393,613 | 2,263,426 | 2,312,356 | 2,416,391 | 2,391,576 | 2,530,923 |
| 26 | | | | | | | | |
| 27 | AP/Lease | 1,123,181 | | | | | | |
| 28 | FCC Secured (class 1) | 84,987 | 146,692 | 146,692 | 146,692 | 146,692 | 146,692 | 133,551 |
| 29 | Ge Secured (class 2) | 434,400 | 521,280 | 521,280 | 521,280 | 521,280 | 521,280 | 347,520 |
| 30 | Wells Secured (class 3) | 387,850 | 465,420 | 465,420 | 465,420 | 465,420 | 465,420 | 310,280 |
| 31 | APCC Secured (class 4) | 16,264 | | | | | | |
| 32 | Ally Secured (class 5) | 10,000 | | | | | | |
| 33 | CDR Secured (class 6) | 12,600 | 30,240 | 30,240 | | | | |
| 34 | Administrative convenience (clas | 6,067 | | | | | | |
| 35 | FCC Unsecured (class 8) | 10,164 | 17,424 | 17,424 | 17,424 | 17,424 | 17,424 | 11,972 |
| 36 | Ge Unsecured (class 8) | 65,600 | 78,720 | 78,720 | 78,720 | 78,720 | 78,720 | 52,480 |
| 37 | Wells Unsecured (class 8) | 76,500 | 91,800 | 91,800 | 91,800 | 91,800 | 91,800 | 61,200 |
| 38 | Cobiz Unsecured (class 8) | 24,810 | 59,544 | 59,544 | 59,544 | 59,544 | 59,544 | 59,544 |
| 39 | All Other unsecured (class 8) | 43,515 | 58,020 | 58,020 | 58,020 | 58,020 | 58,020 | 58,020 |
| 40 | | | | | | | | |
| 41 | Wells Lease | 232,730 | 279,276 | 279,276 | 279,276 | 279,276 | 279,276 | 186,184 |
| 42 | FCC Lease | 190,631 | 326,796 | 326,796 | 326,796 | 326,796 | 326,796 | 256,003 |
| 43 | Pravision for Income Taxes | | 375,072 | 375,072 | 375,072 | 375,072 | 375,072 | 375,072 |
| 44 | Total Other Payments | 2,719,299 | 2,450,284 | 2,450,284 | 2,420,044 | 2,420,044 | 2,420,044 | 1,851,826 |
| 45 | Operating Income | -758,884 | -56,671 | -186,858 | -107,688 | -3,653 | -28,468 | 679,097 |
| 46 | | | | | | | | |
| 47 | Beginning Cash | 1,200,000 | 441,116 | 384,445 | 197,587 | 89,899 | 86,246 | 57,778 |
| 48 | Ending Cash | $441,116 | $384,445 | $197,587 | $89,899 | $86,246 | $57,778 | $736,875 |

Southwest/ Georgia Concrete Pumping
AJ Concrete Pumping
Georgia

| | Forecast 12/31/2013 | Forecast 12/31/2014 | Forecast 12/31/2015 | Forecast 12/31/2016 | Forecast 12/31/2017 | Forecast 12/31/2018 | Forecast 12/31/2019 |
|---|---|---|---|---|---|---|---|
| **Operating Income** | | | | | | | |
| Pumping Income | $2,265,000 | $2,475,000 | $2,750,004 | $2,800,000 | $2,900,000 | $3,000,000 | $3,050,000 |
| Total Operating Income | 2,265,000 | 2,475,000 | 2,750,004 | 2,800,000 | 2,900,000 | 3,000,000 | 3,050,000 |
| **Cost of Sales** | | | | | | | |
| Outside Pump Expense | 22,650 | 24,750 | 27,504 | 28,000 | 29,000 | 30,000 | 30,500 |
| Direct Labor | 520,950 | 569,250 | 632,496 | 644,000 | 667,000 | 690,000 | 701,500 |
| Payroll Taxes | 46,433 | 50,739 | 56,376 | 57,400 | 59,450 | 61,500 | 62,525 |
| License Plates | 23,783 | 25,989 | 27,504 | 28,000 | 29,000 | 30,000 | 30,500 |
| Oil and Filters | 22,650 | 24,750 | 27,504 | 28,000 | 31,900 | 33,000 | 33,550 |
| Outside Boom Repairs | 11,325 | 12,375 | 20,628 | 21,000 | 21,750 | 30,000 | 30,500 |
| Outside Pump Truck Repair | 28,313 | 30,939 | 34,380 | 35,000 | 36,250 | 37,500 | 38,125 |
| Permits and Tolls | 9,060 | 9,900 | 11,004 | 11,200 | 11,600 | 12,000 | 12,200 |
| Pump Parts | 24,915 | 27,225 | 30,252 | 30,800 | 31,900 | 33,000 | 36,600 |
| Large Repairs | 72,000 | 72,000 | 72,000 | 72,000 | 72,000 | 72,000 | 72,000 |
| Pump Truck parts | 33,975 | 37,125 | 41,256 | 42,000 | 43,500 | 45,000 | 45,750 |
| System Parts | 45,300 | 49,500 | 54,996 | 56,000 | 58,000 | 60,000 | 61,000 |
| Tires | 16,988 | 18,564 | 20,628 | 21,000 | 21,750 | 22,500 | 22,875 |
| Total Cost of Sales | 878,342 | 953,106 | 1,056,528 | 1,074,400 | 1,113,100 | 1,156,500 | 1,177,625 |
| Gross Profit | $1,386,658 | $1,521,894 | $1,693,476 | $1,725,600 | $1,786,900 | $1,843,500 | $1,872,375 |
| **Operating Expenses** | | | | | | | |
| Shop Supplies | 33,975 | 37,125 | 41,256 | 42,000 | 43,500 | 45,000 | 45,750 |
| Uniforms | 6,795 | 7,425 | 8,256 | 8,400 | 8,700 | 9,000 | 9,150 |
| Wrecker Service | 680 | 744 | 828 | 840 | 870 | 900 | 915 |
| Fuel | 317,100 | 346,500 | 391,872 | 399,000 | 413,250 | 435,000 | 442,250 |
| DOT Requirements | 906 | 990 | 1,104 | 1,120 | 1,160 | 1,200 | 1,220 |
| Shop Labor | 101,925 | 111,375 | 130,620 | 133,000 | 137,750 | 142,500 | 144,875 |
| Payroll Taxes | 10,193 | 11,139 | 13,068 | 13,300 | 13,775 | 14,250 | 14,488 |
| Total Operating Expenses | 471,574 | 515,298 | 587,004 | 597,660 | 619,005 | 647,850 | 658,648 |
| **Overhead Expense** | | | | | | | |
| Accounting | 5,000 | 5,000 | 5,004 | 5,000 | 5,000 | 5,000 | 5,000 |
| Advertising | | | 2,004 | 2,000 | 2,000 | 2,000 | 2,000 |

Southwest/ Georgia Concrete Pumping
AJ Concrete Pumping
Georgia

| | Forecast 12/31/2013 | Forecast 12/31/2014 | Forecast 12/31/2015 | Forecast 12/31/2016 | Forecast 12/31/2017 | Forecast 12/31/2018 | Forecast 12/31/2019 |
|---|---|---|---|---|---|---|---|
| Bank Charges | $200 | $200 | $504 | $500 | $500 | $500 | $500 |
| Computer Expense | 200 | 200 | 504 | 500 | 500 | 500 | 500 |
| Dues and subscriptions | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 |
| Interest Expense | 1,000 | 1,000 | 996 | 1,000 | 1,000 | 1,000 | 1,000 |
| Health Insurance | 24,000 | 24,000 | 24,000 | 24,000 | 30,000 | 30,000 | 35,000 |
| Professional and Trustee Fees | 7,000 | 7,000 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 |
| Meals and Entertaainment | 300 | 300 | 996 | 1,000 | 1,000 | 1,250 | 1,250 |
| Office Supplies | | | 60,000 | 60,000 | 60,000 | 60,000 | 60,000 |
| P&C Insurance | 50,000 | 50,000 | 54,996 | 55,000 | 60,000 | 60,000 | 60,000 |
| Rent | 32,000 | 32,000 | 32,004 | 32,000 | 32,000 | 32,000 | 32,000 |
| Telephone | 20,000 | 20,000 | 20,004 | 20,000 | 20,000 | 20,000 | 20,000 |
| Travel | 1,500 | 1,500 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 |
| Utilities | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 |
| Office Labor | 129,000 | 129,000 | 135,000 | 140,000 | 145,000 | 145,000 | 150,000 |
| Sales Salary | 60,000 | 60,000 | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 |
| Payroll Taxes | 24,996 | 24,996 | 27,504 | 27,500 | 27,500 | 27,500 | 30,000 |
| Taxes | 3,500 | 3,500 | 3,504 | 3,500 | 3,500 | 3,500 | 3,500 |
| Total Overhead Expense | 374,896 | 374,896 | 468,720 | 473,700 | 489,700 | 489,950 | 502,450 |
| Net Income | $540,188 | $631,700 | $637,752 | $654,240 | $678,195 | $705,700 | $711,277 |

**Southwest/ Georgia Concrete Pumping**
**Forecast Statement of Operations**
**For the years ending December 31, 2013, 2014, 2015, 2016, 2017, 2018 and 2019**

| | Forecast 12/31/2013 | Forecast 12/31/2014 | Forecast 12/31/2015 | Forecast 12/31/2016 | Forecast 12/31/2017 | Forecast 12/31/2018 | Forecast 12/31/2019 |
|---|---|---|---|---|---|---|---|
| Operating Income | | | | | | | |
| Pumping Income | $8,050,000 | $8,520,000 | $8,600,004 | $8,800,000 | $9,000,000 | $9,200,000 | $9,500,000 |
| Total Operating Income | 8,050,000 | 8,520,000 | 8,600,004 | 8,800,000 | 9,000,000 | 9,200,000 | 9,500,000 |
| Cost of Sales | | | | | | | |
| Outside Pump Expense | 100,628 | 106,501 | 107,496 | 110,000 | 112,500 | 92,000 | 95,000 |
| Direct Labor | 1,771,000 | 1,874,400 | 1,935,000 | 1,980,000 | 2,025,000 | 2,116,000 | 2,185,000 |
| Payroll Taxes | 128,800 | 136,320 | 137,604 | 140,800 | 144,000 | 165,600 | 171,000 |
| License Plates | 80,800 | 87,067 | 86,170 | 90,000 | 92,000 | 95,000 | 95,000 |
| Oil and Filters | 96,600 | 102,240 | 103,200 | 105,600 | 108,000 | 119,600 | 123,500 |
| Outside Boom Repairs | 28,178 | 29,821 | 42,996 | 44,000 | 45,000 | 55,200 | 57,000 |
| Outside Pump Truck Repair | 80,500 | 85,200 | 86,004 | 88,000 | 90,000 | 101,200 | 104,500 |
| Permits and Tolls | 48,300 | 51,120 | 51,600 | 52,800 | 54,000 | 55,200 | 57,000 |
| Pump Parts | 100,628 | 106,501 | 107,496 | 110,000 | 112,500 | 124,200 | 128,250 |
| Large Repairs | 144,000 | 144,000 | 144,000 | 144,000 | 144,000 | 144,000 | 144,000 |
| Pump Truck parts | 193,200 | 204,480 | 206,400 | 211,200 | 216,000 | 230,000 | 237,500 |
| System Parts | 112,700 | 119,280 | 120,396 | 123,200 | 126,000 | 128,800 | 133,000 |
| Tires | 80,500 | 85,200 | 86,004 | 88,000 | 90,000 | 92,000 | 95,000 |
| Total Cost of Sales | 2,965,834 | 3,132,130 | 3,214,366 | 3,287,600 | 3,359,000 | 3,518,800 | 3,625,750 |
| Gross Profit | $5,084,166 | $5,387,870 | $5,385,638 | $5,512,400 | $5,641,000 | $5,681,200 | $5,874,250 |
| Operating Expenses | | | | | | | |
| Shop Supplies | 140,878 | 149,101 | 150,504 | 154,000 | 157,500 | 161,000 | 166,250 |
| Vehicle Repairs and Maintenance | 12,078 | 12,781 | 12,900 | 13,200 | 13,500 | 13,800 | 14,250 |
| Uniforms | 4,028 | 4,261 | 4,296 | 4,400 | 4,500 | 4,600 | 4,750 |
| Wrecker Service | 20,128 | 21,301 | 21,504 | 22,000 | 22,500 | 23,000 | 23,750 |
| Rentals | 16,100 | 17,040 | 17,196 | 17,600 | 18,000 | 18,400 | 19,000 |
| Freight | 808 | 853 | 864 | 880 | 900 | 920 | 950 |
| Fuel | 966,000 | 1,022,400 | 1,074,996 | 1,100,000 | 1,125,000 | 1,150,000 | 1,187,500 |
| DOT Requirements | 20,128 | 21,301 | 21,504 | 22,000 | 22,500 | 23,000 | 23,750 |
| Shop Labor | 322,000 | 340,800 | 365,496 | 374,000 | 382,500 | 391,000 | 403,750 |
| Payroll Taxes | 28,178 | 29,821 | 30,096 | 30,800 | 31,500 | 32,200 | 33,250 |
| Total Operating Expenses | 1,530,326 | 1,619,659 | 1,699,356 | 1,738,880 | 1,778,400 | 1,817,920 | 1,877,200 |

Southwest/ Georgia Concrete Pumping
Forecast Statement of Operations
For the years ending December 31, 2013, 2014, 2015, 2016, 2017, 2018 and 2019

| | Forecast 12/31/2013 | Forecast 12/31/2014 | Forecast 12/31/2015 | Forecast 12/31/2016 | Forecast 12/31/2017 | Forecast 12/31/2018 | Forecast 12/31/2019 |
|---|---|---|---|---|---|---|---|
| Overhead Expense | | | | | | | |
| Accounting | 70,000 | 70,000 | 69,996 | 75,000 | 75,000 | 80,000 | 80,000 |
| Advertising | 650 | 650 | 5,004 | 7,500 | 10,000 | 12,000 | 12,000 |
| Bank Charges | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 |
| Computer Expense | 10,000 | 10,000 | 9,996 | 12,000 | 12,000 | 12,000 | 12,000 |
| Contributions | 1,000 | 1,000 | 996 | 1,000 | 1,000 | 2,000 | 2,000 |
| Dues and subscriptions | 4,500 | 4,500 | 4,500 | 4,500 | 4,500 | 4,500 | 4,500 |
| Interest Expense | 27,000 | 27,000 | 27,000 | 30,000 | 30,000 | 10,000 | 10,000 |
| Health Insurance | 180,000 | 180,000 | 200,004 | 200,000 | 200,000 | 225,000 | 225,000 |
| Professional Fees | 158,000 | 60,000 | 60,000 | 60,000 | 60,000 | 60,000 | 60,000 |
| Meals and Entertainment | 12,000 | 12,000 | 15,000 | 17,500 | 20,000 | 20,000 | 20,000 |
| Office Supplies | 28,000 | 28,000 | 27,996 | 30,000 | 30,000 | 30,000 | 30,000 |
| P&C Insurance | 300,000 | 300,000 | 300,000 | 350,000 | 350,000 | 360,000 | 365,000 |
| Rent | 280,000 | 280,000 | 279,996 | 280,000 | 280,000 | 280,000 | 280,000 |
| Sales Tax | 17,640 | 30,240 | 30,240 | | | | |
| Telephone | 50,000 | 50,000 | 50,004 | 50,000 | 50,000 | 50,000 | 50,000 |
| Travel | 12,000 | 12,000 | 18,000 | 20,000 | 24,000 | 24,000 | 24,000 |
| Utilities | 44,000 | 44,000 | 44,000 | 50,000 | 50,000 | 50,000 | 50,000 |
| Officer Salaries | 391,319 | 349,404 | 349,404 | 349,404 | 349,404 | 349,404 | 349,404 |
| Office Labor | 180,000 | 180,000 | 189,996 | 200,000 | 200,000 | 225,000 | 225,000 |
| Sales Salary | 245,004 | 245,004 | 249,996 | 250,000 | 250,000 | 250,000 | 250,000 |
| Payroll Taxes | 114,000 | 114,000 | 120,000 | 120,000 | 120,000 | 120,000 | 120,000 |
| Other Expenses | 1,000 | 1,000 | 996 | 1,000 | 1,000 | 1,000 | 1,000 |
| Total Overhead Expense | 2,133,613 | 2,006,298 | 2,060,628 | 2,115,404 | 2,124,404 | 2,172,404 | 2,177,404 |
| Income(Loss) from Operations | $1,420,227 | $1,761,913 | $1,625,654 | $1,658,116 | $1,738,196 | $1,690,876 | $1,819,646 |
| Plan Payments | | | | | | | |
| AP/Lease | (1,123,181) | | | | | | |
| FCC Secured (class 1) | (84,987) | (145,692) | (145,692) | (145,692) | (145,692) | (145,692) | (133,551) |
| GE Secured (class 2) | (434,400) | (521,280) | (521,280) | (521,280) | (521,280) | (521,280) | (347,520) |
| Wells Secured(class 3) | (387,850) | (465,420) | (465,420) | (465,420) | (465,420) | (465,420) | (310,280) |
| APCC Secured (class 4) | (16,264) | | | | | | |
| Ally Secured (class 5) | (10,000) | | | | | | |

Southwest/ Georgia Concrete Pumping
Forecast Statement of Operations
For the years ending December 31, 2013, 2014, 2015, 2016, 2017, 2018 and 2019

| | Forecast 12/31/2013 | Forecast 12/31/2014 | Forecast 12/31/2015 | Forecast 12/31/2016 | Forecast 12/31/2017 | Forecast 12/31/2018 | Forecast 12/31/2019 |
|---|---|---|---|---|---|---|---|
| CDR Secured (class 6) | $(12,600) | $(30,240) | $(30,240) | | | | |
| Administrative Convenience (class 7) | (6,067) | | | | | | |
| FCC Unsecured (class 8) | (10,164) | (17,424) | (17,424) | $(17,424) | $(17,424) | $(17,424) | $(11,972) |
| GE Unsecured (class8) | (65,600) | (78,720) | (78,720) | (78,720) | (78,720) | (78,720) | (52,480) |
| Wells Unsecured (class 8) | (76,500) | (91,800) | (91,800) | (91,800) | (91,800) | (91,800) | (61,200) |
| Cobiz Unsecured (class 8) | (24,810) | (59,544) | (59,544) | (59,544) | (59,544) | (59,544) | (59,544) |
| All Other Unsecured (class8) | (43,515) | (58,020) | (58,020) | (58,020) | (58,020) | (58,020) | (58,020) |
| Wells Lease | (232,730) | (279,276) | (279,276) | (279,276) | (279,276) | (279,276) | (186,184) |
| FCC Lease | (190,631) | (326,796) | (326,796) | (326,796) | (326,796) | (326,796) | (256,003) |
| Total Plan Payments | (2,719,299) | (2,074,212) | (2,074,212) | (2,043,972) | (2,043,972) | (2,043,972) | (1,476,754) |
| Income(Loss) Before Taxes | $(1,299,072) | $(312,299) | $(448,558) | $(385,856) | $(305,776) | $(353,096) | $342,892 |
| Other Adjustments | | | | | | | |
| Provision For Income Taxes | | 375,072 | 375,072 | 375,072 | 375,072 | 375,072 | 375,072 |
| Total Other Adjustments | | 375,072 | 375,072 | 375,072 | 375,072 | 375,072 | 375,072 |
| Net cash | $(1,299,072) | $(687,371) | $(823,630) | $(760,928) | $(680,848) | $(728,168) | $(32,180) |